Case No. 25-40233

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

*Plaintiff-Appellee,*

v.

R.J. REYNOLDS TOBACCO COMPANY,

*Defendant-Appellant,*

and

PHILIP MORRIS, INCORPORATED,

*Defendant-Appellant.*

On appeal from the United States District Court
for the Eastern District of Texas

## BRIEF OF APPELLANT PHILIP MORRIS USA INC.

<table>
<tr><td>

Christopher Odell
700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
Arnold & Porter Kaye Scholer, LLP
Telephone: 713.576.2400
Facsimile: 713.576.2499

Alexander Shaknes*
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, NY 10019-9710
Telephone:  212.836.8000
Facsimile:  212.836.8689

</td><td>

Daniel Bernstein
Megan Pieper*
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone:  202.942.5000
Facsimile:  202.942.5999

</td></tr>
</table>

*Counsel for Philip Morris USA Inc.*

# CERTIFICATE OF INTERESTED PERSONS

Case No. 25-40233
*State of Texas v. R.J. Reynolds Tobacco Company, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. District Judge Rodney Gilstrap

2. State of Texas

3. Office of the Attorney General of Texas

4. R.J. Reynolds Tobacco Company

5. Greenberg Traurig, LLP

6. ITG Brands, L.L.C.

7. Patton, Tidwell & Culbertson, LLP

8. Baker & Hostetler LLP

9. Arnold & Porter Kaye Scholer LLP

10. Wachtell, Lipton, Rosen & Katz

11. Siebmann, Forrest, Burg & Smith, LLP

*/s/ Christopher M. Odell*
Christopher M. Odell

*Counsel for Philip Morris USA Inc.*

i

## STATEMENT REGARDING ORAL ARGUMENT

Appellant-Defendant Philip Morris USA Inc. ("Philip Morris") requests oral argument.

This case arises from a landmark settlement agreement under which Philip Morris and other major tobacco companies ("Settling Defendants") have paid billions of dollars to the State of Texas and will continue to make large annual payments to the State of Texas in perpetuity. The issue on appeal concerns interpretation of a contractual formula, which the district court incorrectly held to require more than a hundred million dollars in back payments by the Settling Defendants and which will have a significant impact on the Settling Defendants' payments each year going forward. The district court's decision is at odds with determinations by PricewaterhouseCoopers, the independent accounting firm jointly retained by the parties to calculate settlement payments.

Counsel for Philip Morris has long-standing familiarity with the settlement agreement, its amendments, and the payments at issue. Given the complex nature of this dispute, Philip Morris believes that oral argument will aid the court in resolving the issues presented, which have far-reaching consequences for all parties to the settlement.

ii

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

JURISDICTIONAL STATEMENT ......................................................................... 2

STATEMENT OF THE ISSUES ............................................................................. 3

STATEMENT OF THE CASE ................................................................................ 4

I.    Factual Background ...................................................................................... 4

    A.    The Texas Settlement Agreement ...................................................... 4

    B.    Payments Under the Texas Settlement Agreement ........................... 4

    C.    Mechanics of the Profit Adjustment .................................................. 5

    D.    The Tax Rate Change ......................................................................... 7

    E.    PwC's Application of a Single Tax Rate ............................................ 7

II.   Proceedings Below ....................................................................................... 8

SUMMARY OF THE ARGUMENT ....................................................................... 9

ARGUMENT .......................................................................................................... 12

I.    Standard of Review ..................................................................................... 12

II.   The Settlement Agreement Unambiguously Provides that the Tax Rate
    of the "Applicable Year" Is Used to Compare Net Operating Profits ............ 12

    A.    The Agreement Requires Use of a Single Tax Rate in Each
        Year's Profit Adjustment Calculations .............................................. 13

    B.    The District Court Failed to Give Effect to the Settlement
        Agreement's Defined Terms and Express Formula ........................... 16

III.  The Facts and Circumstances Surrounding the Agreement Further
    Support Philip Morris's Interpretation .......................................................... 21

    A.    Commercial Logic of the Profit Adjustment .................................... 22

    B.    The Master Settlement Agreement's Different Approach .................... 26

IV.    The Mississippi Ruling Is Not Persuasive ...................................................... 27

V.    To the Extent That the Texas Settlement Agreement is Ambiguous,
the Extrinsic Evidence Confirming Philip Morris's Interpretation
Should Be Considered.................................................................................... 28

CONCLUSION ..................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Austin Tr. Co. v. Houren*,
  664 S.W.3d 35 (Tex. 2023) ................................................................... 18, 19

*Coker v. Coker*,
  650 S.W.2d 391 (Tex. 1983) ........................................................ 18, 20, 28

*E. Tex. Fire Ins. Co. v. Kempner*,
  87 Tex. 229 (Tex. 1894) ............................................................................ 13

*Habets v. Waste Mgmt., Inc.*,
  363 F.3d 378 (5th Cir. 2004) .................................................................... 12

*Hanser v. McDonough*,
  56 F.4th 967 (Fed. Cir. 2022) .............................................................. 19, 20

*Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
  352 S.W.3d 462 (Tex. 2011) ................................................................ 21, 22

*Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*,
  341 S.W.3d 323 (Tex. 2011) ..................................................................... 12

*Kachina Pipeline Co. v. Lillis*,
  471 S.W.3d 445 (Tex. 2015) ..................................................................... 12

*Keiland Constr., L.L.C. v. Weeks Marine, Inc.*,
  109 F.4th 406 (5th Cir. 2024) ................................................................... 12

*Lavaca Bay Autoworld, L.L.C. v. Marshall Pontiac Buick Oldsmobile*,
  103 S.W.3d 650 (Tex. App. 2003) ........................................................ 20, 21

*Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,
  614 F.3d 105 (5th Cir. 2010) ........................................................ 10, 22, 24

*Murphy Expl. & Prod. Co.-USA v. Adams*,
  560 S.W.3d 105 (Tex. 2018) ................................................................ 12, 21

*Novacor Chems., Inc. v. United States*,
  171 F.3d 1376 (Fed. Cir. 1999) ................................................................ 19

*Sage St. Assocs. v. Northdale Const. Co.*,
863 S.W.2d 438 (Tex. 1993) ................................................................... 28

*Sharpe v. AmeriPlan Corp.*,
769 F.3d 909 (5th Cir. 2014) ............................................................ 27, 29

*Sundown Energy LP v. HJSA No. 3*, *Ltd. P'ship*,
622 S.W.3d 884 (Tex. 2021) .................................... 12, 13, 16, 18

*URI, Inc. v. Kleberg Cnty.*,
543 S.W.3d 755 (Tex. 2018) ............................................................. 21

*Van Dyke v. Navigator Group*,
668 S.W. 3d 353 (Tex. 2023) .............................................................. 28

## Statutes

28 U.S.C. §§ 1331 and 1367 ...................................................................... 2

## Other Authorities

WILLISTON ON CONTRACTS § 32.7 (4th ed. 1999) ................................................ 21

**INTRODUCTION**

This case arises out of the landmark tobacco settlement agreement entered into over two decades ago between the State of Texas and the major tobacco companies. The settling companies have made billions of dollars in annual settlement payments to the State. Those annual payments are calculated pursuant to a contractual formula, which provides for adjustments each year to account for inflation, sales volumes, and the relative profits of the companies' cigarette businesses over time.

At issue on this appeal is calculation of the "profit adjustment" component of the companies' annual settlement payments—specifically, how the federal corporate tax rate affects that calculation.

PricewaterhouseCoopers ("PwC"), the independent accounting firm that the parties jointly engaged to apply the formulas set forth in the settlement agreement to calculate all settlement payments due, used a single tax rate—the tax rate in effect for the year of payment—to calculate the annual profit adjustment amounts. PwC's use of a single tax rate to compare the companies' "net operating profits" from the domestic sale of cigarettes over time is what the clear and unambiguous terms of the parties' agreement requires.

For decades, while the federal corporate tax rate remained constant, the State did not object to PwC's application of this methodology. Nor did the State object to PwC's application of this methodology for five years after Congress, in 2018, lowered

the corporate tax rate from 35% to 21%. But in 2023, the State disputed PwC's calculations, claiming that, as a result of the 2018 tax rate change, it was owed additional profit adjustment payments from the Settling Defendants.

Following motion practice, the district court endorsed the State's erroneous interpretation of the parties' settlement agreement. The district court failed to give effect to the agreement's defined terms and express methodology for calculating profit adjustments. As a result, the district court awarded the State a large windfall that is not supported by the agreement's text, structure, or purpose.

Appellant-Defendant Philip Morris USA Inc. ("Philip Morris") brings this appeal to enforce the parties' agreement as written.

## JURISDICTIONAL STATEMENT

The original Complaint, filed by the State of Texas against major tobacco companies in 1996, contained both federal and state law claims, and it was properly in federal court under 28 U.S.C. §§ 1331 and 1367. ROA.254. The settlement agreement that resolved this litigation is governed by Texas law, and the district court "retains jurisdiction for the purpose of enforcement of the Settlement Agreement." ROA.51991.

Philip Morris appealed the district court's Memorandum Opinion and Order entered March 14, 2024 (Dkt. No 2446) determining Settling Defendants' liability in connection with the State's motion to enforce the settlement agreement, following the district court's entry of a final, appealable Memorandum Opinion and Order on

March 28, 2025 (Dkt. No 2473). Philip Morris timely filed its Notice of Appeal on April 25, 2025, less than 30 days after the district court entered its final appealable order. ROA.61541.

## STATEMENT OF THE ISSUES

The issues presented in this case are:

1. Did the district court err when it concluded that the parties' settlement agreement fixed the Base Net Operating Profit at $3,115,100,000 for purposes of all profit adjustment calculations in perpetuity, notwithstanding the express formula and defined terms in the agreement that provide for that number to change if the maximum federal corporate tax rate changes?

2. Should the district court instead have held, consistent with the determination of the independent accounting firm jointly retained by the parties to calculate settlement payments, that the agreement requires use of a single tax rate (the tax rate of the "Applicable Year") in all respects of each year's profit adjustment calculations?

3. In the alternative, should the district court have determined that the contract is ambiguous and allowed the parties to present extrinsic evidence of their intent?

3

**STATEMENT OF THE CASE**

**I.    Factual Background**

**A.    The Texas Settlement Agreement**

In 1996, the State of Texas sued major tobacco companies, seeking to recover, among other things, healthcare costs associated with tobacco use.  ROA.245-366.  In January 1998, the parties entered into a settlement agreement to resolve the suit (together with amendments, the  "Texas Settlement Agreement").  ROA.49262-49300. Texas, along with Florida, Minnesota, and Mississippi, are collectively referred to as the Previously Settled States, because those four states settled their claims against the tobacco companies before the remaining 46 states entered into the Master Settlement Agreement ("MSA") in November 1998.  *See* ROA.67424-67510.

The parties amended the Texas Settlement Agreement twice: on July 24, 1998 (the "1998 Amendment") and on June 8, 2001 (the "2001 Amendment").  ROA. 60804-60847; ROA.86538- 86542.

**B.    Payments Under the Texas Settlement Agreement**

Under the Texas Settlement Agreement, each Settling Defendant (that is, each tobacco company that joined the agreement) agreed to pay Texas "Annual Payments" in perpetuity.  ROA.60772-60774.  To determine Annual Payments, an $8 billion "Base Payment" is adjusted for inflation, cigarette sales volume, and profits from cigarette sales.  Texas is entitled to 7.25% of the resulting amount.  ROA. 60772-60773.

The cigarette sales volume component is tied to the volume of cigarette sales in 1997: If the Settling Defendants sold fewer cigarettes in a given year compared to 1997, the "volume adjustment" will reduce the size of the annual payment. But if the volume of cigarette sales declined and Settling Defendants increased their net operating profits compared to 1997, the "profit adjustment" will partially offset the volume reduction, increasing the payment to account for the increase in profits. *See* ROA.60753.

### C.     Mechanics of the Profit Adjustment

The profit adjustment is governed by Appendix A to the 2001 Amendment. ROA.60753. Appendix A supplies the contractual formula used to determine the profit adjustment. *Id.* The formula compares the companies' aggregate net operating profits at two points in time: the current year and the 1997 base year. *Id.*

| "Base Net Operating Profit" (base year) | "Actual Net Operating Profit" (current year) |
|---|---|
| "the Settling Defendants' aggregate <u>net operating profits</u> from domestic sales of Cigarettes <u>in 1997</u>" | "the Settling Defendants' aggregate <u>net operating profits</u> from domestic sales of Cigarettes for the <u>Applicable Year</u>" |

"Applicable Year" is defined as "the calendar year ending on the date on which the payment at issue is due," i.e., the current year. ROA.60754.

Both sides of the comparison—the Base Net Operating Profit and the Actual Net Operating Profit—use the same defined term: "net operating profits." ROA.60753-60754. The parties agreed on a two-clause definition for net operating profits that: (1) begins with the companies "operating income," which is expressly

defined to exclude various non-operating income and expenses, including income taxes; and then (2) subtracts "the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the Applicable Year, plus (b) 4.472 percentage points."[1]  *Id.* (emphasis added).

Thus, clause (1) of the net operating profit definition strips out the company's *actual* tax liability from "operating income" and then clause (2) factors back in a negotiated percentage reduction that is not intended to, and does not, align with the company's actual taxes.

Appendix A to the 2001 Amendment illustrates how the formula should be applied.  It states that "[a]pplying the foregoing definition, the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100.000."  ROA.60754.  The foregoing definition, as noted above, incorporates the federal corporate income tax rate of the Applicable Year ("such rate being 35%" in 2001).  *Id.*  The contract goes on to state that "determination of the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes shall be derived using the same methodology" for both the current- and base-year net operating profit numbers.  *Id.*

---

[1] An annotated guide to the provisions is included in Philip Morris's Record Excerpts and demonstrates how the provisions interact.  *See also* ROA.60759.

**D.     The Tax Rate Change**

At the time of the Settlement Agreement in 1997 and until 2018, the maximum federal corporate tax rate was 35%.  ROA.60945.  During this period, PwC—the independent accounting firm jointly retained by the parties to calculate settlement payments—used the 35% tax  rate in its profit adjustment calculations.  *Id.*  Effective January 1, 2018, the Tax Cuts and Jobs Act reduced the maximum marginal federal corporate tax rate to 21%.  *See id.*

**E.     PwC's Application of a Single Tax Rate**

Starting with payment calculations for the year 2018, PwC began to apply a 21% tax rate (which was the rate "in effect on December 31 of the Applicable Year") to the entire profit adjustment calculation, that is, to calculations of both the Base Net Operating Profit and the Actual Net Operating Profit that are compared each year. *See* ROA.60907.  According to PwC's calculation, Texas received profit adjustment payments totaling over $52 million for the year 2018—which was nearly $10 million *more* (over 20% higher) than the State would have received had Congress never cut the corporate tax rate.  ROA.60941.  For the years 2019 through 2022, PwC's calculations resulted in the State receiving more than $300 million in profit adjustment payments from the Settling Payments, including a nearly $60 million benefit from the change in the federal corporate tax rate.  *Id.*

More than five years after the new rate went into effect, the State sent a letter to PwC claiming it was entitled to *additional* profit adjustment payments for each of the years 2018 through 2022 and going forward.  ROA.60905. According to the State,

7

when performing profit comparisons, PwC should be using the new 21% tax rate only for calculations for the current year, while still using the old 35% rate for calculations for the base year. *Id.* The State's letter followed a conclusory ruling from a Mississippi state court adopting the State of Mississippi's position that the Mississippi Settlement Agreement, which contains similar language to the Texas Agreement, should be read to establish a fixed Base Net Operating Profit of $3,115,100,000 for all profit adjustment calculations in perpetuity, regardless of the tax rate in the Applicable Year. *Id.*; *see* ROA.60909-60923.

Notwithstanding the State's new reading of the agreement, PwC stood by its original determination regarding the use of a single tax rate for purposes of profit adjustment calculations. ROA.60965.

## II.   Proceedings Below

In May 2023, the parties filed cross-motions in the U.S. District Court for the Eastern District of Texas to enforce the Texas Settlement Agreement. ROA.60722-60739; ROA.61081-61099. Specifically, the parties sought a ruling on the applicable tax rate to be used in the annual calculation of profit adjustment profits due to the State. *See id.*

The district court granted the State's motion, agreeing with the State's interpretation of the agreement over the interpretation applied by PwC and supported by the Settling Defendants. *See* ROA.61326. Rather than give effect to all relevant contractual provisions, the district court relied heavily on a portion of a single

sentence—a sentence that merely provides an example of how the calculation worked in 2001, at the time the relevant contract language was adopted.  ROA.61343.

Based on this mere illustration, the district court determined that the "Base Net Operating Profit" should be frozen at $3,115,100,000 for purposes of profit adjustment calculations each year, irrespective of whether the tax rate is the same in the Applicable Year as it was 1997.  *Id.*  The district court's order applied both prospectively and retrospectively, requiring the Settling Defendants to make over $134 million in *additional* profit adjustment payments for the years 2018-2022.  *See* ROA.61520.

Philip Morris brings this appeal to reverse the district court's decision regarding the applicable tax rate and enforce the contract consistent with its terms.

## SUMMARY OF THE ARGUMENT

The 2001 Amendment to the Texas Settlement Agreement sets forth a formula for calculating the portion of annual settlement payments known as the profit adjustment.  Through a series of defined terms, the profit adjustment is calculated each year by comparing the settling companies' aggregate "Base Net Operating Profit" (i.e., net operating profit in 1997) to their "Actual Net Operating Profit" (i.e., net operating profit in the year for which the payment is being calculated).  *See* ROA.60753.

The contract defines the term "Base Net Operating Profit" as the "Settling Defendants' aggregate *net operating profits* from domestic sales of Cigarettes in

9

1997." *Id.* (emphasis added). *Net operating profits* is also a defined term, which expressly takes into account, among other things, the "marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 *of the Applicable Year*." ROA.60754 (emphasis added). The "Applicable Year" is defined as "the calendar year ending on the date on which the payment at issue is due." *Id.*

Tracing through these defined terms makes clear that the contractual formula contemplates a determination of the Base Net Operating Profit using the Applicable Year's tax rate in each year's profit adjustment calculation. The contract provides an example of how this would have worked in 2001, at the time of the relevant contract amendment: in that year, the marginal federal tax rate was 35%, which happens to be the same tax rate that was in place in the base year of 1997, the year before the Texas Settlement Agreement was entered. *See id.* The contract further directs that the Settling Defendants' "aggregate net operating profits from domestic sales of Cigarettes shall be derived using the same methodology." *Id.*

Applying the "same methodology" required by the parties' agreement, the Base Net Operating Profit is not a fixed number for eternity. It may change for purposes of an Applicable Year's profit adjustment calculations, depending on the Applicable Year's federal corporate tax rate. This allows for an apples-to-apples comparison of net operating profits over time—that is, a comparison of *operating* profits from the domestic sales of cigarettes.

10

If the parties had intended to fix the Base Net Operating Profit at $3.115 billion for each year's net operating profit comparison (as the district court found), they easily could have done so. The contract simply could have called for comparison of Actual Net Operating Profits to a fixed number (be it $3,115,100,000 or another number, as the Settling Defendants did in the 1998 Master Settlement Agreement that predated, and had the same drafters as, the relevant provisions of the 2001 Amendment to the Texas Settlement Agreement). But that is not what the Texas Settlement Agreement provides. Rather, the agreement establishes a methodology for determining "net operating profits" in both the Base and the Applicable Years, using the tax rate of the "Applicable Year," for an apples-to-apples comparison of net operating profits over time.

The text, structure, and commercial logic of the Texas Settlement Agreement all support Philip Morris's interpretation—an interpretation shared by PwC, the independent accounting firm that the parties jointly retained to apply its accounting expertise to the calculation of settlement payments. Accordingly, this Court should reverse the district court's opinion and enforce the Settlement Agreement as written.

To the extent that there is any ambiguity in the admittedly complex contractual formula for calculating profit adjustments under the Texas Settlement Agreement, extrinsic evidence should be considered. That evidence also confirms Philip Morris's position that a single tax rate should be applied when comparing the Settling Defendants' net operating profits across time.

11

**ARGUMENT**

## I.     Standard of Review

The Court "review[s] matters of contract interpretation *de novo*."  *Keiland Constr., L.L.C. v. Weeks Marine, Inc.*, 109 F.4th 406, 415 (5th Cir. 2024) (citing *Habets v. Waste Mgmt., Inc.*, 363 F.3d 378, 382 (5th Cir. 2004)).  Since the legal issue here arises from a contract under Texas law, the Court "appl[ies] the substantive law of" Texas.  *Keiland*, 109 F.4th at 415.

## II.     The Settlement Agreement Unambiguously Provides that the Tax Rate of the "Applicable Year" Is Used to Compare Net Operating Profits

To interpret the parties' contract, courts "must ascertain the true intentions of the parties as expressed in the writing itself."  *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)).  "This analysis begins with the contract's express language."  *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018).  And the analysis requires giving effect to defined terms.  *See Sundown Energy LP v. HJSA No. 3*, *Ltd. P'shi*p, 622 S.W.3d 884, 888 (Tex. 2021) "[C]ourts cannot interpret a contract to ignore clearly defined terms.  Equally important, [courts] avoid construing contracts in a way that renders contract language meaningless."  *Id.* (internal quotation marks and citation omitted).

12

"[W]here the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction." *Sundown Energy*, 622 S.W.3d at 888 n.22 (quoting *E. Tex. Fire Ins. Co. v. Kempner*, 87 Tex. 229 (Tex. 1894)).

Here, the plain and unambiguous terms of the Settlement Agreement require that a single tax rate—the tax rate of the "Applicable Year"—be used in the profit adjustment calculation to compare "net operating profits" over time. ROA.60754.

### A. The Agreement Requires Use of a Single Tax Rate in Each Year's Profit Adjustment Calculations

Appendix A to the 2001 Amendment to the Settlement Agreement sets forth a formula for calculating profit adjustment payments. ROA.60753-60754. The formula involves comparing the Base Net Operating Profit (base year) to the Actual Net Operating Profit (current year), and each leg of that comparison employs the exact same defined term—"net operating profits." *Id.* The parties agreed on a single, detailed definition of "net operating profits," which features a negotiated percentage reduction that is tied to the maximum marginal corporate "tax rate . . . of the Applicable Year" (the payment year at issue). *Id.*

As shown below, the definition of net operating profits is incorporated into the definitions of both "Base Net Operating Profit" (base year) and "Actual Net Operating Profit" (current year):

13

Definition of **"Base Net Operating Profit"**:

"the Settling Defendants' aggregate **net operating profits** from domestic sales of Cigarettes in 1997"

Definition of **"Actual Net Operating Profit"**

"the Settling Defendants' aggregate **net operating profits** from domestic sales of Cigarettes for the Applicable Year"

Formula for **"net operating profits"**:

(1) "operating income" before certain expenses including "general corporate expenses and income taxes"; minus

(2) "the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 **of the Applicable Year**, plus (b) 4.472 percentage points"

Definition of **"Applicable Year"**:

"the calendar year ending on the date on which the payment at issue is due, regardless of when such payment is made. . ."

This agreement's language leaves no doubt that the definition of "Applicable Year," and the statutory tax rate in effect during that Applicable Year, is incorporated into the definition of "net operating profits," which, in turn, is employed in the definitions of both "Base Net Operating Profit" (the upper left half of the diagram) and "Actual Net Operating" (the upper right half of the diagram).

14

Indeed, the contract makes clear in more than one place that the single definition of "net operating profits" is used to determine Base Net Operating Profit, as well as the Actual Net Operating Profit to which it is compared. First, the agreement uses the term net operating profits in the definition of Base Net Operating Profit. *See supra*. Then, after defining "net operating profits," the agreement goes on to provide an illustration of how Base Net Operating Profit (i.e., 1997 net operating profit) is determined, expressly "[a]ppyling the foregoing definition" of net operating profits—a definition that, as shown above, is keyed to "the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the Applicable Year, plus (b) 4.472 percentage points." ROA.60754. No other tax-rate adjustment is referenced anywhere in the agreement.

Because the profit adjustment compares business performance over time, the parties to the Settlement Agreement recognized and stated the importance of "using the same methodology" in both legs of the net-operating-profit comparison. *Id.* A single defined term ("net operating profits") describes precisely which financial items are included or excluded in the profit adjustment calculations, ensuring the Settling Defendants' business performance is measured the same way—"using the same methodology"—each year.

The words the parties chose mean what they say: net operating profits are determined by reference to the "tax rate . . . of the Applicable Year," and the "same methodology" must be used to determine both the Actual Net Operating Profit

(Applicable Year's profit) and the Base Net Operating Profit (base year's profit).
Accordingly, the agreement requires use of a single tax rate in the comparison that is
performed for each year's profit adjustment calculation. Only this reading gives
effect to all the contract's provisions, including its defined terms. *See Sundown
Energy*, 622 S.W.3d at 888 (requiring courts to give effect to all contract terms and
avoid rendering contract language meaningless).

### B.   The District Court Failed to Give Effect to the Settlement Agreement's Defined Terms and Express Formula

The district court erroneously determined that "the Settling Defendants must
use $3,115,100,000 as the Base Year Net Operating Profit" in each and every year's
profit adjustment calculation, irrespective of the Applicable Year's tax rate.
ROA.61326. As support for its conclusion, the district court placed heavy reliance
on *a portion* of a single sentence in Appendix A to the 2001 Amendment—the
sentence that illustrates how to apply the definition of "net operating profits" using
the 35% tax rate in effect at the time of the 2001 Amendment. ROA.61341. This,
according to the district court, reveals an intent to set the base amount at $3.115
billion for all time. *Id.* But the district court's decision cannot be squared with the
actual words of the agreement.

The *full sentence* on a part of which the district court relied reads: "***Applying
the foregoing definition***, the Settling Defendants' aggregate net operating profits
domestic sales of Cigarettes in 1997 were $3,115,100,000." ROA.60754 (emphasis
added). By its own terms, this sentence does not purport to override what comes

before it and freeze the $3.115 billion figure in perpetuity, regardless of any future change in the federal corporate tax rate. Rather, it states explicitly that the $3.115 billion figure is an illustration derived by "[a]pplying the foregoing definition" of net operating profits. And that "foregoing definition" provides, as set out above, that the tax rate used to calculate net operating profits is the tax rate "of the Applicable Year," i.e., the year of the payment at issue. *Id.*

In fact, the "foregoing" definition specifies exactly which tax rate the agreement is "[a]pplying" to calculate the 1997 base-year profits: "the maximum marginal federal corporate income tax rate (***such rate being 35% as of May 1, 2001***)…." *Id.* (emphasis added). Thus, as the 2001 Amendment itself provides, the companies' base-year net operating profits were calculated under the agreement not by looking to 1997 for the tax rate in effect then, but by using the tax rate "as of . . . 2001" when the agreement was entered.[2] *Id.*

This point is critical. The agreement clearly and unambiguously specifies that the parties themselves calculated the net operating profits in 1997—the $3.115 billion figure—using the tax rate *in effect in 2001*. If the district court were correct, the Settlement Agreement would have stated that the net operating profit in 1997 was $3.115 billion applying the tax rate in effect in 1997. But it does not. Rather, it states

---

[2] In fact, the $3.115 billion figure itself does not remain fixed each year, even apart from any change in the corporate tax rate. As the district court itself recognized, that number is adjusted for inflation each year, per the agreement, to ensure an apples-to-apples comparison in terms of today's dollars. ROA.61337.

that, at the time the operative language was agreed to in May 2001, the parties calculated the Base Net Operating Profit in 1997 using the tax rate "as of May 1, 2001." *Id.* That language conclusively answers the question before this Court.

Indeed, if the parties really intended for the profit adjustment calculation simply to compare each year's Actual Net Operating Profit to the number $3.115 billion, there would be no need for a definition of Base Net Operating Profit that incorporates an elaborate definition of "net operating profits." The agreement could have said that the profit adjustment applies if Actual Net Operating Profit is greater than $3.115 billion in a given year. But it does not say that.[3] The agreement instead uses a series of defined terms (including "net operating profit" and "Applicable Year") that must be given effect. *Sundown Energy*, 622 S.W.3d at 888. The agreement, moreover, mandates that the "same methodology" be used to calculate the Actual Net Operating Profit and Base Net Operating Profit that are compared each year. ROA.60754.

Under Texas law, a court must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original); *see also Austin Tr. Co. v. Houren*, 664 S.W.3d 35, 42 (Tex. 2023) ("Contract terms cannot be viewed in isolation; each provision must be

---

[3] As discussed *infra* at 26, the Settling Defendants' 1998 Master Settlement Agreement with other states provides an instructive contrast to the language used in the 2001 Amendment to the Texas Settlement Agreement.

considered in the context of the contract as a whole.”).

Here, all contractual provisions can only be harmonized if the reference to a $3.115 billion Base Net Operating Profit is viewed in context and taken for what it is: an illustrative example of how to “appl[y] the foregoing definition” of net operating profit “as of . . . 2001.” ROA.60754. The definition being applied refers to the “the maximum marginal federal corporate income tax rate (***such rate being 35% as of May 1, 2001***) in effect on December 31 of the Applicable Year” *Id.* (emphasis added). This parenthetical’s specific language “(such rate being 35% as of…)” makes clear it is an illustrative example, given that the particular 35% tax rate in effect as of 2001 (the Applicable Year at the time the agreement was drafted) was subject to change in the future. *See id.* And as the agreement instructs, if the tax rate of the Applicable Year changes, then the Base Net Operating Profit would change too, as the “foregoing definition” of “net operating profits” is applied. *See id.*

*Hanser v. McDonough*, 56 F.4th 967 (Fed. Cir. 2022), which the district court (and the State) cited, supports Philip Morris’s contention that the $3.115 billion base figure should be read as merely illustrative. The *Hanser* court explained that:

> There is no general rule or presumption that a parenthetical is always definitional. Instead, as in many areas of law (and life), context is crucial. Hence, to determine whether a particular parenthetical provides a definition or is “merely an illustrative example,” *Novacor Chems., Inc. v. United States*, 171 F.3d 1376, 1381 (Fed. Cir. 1999), we must consider the specific language at issue in the . . . context in which it appears and then draw the most sensible conclusion about its meaning.

56 F.4th at 971.  Here, the "most sensible" conclusion is that the $3.115 billion figure is illustrative, not definitional, in the context in which it appears.

Treating the $3.115 billion figure as illustrative comports with the Texas law interpretive principle that contract provisions may be harmonized by giving precedence to "terms stated earlier in an agreement . . . over subsequent terms." *Coker*, 650 S.W. 2d at 393.  The profit adjustment formula in Appendix A to the 2001 Amendment first defines Base Net Operating Profit by reference to the defined term "net operating profits."  ROA.60753.  It then defines the term "net operating profits" by reference to a single tax rate adjustment, based on the tax rate of the Applicable Year.  ROA.60754.  Only subsequently does the agreement "apply[] the foregoing definition" to arrive at the $3.115 billion figure—a figure keyed to the tax rate as of 2001.  *Id.*

*Lavaca Bay Autoworld, L.L.C. v. Marshall Pontiac Buick Oldsmobile*, 103 S.W.3d 650 (Tex. App. 2003), a case applying *Coker*, is instructive.  In *Lavaca*, the court was faced with competing interpretations of a contract, where one party sought to give effect to a contractual formula and another party relied on a specific number referenced in the agreement.  The court gave precedence to the formula, which the parties set forth in "elaborate [] provisions" that appeared earlier in the contract, that "explicitly instruct[ed] the parties on how to determine" the amount at issue, and that were therefore necessarily more "fundamental" to the contract than the later reference to a single number.  *Id.* at 659.  As a result, the court refused to adopt an interpretation

20

that would "contradict" and "destroy the Formulas and their express effect on the Agreement." *Id.*

Likewise, this Court should not countenance an interpretation that would render meaningless the contractual formula for profit adjustment calculations. That formula expressly states how to determine both Base Net Operating Profit and Actual Net Operating Profit—using a single definition of net operating profits, with a single tax rate adjustment keyed to the Applicable Year's tax rate—to allow for an apples-to-apples comparison of net operating profits from the domestic sale of cigarettes over time. Freezing the Base Year Net Operating Profit for all of time would defeat the effect of the net operating profit definition and its express use of the Applicable Year's tax rate.

## III.   The Facts and Circumstances Surrounding the Agreement Further Support Philip Morris's Interpretation

The "facts and circumstances" surrounding a contract can "provide context that elucidates the meaning of the words employed." *Murphy Expl. v. Adams*, 560 S.W. 3d at 110 (quoting *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018)). Indeed, the parol evidence rule "does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text." *Hous. Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011). Such circumstances include "the commercial or other setting in which the contact was negotiated and other objectively determinable factors that give a context to the transaction between the parties." *Id.* (quoting WILLISTON ON

21

CONTRACTS § 32.7 (4th ed. 1999)).

Here, applying a single tax rate is not only required by the plain language of the parties' agreement; it is also consistent with the commercial logic of the profit adjustment set forth in the 2001 Amendment and the context in which it was negotiated.

### A.    Commercial Logic of the Profit Adjustment

As discussed above, the profit adjustment is an offset to the volume adjustment. It is calculated based on a comparison of the companies' "operating profits" from "domestic sales of Cigarettes." ROA.60753. Operating profits refer to a specific kind of profit, which measures the operating performance of a business without regard to non-operating factors. The parties thus specifically defined "net operating profits" to *exclude* items like general corporate expenses, interest expenses, and, notably, the parties' *actual income taxes*. *Id.*

Put differently, the parties' defined terms evince an intent to measure changes in the true *operating* performance of the underlying cigarette-selling business over time, excluding non-operating factors (like taxes) that could distort that apples-to-apples comparison. Holding the tax-rate adjustment constant ensures that the companies' "operating profits" from "domestic sales of Cigarettes" remain the focus of the comparison. *See id.*

The district court was therefore mistaken when it stated that "nothing" in the parties' agreement suggests that the comparison must be made with a "constant tax

rate, instead of using real world numbers and real world tax rates." ROA.61343. Quite the contrary. The agreement explicitly strips out the company's *actual* tax liability for both the base and current years' net operating profits, then factors back in a negotiated percentage reduction (again, for both the base and current years), which would never align with the company's actual taxes.[4] This negotiated percentage reduction (based on the maximum marginal federal tax rate of the Applicable Year) is a construct created to facilitate a comparison of net operating profits from the domestic sales of cigarettes over time.

Moreover, the district court failed to account for the fact that the negotiated tax reduction employs a 4.472% adjustment on top of the federal corporate tax rate. This additional percentage reduction is derived from an average of the corporate income tax rates in the 50 states. ROA.60754. Between the 1997 base year and the 2001 Amendment, nine states changed their corporate tax rates. ROA.60943. Had the parties intended to use a 1997 tax rate for the base year and a different tax rate for the current year, they would have needed to use two different averages—one for 1997, and one for the current year. But instead, they calculated a single average applicable to both timeframes, further confirming the Settling Defendants' position and the agreement's stated intent to use the "same methodology" for the calculation of base

---

[4] No company ever pays income taxes equal to the maximum marginal tax rate, plus another (negotiated) percentage rate, on its entire operating income without accounting for a multitude of deductions and credits that companies use when calculating their actual tax liabilities.

23

and current year net operating profits.[5]  *See* ROA.60754.

If two different tax rates are used, as the decision below effectively requires, then the 1997 base-year operating profits no longer serves its contractual purpose—as a baseline to compare the companies' operating profits in future years.  If the district court is right, fluctuations in the tax rate could award a significant windfall to the tobacco companies (if taxes increase) or to the State (if taxes decrease) by arbitrarily widening or narrowing the difference between the current year and the base-year profit figures—for reasons entirely unrelated to profits earned from cigarette sales.

Thus, if the decision below is affirmed and the corporate tax rate increases in future years, the State could be deprived of *all* profit adjustment payments—again, without any change in the companies' operating profitability and even in a circumstance where the companies were *more* profitable in their cigarette business as compared to the base year.[6]  *See Mid-Continent Cas. Co. v. Bay Rock Operating Co.*,

---

[5] The company's effective tax liability may differ wildly from the maximum federal marginal tax rate.  For example, Philip Morris's parent company reported an effective tax rate of negative 4.1% for 2017, and 269.5% for 2019.  ROA.60881.  In neither case did the fluctuations in these real-world effective tax rates increase (or decrease) the settlement payments made to the State when they were calculated by PwC using the negotiated tax reduction set forth in Appendix A to the Texas Settlement Agreement.

[6] For example, in 2004, the Settling Defendants owed a profit adjustment, but a very small increase in the tax rate (~2%) would have wiped out that payment entirely.  *See* ROA.60947.  Conversely, in 2008, no profit adjustment was owed due to the Great Recession.  However, applying today's 21% tax rate would have triggered an $11 million obligation to Texas.  *See id.*

614 F.3d 105, 114 (5th Cir. 2010) (contract provisions are to be interpreted "to avoid meanings that produce unreasonable, oppressive, or absurd results").

But when the same tax adjustment is made to both the current year and base year, as the agreement requires, the relationship between the two figures is preserved—ensuring that a change in the tax rate, while increasing or decreasing the *percentage amount* of the tax reduction, will never, on its own, cause the profit adjustment to be triggered or eliminated.[7]

Instead, that determination would be based on a true apples-to-apples comparison between operating profits from domestic cigarette sales. In this way, the profit adjustment fulfills its core commercial purpose of offsetting the volume adjustment, regardless of how much—or in which direction—Congress might happen to change corporate tax rates in the future. Under the district court's reading, it does not.

---

[7] Mathematically, when a single tax rate is used, the percentage-point change in the rate will result in an equivalent change in the profit adjustment owed to the State. For example, in 2017, when the maximum corporate tax rate in effect was 35%, the formula specified in the agreement resulted in a 39.472% reduction (35% + 4.472%) in the amount of profit adjustment owed after comparing the Settling Defendants' net operating profits in the current and base years. ROA.60950-60951. In 2018, when the tax rate was lowered 14 points to 21%, the formula resulted in a smaller 25.472% (21% + 4.472%) reduction in the amount of profit adjustment owed—which increased the State's recovery by 14% (39.472% - 25.472%) of the total pretax amount. ROA.60887.

**B.    The Master Settlement Agreement's Different Approach**

If the parties really intended to freeze the Base Net Operating Profit at $3.115 billion forever (as the district court found), they knew how to do so.  The 1998 Master Settlement Agreement provides an instructive contrast.   Years before the 2001 Amendment that contains the operative provision at issue here, the same tobacco companies, represented by the same counsel, settled claims with 46 U.S. states, Washington D.C., and five U.S. territories.  Importantly, the MSA's calculation of the profit adjustment does not include any tax-rate reduction.  ROA.60876-60877.  For that reason, there was no need for the MSA to specify a calculation procedure that would address a future change in the tax rate.

Accordingly, the MSA (unlike the Texas Settlement Agreement), ***does*** provide for a fixed base-year profit figure.  And it does so in a very simple, straightforward way—it specifies a number for the base year profit, without invoking any kind of calculation procedure:

| MSA Exhibit E (1998)<br>(fixed base) | Texas Appendix A (2001)<br>(floating base) |
|---|---|
| ". . . the Original Participating Manufacturers' aggregate operating income from sales of Cigarettes for the Applicable Year . . . (the 'Actual Operating Income') ***is greater than $7,195,340,000 (the 'Base Operating Income')*** . . . ."  ROA.60876 (emphasis added). | ". . . the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes for the Applicable Year (the 'Actual Net Operating Profit') ***is greater than the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 (the 'Base Net Operating Profit')*** . . . ."  ROA.60753 (emphasis added). |

26

The same lawyers who drafted the MSA could have taken the same approach when drafting the later-in-time 2001 amendment to the Texas Settlement Agreement. But they did not. Instead, they departed from the MSA language and defined Base Net Operating Profit by reference to another defined term, "net operating profits," which—as detailed above—is supposed to be calculated using the same methodology as the "Applicable Year," applying the tax rate of the "Applicable Year" in its calculation. *See Sharpe v. AmeriPlan Corp.*, 769 F.3d 909, 916-17 (5th Cir. 2014) ("The language . . . demonstrates that [it] knew how to draft a narrow [provision], and its decision in later [agreements] to add far more extensive language . . . must be given effect[.]").

## IV.    The Mississippi Ruling Is Not Persuasive

The district court correctly recognized that a ruling by a Mississippi state court judge on similar provisions in a different agreement is "not precedential" but still erroneously found that ruling persuasive. ROA.61343. The Mississippi decision, which is currently on appeal, includes hardly any reasoning at all. The judge's ruling contains less than two pages of "Analysis" and sidesteps the Settling Defendants' key arguments about the express language, structure, and commercial logic of the agreement. *See* ROA.60937-60938.

Regardless of what the Mississippi agreement does or does not require, the Texas Settlement Agreement, governed by Texas law, does not mandate use of a fixed $3.115 billion Base Net Operating each and every year, even when a different tax rate is used to calculate Actual Net Operating Profit. The Texas Settlement Agreement

requires use of a single tax rate for both sides of the net operating profits comparison.

**V.    To the Extent That the Texas Settlement Agreement is Ambiguous, the Extrinsic Evidence Confirming Philip Morris's Interpretation Should Be Considered**

Philip Morris and the State both have argued that their competing interpretations of the 2001 Amendment to the Texas Settlement Agreement are reasonable. While Philip Morris maintains that its interpretation is the *only* reasonable interpretation, supported by clear and unambiguous contractual provisions, if this Court were to find the complex contract language at issue here to be "uncertain and doubtful" or "reasonably susceptible to more than one meaning," then the contract would be ambiguous. *Coker*, 650 S.W.2d at 393. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* at 394*; see also Sage St. Assocs. v. Northdale Const. Co.*, 863 S.W.2d 438, 445 (Tex. 1993) (explaining that a court can find ambiguity even where both parties plead that a contract is unambiguous).

If "ordinary rules of construction are incapable of generating a single answer" then there is "inescapable ambiguity," and Texas case law authorizes "recourse to extrinsic evidence" as the "next step." *Van Dyke v. Navigator Group*, 668 S.W. 3d 353, 365 (Tex. 2023).

Here, evidence of the parties' negotiating history—which the district court declined to consider—confirms what Philip Morris has been saying all along and what

28

PwC independently determined year-after-year: that the parties to the Texas Settlement Agreement intended for a single tax rate to be applied in all calculations of the profit adjustment. As discussed *supra* at 26, this negotiating history is of course informed by the Settling Defendants' 1998 Master Settlement Agreement, which preceded the 2001 Amendment to the Texas Settlement. The MSA demonstrates that if the parties had wanted to establish a fixed base amount for annual profit adjustment calculations, they knew how to do so. The starkly different language used in the 2001 Amendment to the Texas Settlement must be given effect. *See Sharpe*, 769 F.3d at 916-17.

Moreover, evidence would show that from its inception in 1998, the Texas Settlement Agreement included a profit adjustment component to the annual settlement payment calculation, based on an apples-to-apples comparison of the companies' operating profits from cigarette sales in the current and 1997 base years. ROA.60773; ROA.60848. Prior versions of the profit adjustment did not include any tax reduction provision. ROA.60773; ROA.60848. Then, when the parties entered into the 2001 Amendment, they sought to resolve disputes about how the net operating profits should be calculated and, in particular, considered whether certain large, one-time settlement payments that were made in 1997 should have been part of the 1997 base amount. ROA.56159; *see also* ROA.61224, ROA.61229.

In the 2001 Amendment, the parties agreed to a compromise: to include expenses in the base year, but, in exchange, partially reduce the size of the resulting

payment, using a tax rate as a proxy for that reduction. *See* ROA.60753-60754. The negotiated formula thus was intended to trigger a profit adjustment in years where the companies are actually more profitable from cigarette sales than they were in the base year (as the profit adjustment was originally conceived), while at the same time reducing any profit adjustment payment amount through the tax-rate mechanism introduced in the 2001 Amendment—just as the terms used in the Amendment provides.

## CONCLUSION

Philip Morris respectfully requests that this Court (1) reverse the district court's determination that the Texas Settlement Agreement fixes the Base Year Net Operating Profit at $3,115,100,000 for purposes of every year's profit adjustment calculations, (2) hold that application of the tax rate in PwC's calculations of the profit adjustment payments due to Texas for the years 2018-2022 is consistent with the Texas Settlement Agreement, and (3) hold that profit adjustment calculations for subsequent years be calculated consistently therewith. In the alternative, this Court should vacate the district court's liability decision and remand for further proceedings.

Respectfully submitted,

Daniel Bernstein

Megan Pieper*

Arnold & Porter Kaye Scholer, LLP

601 Massachusetts Ave., NW

Washington, DC 20001-3743

Telephone:  202.942.5000

Facsimile:  202.942.5999

/s/*Christopher M. Odell*

Christopher M. Odell

700 Louisiana Street | Suite 4000

Houston, TX 77002-2755

Arnold & Porter Kaye Scholer, LLP

Telephone: 713.576.2400

Facsimile: 713.576.2499

Alexander Shaknes*

Arnold & Porter Kaye Scholer, LLP

250 West 55th Street

New York, NY 10019-9710

Telephone:  212.836.8000

Facsimile:  212.836.8689

*Counsel for Philip Morris USA Inc.*

31

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on July 23, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Christopher M. Odell*
Christopher M. Odell

*Counsel for Philip Morris USA Inc*

## CERTIFICATE OF COMPLIANCE

1.     This Motion complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B) because:

- this Motion contains 7,201 words, excluding the parts of the Motion exempted by Fed. R. App. P. 32(f).

2.     This Motion also complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type requirements of Fed. R. App. P. 32(A)(6) because:

- this Motion has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with a 14-point font named Times New Roman.

*/s/ Christopher M. Odell*
Christopher M. Odell

*Counsel for Philip Morris USA Inc.*