Case No. 25-40233

IN THE UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

---

STATE OF TEXAS,

*Plaintiff-Appellee*,

v.

R.J. REYNOLDS TOBACCO COMPANY,

*Defendant-Appellant*,

and

PHILIP MORRIS, INCORPORATED,

*Defendant-Appellant.*

---

BRIEF OF R.J. REYNOLDS TOBACCO COMPANY

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS

---

Elli Leibenstein
Greenberg Traurig, LLP
360 North Green Street, Suite 1300
Chicago, IL 60607
Telephone:  312.456.8400

Stephen Saxl
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone: 212.801.9200

Elliot H. Scherker
Brigid F. Cech Samole
Bethany J. M. Pandher
Greenberg Traurig, P.A.
Wells Fargo Center, Suite 4400
333 Southeast Second Avenue
Miami, Florida 33131
Telephone:  305.579.0500

Rene Trevino
Greenberg Traurig, LLP
1000 Louisiana Street, Suite 6700
Houston, Texas 77002
Telephone:  713.374.3500

*Counsel for R.J. Reynolds Tobacco Company*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-40233
*State of Texas v. R.J. Reynolds Tobacco Company, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1. District Judge Rodney Gilstrap

2. State of Texas

3. Office of the Attorney General of Texas

4. Ken Paxton

5. Jeffrey C. Mateer

6. Ryan L. Bangert

7. Darren L. Mccarty

8. Joshua R. Godbey

9. Elizabeth Joan Brown Fore

10. Cynthia A. Morales

11. Christopher D. Hilton

12. Joseph David Hughes

13. R.J. Reynolds Tobacco Company

14. Greenberg Traurig, LLP

# CERTIFICATE OF INTERESTED PERSONS
## (CONTINUED)

Case No. 25-40233

*State of Texas v. R.J. Reynolds Tobacco Company, et al.*

15. Elliot H. Scherker

16. Brigid F. Cech Samole

17. Bethany J. M. Pandher

18. Mary Olga Lovett

19. Rene Trevino

20. Stephen Saxl

21. Elli Leibenstein

22. Katherine G. Treistman

23. Aimee Housinger

24. Jesse W. Wainwright

25. ITG Brands, L.L.C.

26. Patton, Tidwell & Culbertson, LLP

27. Kelly B. Tidwell

28. Geoffrey P. Culbertson

29. Baker & Hostetler LLP

30. Elizabeth B. McCallum

31. Robert J. Brookhiser, Jr.

32. Philip Morris, Incorporated

# CERTIFICATE OF INTERESTED PERSONS
## (CONTINUED)

Case No. 25-40233
*State of Texas v. R.J. Reynolds Tobacco Company, et al.*

33.    Arnold & Porter Kaye Scholer LLP

34.    Alexander Shaknes

35.    Daniel Bernstein

36.    Wachtell, Lipton, Rosen & Katz

37.    Paul Michael Vizcarrondo, Jr.

38.    Ian Boczko

39.    Steven P. Winter

40.    David P. T. Webb

41.    Simon J. Williams

42.    Siebmann, Forrest, Burg & Smith, LLP

43.    Michael Charles Smith

*s/ Elliot H. Scherker*
Elliot H. Scherker

*Counsel for R.J. Reynolds Tobacco Company*

C-3 of 3

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant R.J. Reynolds Tobacco Company submits that oral argument would be of material benefit to the Court in addressing the unique issues presented by this appeal.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ........................................i

TABLE OF CITATIONS ...............................................................................v

JURISDICTIONAL STATEMENT ...............................................................1

ISSUES PRESENTED...................................................................................1

STATEMENT OF THE CASE........................................................................2

I.      THE TEXAS SETTLEMENT AGREEMENT. ....................................2

        A.      The Tobacco Litigation and Settlement Agreement. ...........2

        B.      Payments Under the Texas Settlement Agreement.............3

                1.      The Mechanics of the Payment Formula. ................3

                2.      The Relevant Contract Language. ..........................5

II.     THE PRESENT DISPUTE..................................................................7

        A.      The Change in the Federal Corporate Tax Rate...................7

        B.      The Settling Defendants' Motion to Enforce. ....................9

        C.      The State's Opposition and Cross-Motion to Enforce. ......10

III.    THE LIABILITY ORDER. ................................................................10

IV.     THE ALLOCATION ORDER. ...........................................................12

        A.      ITG's Acquisition of the Covered Brands from RJRT, the
                Allocation Dispute, and the ITG Status Agreement. .........12

        B.      Application of the Liability Order and the Allocation
                Dispute...............................................................................14

SUMMARY OF ARGUMENT ........................................................................15

## TABLE OF CONTENTS
### (Continued)

**Page**

ARGUMENT ...........................................................................................................18

I.　STANDARD OF REVIEW.............................................................................18

II.　THE PLAIN AND UNAMBIGUOUS LANGUAGE OF THE
SETTLEMENT AGREEMENT MANDATES USE OF A
SINGLE TAX RATE IN THE PROFIT ADJUSTMENT
FORMULA TO CALCULATE NET OPERATING PROFITS...................18

　　A.　The Settlement Agreement Applies the "Tax Rate . . . of
the Applicable Year" to All Calculations Concerning Net
Operating Profits. ...................................................................................19

　　B.　The Settlement Agreement Adopts a Uniform Definition
of "Net Operating Profits" For Use in Both the Base and
Current Year Calculations. .....................................................................22

　　C.　The District Court's Construction of the Settlement
Agreement Contravenes the Plain Language of the
Contract. .................................................................................................24

III.　THE DISTRICT COURT ERRED IN REFUSING TO
CONSIDER CONTEXTUAL EVIDENCE CONCERNING
NEGOTIATION OF THE 2001 AMENDMENT.........................................28

IV.　THE PLAIN LANGUAGE OF THE ITG STATUS
AGREEMENT REQUIRES ALLOCATING PROFIT
ADJUSTMENT PAYMENTS FOR 2018 AND 2019
DIFFERENTLY FROM SUBSEQUENT YEARS.......................................31

　　A.　The ITG Status Agreement Treats the Allocation of Profit
Adjustment Payments for 2018 and 2019 Differently From
Subsequent Years. ..................................................................................32

　　　　1.　In the ITG Status Agreement, the Parties Agreed to
Combine ITG's Volume and Profits With RJRT's
Volume and Profits for 2018 and 2019...................................34

iii

**TABLE OF CONTENTS**
(Continued)

**Page**

2. The ITG Status Agreement Adopted a Different Methodology for Allocating the Profit Adjustment Beginning January 1, 2020. .......................................................36

B. The Plain Language of the ITG Status Agreement Confirms That the Post-2020 Allocation Methodology Should Not Be Applied to Profit Adjustment Payments for 2018 and 2019. ...............................................................39

C. The District Court's Ruling That the Profit Adjustment for 2018 and 2019 Should Be Allocated Based on the Approach the ITG Status Agreement Specifies for the Period Beginning in 2020 Contravenes the Plain Language of the Agreement. ...............................................................41

V. THE DISTRICT COURT'S INTEREST AWARD CONTRAVENES APPLICABLE LAW. .......................................................48

A. Prejudgment Interest Accrues From the Filing of the State's Cross-Motion to Enforce, Not the Dates Payments Were Due Originally. ...............................................................49

B. Post-Judgment Interest Runs From the Date of Entry of Judgment, Not the Date of the Liability Ruling. ...............................................52

CONCLUSION ...............................................................55

CERTIFICATE OF SERVICE ...............................................................56

CERTIFICATE OF COMPLIANCE ...............................................................57

iv

# TABLE OF CITATIONS

**Page(s)**

**Cases**

*Alicea v. Curie Bldg., L.L.C.*,
  632 S.W.3d 142 (Tex. App—El Paso Feb. 17, 2021) ........................................26

*Americo Life, Inc. v. Myer*,
  440 S.W.3d 18 (Tex. 2014) ...............................................................................28

*Arete Partners, L.P. v. Gunnerman*,
  643 F.3d 410 (5th Cir. 2011) ............................................................................49

*Austin Tr. Co. v. Houren*,
  No. 21-0355, 2023 WL 261834 (Tex. Mar. 24, 2023) ......................................20

*Balfour Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co.*,
  968 F.3d 504 (5th Cir. 2020) ............................................................................19

*In re Deepwater Horizon*,
  858 F.3d 298 (5th Cir. 2017) ............................................................................18

*Elbar Invs., Inc. v. Prins (In re Okedokun)*,
  968 F.3d 378 (5th Cir. 2020) ............................................................................49

*Ferrant v. Indep. Or. of Foresters*,
  No. 2-16-98-CV, 2017 WL 218287 (Tex. App.—Fort Worth Jan.
  19, 2017) ...........................................................................................................28

*First Bank v. Brumitt*,
  519 S.W.3d 95 (Tex. 2017) ...............................................................................29

*Foretravel, Inc. v. Star City Coach Works Ltd.*,
  No. 9:09-CV-141, 2011 WL 13196207 (E.D. Tex. Jan. 5, 2011) .....................53

*Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*,
  327 S.W.3d 118 (Tex. 2010) .......................................................................19, 39

*Great Am. Ins. Co. v. Primo*,
  512 S.W.3d 890 (Tex. 2017) .......................................................................19, 39

# TABLE OF CITATIONS
## (Continued)

**Page(s)**

*Gulf Eng'g Co., L.L.C. v. Dow Chem. Co.*,
　961 F.3d 763 (5th Cir. 2020) ...............................................................................18

*Hoffman v. L & M Arts*,
　838 F.3d 568 (5th Cir. 2016) ...............................................................................29

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*,
　352 S.W.3d 462 (Tex. 2011) ...............................................................................29

*Matter of Imperial Petroleum Recovery Corp.*,
　84 F.4th 264 (5th Cir. 2023) ...............................................................................54

*Johnson & Higgins*,
　962 S.W.2d at 531–32 ...........................................................................................53

*Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*,
　962 S.W.2d 507 (Tex. 1998) ...............................................................................49

*Kachina Pipeline Co. v. Lillis*,
　471 S.W.3d 445 (Tex. 2015) ...............................................................................23

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
　494 U.S. 827 (1990)...............................................................................................54

*Krieser v. Hobbs*,
　166 F.3d 736 (5th Cir. 1999) ...............................................................................54

*McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*,
　736 F.3d 375 (5th Cir. 2013) ........................................................................21, 26

*Meaux Surface Prot., Inc. v. Fogleman*,
　607 F.3d 161 (5th Cir. 2010) ...............................................................................53

*Murphy Expl. & Prod. Company-USA v. Adams*,
　560 S.W.3d 105 (Tex. 2018) ...............................................................................23

*Nat'l Oilwell Varco, L.P. v. Auto-Dril Inc.*,
　68 F.4th 206 (5th Cir. 2023) ...............................................................................27

# TABLE OF CITATIONS
## (Continued)

**Page(s)**

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*,
  574 S.W.3d 882 (Tex. 2019) ........................................................31, 41

*Perthius v. Baylor Miraca Genetics Labs., LLC*,
  645 S.W.3d 228 (Tex. 2022) ................................................................19

*In re Sanchez Energy Corp.*,
  139 F.4th 411 (5th Cir. 2025) ............................................................19

*URI, Inc. v. Kleberg Cnty.*,
  543 S.W.3d 755 (Tex. 2018) ...............................................................29

*Weaver v. Metro. Life Ins. Co.*,
  939 F.3d 618 (5th Cir. 2019) .........................................................19, 26

*Wheelbarger v. Landing Council of Co-Owners*,
  471 S.W.3d 875 (Tex. App. 2015)........................................................51

**Statutes**

28 U.S.C. § 1961(a) .................................................................18, 48, 53

28 U.S.C. § 1961(b) ............................................................................53

Tex. Fin. Code § 304.003(c) ................................................................53

Tex. Fin. Code § 304.103........................................................................52, 53

Tex. Fin. Code § 304.104................................................................*passim*

**Other Authorities**

Fed. R. App. P. 4(a)(4)(B)(i)................................................................15

Fed. R. Civ. P. 54(a)...........................................................................53

## JURISDICTIONAL STATEMENT

The district court entered its Memorandum Opinion and Order determining R.J. Reynolds Tobacco Company's liability on March 14, 2024, and its subsequent Memorandum Opinion and Order concerning allocation of damages among the defendants on March 28, 2025. The district court has not yet entered final judgment.

## ISSUES PRESENTED

1.  Whether the amended Settlement Agreement between Texas and settling tobacco companies requires the parties to use a uniform tax rate to calculate the Net Operating Profits for the Profit Adjustment portion of the annual payments due to the State.

2.  Whether the district court erred in refusing to enforce the amended Settlement Agreement's plain and unambiguous language.

3.  Whether the district court erred in refusing to consider the context surrounding the negotiation and execution of the 2001 Amendment to the amended Settlement Agreement in interpreting its plain language.

4.  Whether the ITG Status Agreement requires Profit Adjustment payments due to Texas for 2018 and 2019 to be allocated among the settling tobacco companies differently from subsequent years.

5.    Whether the district court erred in awarding (i) prejudgment interest from a date other than that prescribed by Texas law and the Texas Finance Code; and (ii) post-judgment interest from a non-final order before entry of judgment.

## STATEMENT OF THE CASE

### I.    THE TEXAS SETTLEMENT AGREEMENT.

#### A.    The Tobacco Litigation and Texas Settlement Agreement.

On March 28, 1996, the State of Texas sued major tobacco companies, including R.J. Reynolds Tobacco Company (RJRT), Brown & Williamson Tobacco Corporation (B&W), Lorillard Tobacco Company (Lorillard), United States Tobacco Company, and Philip Morris, Incorporated (PM USA) (collectively, the Settling Defendants), to recover, among other things, alleged healthcare costs it incurred, and would continue to incur, in connection with tobacco use in the State. (ROA.60726). Similar lawsuits against the major tobacco companies were filed by various other states, resulting in a series of settlement agreements.[1]

In exchange for the dismissal and perpetual release of Texas's claims, on January 16, 1998, Texas and the Settling Defendants entered into the Comprehensive Settlement Agreement and Release (the Settlement Agreement). (ROA.60760-

---

[1] Florida, Mississippi, Texas, and Minnesota were the first states to enter into settlement agreements with the Settling Defendants in 1997-98 (collectively, the Previously Settled States). (ROA.60726). A Master Settlement Agreement (MSA) followed in November 1998, which settled the claims of the remaining 46 States, five territories, and the District of Columbia. (ROA.60726, 60873-78 (excerpts)).

60802). The Settlement Agreement required lump sum "Initial Payments" of hundreds of millions of dollars to be made by each Settling Defendant (ROA.60771), in addition to "Annual Payments," calculated pursuant to a detailed, negotiated formula. (ROA.60772-74).

Since its execution, the parties have twice amended the Settlement Agreement—first, on July 24, 1998, and again, on June 8, 2001. (ROA.60740-57, 60803-72). The Settlement Agreement, and its amendments, are governed by Texas law. (ROA.60741-42, 60788).

**B.    Payments Under the Texas Settlement Agreement.**

*1.    The Mechanics of the Payment Formula.*

The Settling Defendants agreed to two categories of payments to the State: "initial payments"; and "annual payments," in perpetuity. (ROA.60771, 60772-74). After the 1998 and 2001 amendments, the parties agreed on the following structure: (i) the parties begin with a base payment, which was $4 billion in 1998 and increased to $8 billion in 2003 and going forward; (ii) the State is entitled to a 1.7% share of that base payment, which is then adjusted annually for inflation; and (iii) the payment is further modified, each year, if certain conditions are met, as set forth in Appendix A to the 2001 Amendment. The last step includes, if applicable, (1) a downward Volume Adjustment, and (2) an upward Profit Adjustment, which is at issue in this dispute. (ROA.60753-56). Due to the complexity of the methodology

set forth in the Settlement Agreement and its amendments, the parties selected the accounting firm PricewaterhouseCoopers (PwC) to calculate the annual settlement payments due from the Settling Defendants to the State. (ROA.60725).

The Volume Adjustment clause concerns the actual number of cigarettes sold by the Settling Defendants, and compares the number sold in the "current" year with the aggregate number of cigarettes sold in 1997—the "base" year. (ROA.60753-56). If the Settling Defendants sell *fewer* cigarettes in the current year than in the base year, the volume adjustment *reduces* the amount of the annual payment owed for that year. (ROA.60753).

If the Volume Adjustment is applied, the Profit Adjustment (ROA.60753-54), may be triggered. In that circumstance, the Profit Adjustment may partially offset the reduction the Settling Defendants receive if, despite having sold fewer cigarettes in the current year than the base year, the Settling Defendants' aggregate net operating profits from the sales of cigarettes are *greater* than their net operating profits in the 1997 base year. The Settling Defendants' base-year net operating profits are, in turn, adjusted for inflation to facilitate an "apples-to-apples" comparison between the two time frames. And if the Settling Defendants, after adjustment for inflation, are *more profitable* in the aggregate in the current year, as compared to the 1997 base year, then the Volume Adjustment is reduced by a

percentage of that difference, increasing the amount of the annual payment owed to the State for that year.

> 2.    *The Relevant Contract Language.*

Appendix A to the 2001 Amendment is titled: "Formula for Calculating Volume Adjustments." Beginning with Subsection (A), "Actual Volume" and "Base Volume" are defined:

> [I]n the event the aggregate number of Cigarettes shipped for domestic consumption by the Settling Defendants in the Applicable Year (as defined herein below) (the "Actual Volume") *is greater than* the aggregate number of Cigarettes shipped for domestic consumption by the Settling Defendants in 1997 (the "Base Volume"), the Applicable Base Payment shall be multiplied by the ratio of the Actual Volume to the Base Volume.

(ROA.60753).

Subsection (B), which applies when the Actual Volume is less than the Base Volume, then sets forth a mechanism for volume and profit adjustments:

> (i)    the Applicable Base Payment shall be reduced by subtracting from it the amount equal to such Applicable Base Payment multiplied both by 0.98 and by the result of (1) 1 (one) minus (2) the ratio of the Actual Volume to the Base Volume; and
>
> (ii)    if a reduction of the Applicable Base Payment results from the application of subparagraph (B)(i) of this Appendix, but the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes for the Applicable Year (the "Actual Net Operating Profit") is greater than the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 (the "Base Net Operating Profits") . . . then the amount by which the Applicable Base Payment is reduced by the application of subparagraph (B)(i) shall be reduced (but not

below zero) by 7.25% of 25% of such increase in profits.

(ROA.60753-54).

Subsection (B) adopts a common definition for "net operating profits," or "NOP" regardless of the year at issue and reduces it by the "maximum marginal federal corporate income tax rate" that is "in effect on December 31 of the Applicable Year":

> For purposes of this Appendix, the term "net operating profits" shall mean: (1) operating income before goodwill amortization, . . . and casualty losses; (all as reported to the United States Securities and Exchange Commission ("SEC") for the Applicable Year . . . ; minus (2) the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) *the maximum marginal federal corporate income tax rate* (such rate being 35% as of May 1, 2001) *in effect on December 31 of the Applicable year*, plus (b) 4.472 percentage points.
>
> Notwithstanding the foregoing, the Settling Defendants' aggregate total amount of restructuring charges. . . included for purposes of clause (1) of the preceding sentence shall not in any Applicable Year exceed the Annual Restructuring Cap . . . . *Applying the foregoing definition, the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000.*

(ROA.60753-54) (emphasis added).

Subsection (C) specifically defines the term "Applicable Year" for all payment calculations:

> (C) *"Applicable Year" means . . . the calendar year ending on the date on which payment at issue is due*, regardless of when such payment is made.

(ROA.60754) (emphasis added).

6

## II.    THE PRESENT DISPUTE.

### A.    The Change in the Federal Corporate Tax Rate.

This dispute concerns whether the formula for calculating the Profit Adjustment, set forth in subsection (B)(ii) of Appendix A, uses a single or two different federal corporate tax rates to calculate the base and current-year NOPs. When the parties executed the Settlement Agreement—through the final amendment in 2001—the maximum marginal federal corporate income tax rate was 35%. (ROA.60728). In 2018, the federal corporate income tax rate was reduced from 35% to 21%.[2] (ROA.60728).

When PwC was preparing its profit adjustment calculations in 2019 for the 2018 year, PwC applied the updated 21% tax rate—in effect for the "Applicable Year"—to both the Base Year and current year NOP calculations. (ROA.60725, 60885-903). PwC noted that Appendix A "stipulates that the Tax Rate to be used for the [profit adjustment] calculation" is the rate "in effect on December 31 of the Applicable Year," reflecting "the apparent intent of the parties to use the same Tax Rate when computing both the base and current year aggregate net operating profits." (ROA.60886-87). By PwC's calculation for 2018 alone, Texas received profit adjustment payments totaling over $52 million—approximately $10 million

---

[2] This was the first time the federal corporate income tax rate changed since the 2001 Amendment.

7

*more* (over 20% higher) than the State would have received had Congress not changed the corporate tax rate. (ROA.60728, 60940-41).

Four years later, on March 3, 2023, the State sent a letter to PwC arguing it was entitled to additional profit adjustment payments for each year from 2018 through 2022, and going forward. (ROA.60904-23). The State argued the profit adjustment should apply two different tax rates: the 35% tax rate for the Base Year (as was in effect in 2001) and the 21% rate for the "Applicable Year." (ROA.60905). The State relied in the letter on a ruling from a court in Pascagoula, Mississippi, which adopted the State's "two tax rate" position in a dispute arising under the Mississippi Settlement Agreement executed between the Settling Defendants and Mississippi. (ROA.60924-39).[3]

After analyzing the plain text of Appendix A, and a response from the Settling Defendants challenging the "two tax rate" position as inconsistent with the plain language of the amended Settlement Agreement and commercially untenable, PwC issued its calculations and adhered to its prior determination. (ROA.60964-69). PwC agreed with the Settling Defendants that the formula should uniformly apply the new corporate tax rate. (ROA.60964-69). The State convened a meeting with PwC to request that it revisit that determination, which PwC denied. (ROA.60729).

---

[3] RJRT has appealed the Mississippi ruling to the Mississippi Supreme Court.

**B.     The Settling Defendants' Motion to Enforce.**

To resolve the dispute concerning whether the Profit Adjustment should utilize a single tax rate—the one for the "Applicable Year"—or two tax rates, the Settling Defendants filed a Motion to Enforce Settlement Agreement ("Motion to Enforce"). (ROA.60722-39). Based on the plain language of the 2001 Amendment, the Settling Defendants argued that the agreed methodology to calculate future payments and the plain language of Appendix A require use of a single tax rate in the formula, such that both the Applicable Year NOP and Base Year NOP would use the federal tax rate in effect in the year the payment was due. (ROA.60730-33). The Settling Defendants explained that the prior agreed determination in 2001 of the 1997 Base Year NOP to be $3,115,100,000, which the Agreement specifically states was determined utilizing the tax rate of 35% in effect in 2001, was only for illustrative purposes based on that year's tax rate, and the value for the 1997 Base Year NOP for use in calculating all future payments would be different if the maximum marginal federal corporate income tax rate changed. In application, a fixed value would make no sense because it would skew the Profit Adjustment such that external factors—unrelated to the "operating" profits of the Settling Defendants—would drive the tax reduction. (ROA.60734-37). The Settling Defendants explained the Mississippi ruling was not persuasive, because the district court had already ruled that decisions by other Previously Settled States' courts were

9

"not binding on [the Texas district court], which must apply a different body of law (Texas law) to a different settlement agreement," and for the lack of analysis in the opinion itself, which contravenes the plain language of the Settlement Agreement. (ROA.60736).

### C. The State's Opposition and Cross-Motion to Enforce.

Opposing the Motion to Enforce and cross-moving to enforce the Settlement Agreement, the State sought a ruling that the 1997 Base Year NOP is a fixed value of $3,115,100,000 (the Fixed 1997 NOP) and that this value should be used as the Fixed 1997 NOP in all future payment calculations. (ROA.60971). The State also argued that the Mississippi judgment should be applied in Texas to preclude the Settling Defendants "from engaging in serial litigation on this issue." (ROA.60982-87).

### III. THE LIABILITY ORDER.

In its order granting the State's cross-motion to enforce, the district court adopted the State's revised contractual language (the Liability Order). (ROA.61326-44). In its preliminary analysis, the district court rejected the State's position that collateral estoppel applied to the tax issue based on the Mississippi litigation for lack of identical issues. (ROA.61330-33). Likewise, the district court rejected that judicial estoppel applied based on a ruling of the Mississippi court in 2022, because the State raised the issue for the first time in its reply, which operates as a waiver,

*and* because the State failed to identify an equitable rationale to apply the doctrine. (ROA.61334-35).

Turning to its construction of the Settlement Agreement, the district court ultimately ruled in the State's favor. (ROA.61341-44). The district court found "the contract unambiguously states a fixed number that constituted Defendants' net operating profits in 1997, and that fixed number is not subject to recalculation each year." (ROA.61341). In the court's view, the language in Appendix A that states "[t]he Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes shall be derived using the same methodology *as was employed in deriving* such Settling Defendants' *aggregate net operating profit from domestic sales of Cigarettes in 1997*" "harmonizes the formula outlined in Appendix A," and that nothing in the Appendix supports that the Base Net Operating Profits should be recalculated every year. (ROA.61341) (emphasis added). The district court was persuaded by the State's argument that "the corporate tax rate affects actual profits" and that "[r]etroactively applying the corporate tax rate of the Applicable Year to 1997 . . . does not make sense in the context of the agreement (and the Profit Adjustment) as a whole." (ROA.61342). Accordingly, it was "clear to the Court from the language of Appendix A that the State and the Defendants agreed on a numerical amount constituting the NOP in 1997 for the Defendants: $3,115,100,000." (ROA.61343).

Based on its finding that the contractual language was "clear and unambiguous," the court did not consider or see any basis to consider the negotiating history laid out by the Settling Defendants in the Motion to Enforce. (ROA.61342 n.13). Finally, although the district court did not apply issue preclusion, it noted the Mississippi decision "can be (and is) informative and helpful to consider, as it reflects the same plain reading of specific language, as is at issue here." (ROA.61343 & n.14). The court thus granted the State's cross-motion to enforce the settlement agreement, ordering the parties must use the fixed rate of $3,115,100,000 as the Base Year Net Operating Profit in calculating the Annual Payments due under the Settlement Agreement each year. (ROA.61344). As a result, the district court ordered briefing on the issue of damages and interest for underpayments made by the Settling Defendants beginning in April 2019 (for 2018). (ROA.61344).

## IV.    THE ALLOCATION ORDER.

### A.    ITG's Acquisition of the Covered Brands from RJRT, the Allocation Dispute, and the ITG Status Agreement.

In June 2015, ITG acquired certain cigarette brands (the Covered Brands) from RJRT. Thereafter, an issue arose over the effect of ITG's volume and profits attributable to the Covered Brands on the Annual Payments to Texas, including the Profit Adjustment, and the allocation of the Profit Adjustment among the companies. These disputes were the subject of separate motions to enforce filed against RJRT and ITG by the State and PM USA in 2019. (ROA.55146-66, 56025-43).

12

In its February 25, 2020 Memorandum Opinion and Order and August 14, 2020 Amended Judgment, the district court ordered that RJRT was responsible under the Settlement Agreement to make profit-based and volume-based settlement payments to Texas for the ITG-owned Covered Brands and deferred determination as to ITG's liability. (ROA.59837-928, 60352-68). RJRT, ITG, and the State appealed from portions of the order and judgment.

While those appeals were pending, on May 21, 2021, the State of Texas, RJRT, PM USA, and ITG settled all remaining issues between them, executing the Notice Regarding ITG Brands, LLC's Status Under the Texas Tobacco Settlement Agreement and Agreement Resolving Disputes Thereunder (the ITG Status Agreement) (ROA.61369-92). The parties filed that agreement with the district court with a Joint Notice of Settlement. (ROA.60676-80, 60681-705). The ITG Status Agreement unambiguously prescribes one agreed allocation method for the period through 2019, and a separate and distinct allocation method for 2020 forward:

> (4) for the period from June 12, 2015 through December 31, 2019, the "profit adjustment payments" as set forth in [PwC] Notice IDs SS208 and SS209 *already account for the Covered Brands* in the profit adjustment calculations based on [the district] [c]ourt's February 25, 2020 decision on the State and PM USA's motions to enforce, *so there is no need to recalculate for those years*.

(ROA.61376) (emphasis added).

**B.     Application of the Liability Order and the Allocation Dispute.**

The Liability Order awarded the State "underpayments made by the Defendants beginning in April 2019" (*i.e.,* beginning with the 2018 payment). (ROA.61344). These underpayments were to be calculated by comparing the Annual Payments made each year to what the Annual Payments would have been using $3,115,100,000 as the aggregate Base Net Operating Profit without adjusting the tax rate. (ROA.60987). At the State's request, PwC prepared damages calculations and allocations. (ROA.61411). RJRT agreed with PwC's calculations and allocations of the "Incremental Change" for 2018-2019 and 2021-2022.[4] PM USA, however, disputed the allocation among the Settling Defendants for 2018 and 2019, and at its request PwC prepared alternative calculations. (*Compare* ROA.61395 *with* ROA.61411).

In other words, the parties agreed on the total amount of underpayments due to the State under the district court's order but RJRT and PM USA differed on the allocation of those payments between them for 2018 and 2019 based the ITG Status Agreement. Accordingly, both RJRT and PM USA filed separate memoranda, advancing their positions on the allocation issue. In its March 28, 2025 Memorandum Opinion and Order (the Allocation Order), the district court ruled for

---

[4] RJRT and PM USA agreed there was an error in RJRT's favor in the calculation for 2020. (ROA.61399; ROA.61521).

14

PM USA, directing that underpayments for those years would be allocated according to the methodology the parties had agreed would apply starting January 1, 2020. The Allocation Order also awarded the State prejudgment interest accruing from the date the "underpayments" began in April 2019 and post-judgment interest from the date of the Liability Order.

On April 25, 2025, pursuant to Federal Rule of Appellate Procedure 4(a)(4)(B)(i), RJRT and PM USA filed separate Notices of Appeal. (ROA.61528-30, 61541-43). On April 28, 2025, RJRT filed its amended Notice of Appeal from the two Memorandum Opinions and Orders, concerning liability under the Settlement Agreement and the amount of damages, respectively. (ROA.61544-46).

## SUMMARY OF ARGUMENT

The first issue before the Court is whether the district court erred in interpreting the plain language of the amended Settlement Agreement. By adopting the State's position, the district court effectively rewrote Appendix A to the Settlement Agreement.

Rather than calculating the Base Year NOP according to the formula negotiated by the parties, as the plain language of Appendix A mandates, the court determined that a fixed rate of $3,115,100,000 should be applied every year going forward regardless of the tax rate for the Applicable Year. The result is an unbalanced formula that no longer accomplishes what the plain language of the

Settlement Agreement directs and what the parties intended—for net operating profits to drive the calculation, as a profit adjustment, in determining the amount of future payments. Instead, by applying a different tax rate to the Base Year NOP than was used for the Appliable Year NOP, the formula no longer yields an "apples-to-apples" comparison necessary to evaluate the profitability of the Settling Defendants' business in the year a payment is due versus the base 1997 year. Having failed to enforce the Settlement Agreement according to its plain language, the district court committed reversible error, which the Court should correct on its independent review.

Despite its erroneous ultimate ruling, the district court got the first step of contract interpretation correct. Because the plain language of the amended Settlement Agreement is unambiguous, there was no need for the court, or for this Court, to apply canons of construction or consider extrinsic evidence. Texas law, however, authorizes consideration of the parties' contemporary negotiating history of the 2001 Amendment, offered in the district court, which points only to the Settling Defendants' construction. That history reinforces what the amended Settlement Agreement's text already makes clear: because the same methodology is used for all NOP calculations, a single tax rate must be used to effectuate the profit adjustment. Only then do annual payments reflect actual business performance, adjusting downward if there is a decline in volume of cigarettes, and then upward if

there is an increase in net operating profits from cigarettes, of the Settling Defendants in the applicable year.

Next, applying its liability ruling, the district court directed an improper allocation of damages that contravenes the plain language of the parties' ITG Status Agreement. Specifically, the district court ignored the agreed upon and carefully negotiated language that directs a separate methodology for the calculation of Profit Adjustment payments due to Texas for the years 2018 and 2019. By incorrectly applying the methodology prescribed for allocation of post-2020 payments to all payments—despite clear language to the contrary—the district court exceeded its authority in rewriting the ITG Status Agreement to RJRT's prejudice.

Finally, the district court compounded its error in miscalculating both pre- and post-judgment interest in favor of the State. Rather than adhere to applicable law which mandates that prejudgment interest run from the *earlier* of either the 180th day after a defendant receives notice of a claim or the date the suit is filed, the district court awarded the State prejudgment interest from the date that alleged underpayments began in 2019. *See* Tex. Fin. Tex. Fin. Code § 304.104. Where the State first provided written notice of its claim concerning the corporate tax dispute by letter dated March 2, 2023, and filed its cross-motion to enforce the settlement agreement on May 22, 2023, prejudgment interest under Texas law began to accrue at the filing of the cross-motion. Concerning post-judgment interest, the district court

17

ignored that under 28 U.S.C. § 1961(a), post-judgment interest runs from the date of entry of judgment at the federal statutory rate. The Liability Order, which called for further briefing on the issue of damages and interest, was not a judgment and cannot serve as the basis for post-judgment interest. Instead, the Allocation Order, which awarded and allocated the damages due, is the correct trigger for post-judgment interest.

## ARGUMENT

### I.    STANDARD OF REVIEW.

"Interpretation of a contract is a legal question that is . . . subject to de novo review." *Gulf Eng'g Co., L.L.C. v. Dow Chem. Co.*, 961 F.3d 763, 766 (5th Cir. 2020). De novo review is "a fresh, independent determination." *In re Deepwater Horizon*, 858 F.3d 298, 303 (5th Cir. 2017) (citation omitted).

### II.    THE PLAIN AND UNAMBIGUOUS LANGUAGE OF THE SETTLEMENT AGREEMENT MANDATES USE OF A SINGLE TAX RATE IN THE PROFIT ADJUSTMENT FORMULA TO CALCULATE NET OPERATING PROFITS.

The Court need look no further than the plain language of the amended Settlement Agreement to resolve this dispute. Through careful drafting and negotiation, the parties agreed to defined terms that mandate use of a single tax rate—the tax rate in effect in the "Applicable Year" payment is due—to calculate the Profit Adjustment. No other interpretation can be squared with the text of Appendix A, which applies uniform definitions to the Base Year and Applicable

18

Year NOPs. (ROA.60753-54). The district court committed reversible error in straying from the clear and unambiguous contractual language, adopting a commercially untenable construction that undermines the purpose of the Profit Adjustment and its attendant tax reduction.

### A. The Settlement Agreement Applies the "Tax Rate . . . of the Applicable Year" to All Calculations Concerning Net Operating Profits.

Under Texas law, the goal of contract interpretation is to "ascertain the parties' true intent as expressed by the plain language." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). The courts will "presume parties intend what the words of their contract say." *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Stated otherwise, "[t]ext is the alpha and the omega of the interpretive process." *Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 626 (5th Cir. 2019) (citation omitted); *accord In re Sanchez Energy Corp.*, 139 F.4th 411, 417 (5th Cir. 2025) ("interpretation begins with the words of the contract").

Thus, "[w]hen parties disagree over the meaning of an unambiguous contract, the intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written." *Balfour Beatty Constr., L.L.C. v. Liberty Mut. Fire Ins. Co.*, 968 F.3d 504, 509 (5th Cir. 2020) (citation and internal quotation marks omitted). The plain language controls, "not . . . what one side or the other alleges they intended to say but did not." *Perthius*

*v. Baylor Miraca Genetics Labs., LLC*, 645 S.W.3d 228, 236 (Tex. 2022) (cleaned up). When interpreting the plain language of a contract, the Court must "examine the instrument in its entirety in an effort to harmonize and give effect to all contractual provisions." *Austin Tr. Co. v. Houren*, No. 21-0355, 2023 WL 261834, at *4 (Tex. Mar. 24, 2023).

By design, Appendix A contemplates two adjustments to the set base annual payment: the Volume Adjustment, concerning the number of cigarettes sold in the year payment is due compared to 1997, and the Profit Adjustment, which looks at how profitable the companies are from the sale of cigarettes in that payment year as compared to 1997. The Profit Adjustment is calculated by comparing the Settling Defendants' "net operating profits" from domestic cigarette sales in 1997 (the Base Year) to today (the Applicable Year). If the Settling Defendants' net operating profits from domestic cigarette sales are greater in the current year than in 1997, the profit adjustment will increase the annual settlement payment for that year by a percentage of that difference to offset a decrease attributable to a decline in volume.

To ensure an "apples-to-apples" comparison between the two time frames, the Settlement Agreement establishes that "net operating profits" are measured using "the same methodology" in both the base and current year. (ROA.60753-54). Thus, the sole formula set forth at Subsection (B)(ii) of Appendix A applies to calculate both the Base Year NOP and the Applicable Year NOP.

20

A key component of that formula for calculating the Settling Defendants' NOP is a tax reduction. The formula plugs in the federal corporate tax rate "in effect on December 31 *of the Applicable Year*." The "Applicable Year" is defined in the Settlement Agreement as the current year, i.e., the year in which the annual "payment at issue is due." (ROA.60753-54).

When the federal corporate income tax rate changed from 35% to 21%, the new "tax rate . . . of the Applicable Year" became 21% for purposes of the formula. Accordingly, in 2018, PwC used the new 21% tax rate to calculate the profit adjustment. (ROA.60725, 60885-903).

But the district court accepted the State's invitation selectively to credit the definitions of "Actual Net Operating Profit" and "Base Net Operating Profit," excising the phrase "of the Applicable Year" from the Base Year NOP definition. The district court's ruling did not address the fact that the tax rate "of the Applicable Year" applies in calculating *both* Actual NOP and Base NOP. This selective reading violated the basic rules of contract construction that the plain language of a contract controls and that a contract must be read "in order to harmonize and give effect to all of its provisions so that none will be rendered meaningless." *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377–78 (5th Cir. 2013). This error, standing alone, is sufficient to reverse the Memorandum Opinions and Orders.

**B.      The Settlement Agreement Adopts a Uniform Definition of "Net Operating Profits" For Use in Both the Base and Current Year Calculations.**

Compounding its error, the district court ignored the common definition of "net operating profits" that also applies to both calculations of "Actual Net Operating Profit" and "Base Net Operating Profit." The phrase "net operating profits" is also defined in Appendix A. (ROA.60753–54). "For purposes of this Appendix, the term 'net operating profits' *shall* mean . . . ." *Id.* The term is then defined using a detailed, two-step formula:

(1) The calculation begins by referencing the companies' "operating income," which is defined to specifically exclude various non-operating income and expenses. (ROA.60753-54). Those excluded items include general corporate expenses, interest expense, and (notably) corporate income taxes. (ROA.60753).

(2) The next step is to perform an adjustment based on tax rates: the contract subtracts "the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) *in effect on December 31 of the Applicable Year*, plus (b) 4.472 percentage points." (ROA.60754) (emphasis added). The Settlement Agreement defines "Applicable Year" as the current year, i.e., the year in which "the payment at issue is due." *Id*.

22

Appendix A then offers an exemplar, showing how the calculation should be applied: "[a]pplying the foregoing definition, the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000." *Id*.

Under Texas law, the district court was not free to ignore the plain meaning of these words. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (the court "must ascertain the true intentions of the parties as expressed in the writing itself.") (citation omitted); *Murphy Expl. & Prod. Company-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018) ("analysis begins with the contract's express language"). And the intentions "expressed" in the Settlement Agreement itself are that the two-step formula in Subsection (B)(ii) will apply to calculate both Base and Applicable Year Net Operating Profits, in perpetuity.

Use of a single tax rate is the only interpretation of the words that makes sense. The commercial logic of using "operating" profits to calculate the Profit Adjustment allowed for a consistent and accurate comparison of the Settling Defendants' business performance from "domestic sales of Cigarettes," ensuring the Profit Adjustment would be based on just that—*profit from cigarettes*. Applying two different tax rates disturbs that harmony, artificially skewing the comparison between the Base Year and Applicable Year NOPs based on extrinsic factors—like

23

the federal corporate tax rate—entirely divorced from the operations of the Settling Defendants' cigarette businesses.

A holistic reading of Appendix A confirms the parties did not intend for such extrinsic factors to drive the Volume and Profit Adjustments. Specifically, the parties excluded "income taxes" from clause (1) of the net operating profits definition:

> (1) [O]perating income *before* goodwill amortization, trademark amortization, minority interest, net interest expense, non-operating income and expense, *general and corporate expenses and income taxes*, and excluding extraordinary items and the cumulative effect of changes in method of accounting.

(ROA.60754) (emphasis added). By explicitly excluding income taxes from the first step of the calculation, the parties insulated the calculation from changes in taxes, allowing for a consistent comparison of the Settling Defendants' business performance over time. Thus, if the actual business performance improved, the profit adjustment would offset the volume adjustment resulting from a decrease in volume.

### C. The District Court's Construction of the Settlement Agreement Contravenes the Plain Language of the Contract.

The district court adopted the State's skewed construction of the 2001 Amendment, which rewrites the express definitions of the Settlement Agreement and excises the $3,115,100,000 figure to fix it in perpetuity regardless of changes in the tax rate. That construction cannot be reconciled with the plain language of Appendix A, which provide a detailed two-step formula for calculating net operating

24

profits that explicitly incorporates the tax rate "in effect on December 31 of the Applicable Year."

The district court incorrectly concluded that "[n]othing in Appendix A expresses or even suggests that the Base Net Operating Profits is an indefinite amount that must be recalculated each year." (ROA.61341). In doing so, the court ignored the plain definition of "net operating profits," which applies the tax rate of the Applicable Year to the Base Year. The court thus ignores the text of the uniform NOP definition, which makes clear that the $3,115,100,000 figure is explicitly fixed as to everything *but* the tax rate. Instead, the court credited only the single illustrative sentence—"applying the foregoing definition, the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100"— and treated that example as a permanent value, even though the sentence itself explicitly states that the figure is dependent on the 35% tax rate of the Applicable Year in effect at the time.

In essence, the district court effectively rewrote the NOP definition, ignoring the two-step formula for calculation that requires the tax rate of the Applicable Year be applied to the Base Year and Applicable Year in favor of the figure in the illustration that concludes the paragraph, even though the illustration makes plain that it is dependent on the tax rate in the Applicable Year:

> For purposes of this Appendix, the term "net operating profits" shall mean: (1) operating income before goodwill amortization, . . . and

25

casualty losses; (all as reported to the United States securities and Exchange Commission ("SEC") for the Applicable Year . . . );

minus (2) the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) *the maximum marginal federal corporate income tax rate* (such rate being 35% as of May 1, 2001) *in effect on December 31 of the Applicable year*, plus (b) 4.472 percentage points.

Notwithstanding the foregoing, the Settling Defendants' aggregate total amount of restricting charges. . . included for purposes of clause (1) of the preceding sentence shall not in any Applicable Year exceed the Annual Restructuring Cap . . . . *Applying the foregoing definition, the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000.*

(ROA.60753-54) (emphasis added). But the district court improperly ignored all the language preceding the $3,115,100,000 value; perhaps, most importantly the caveat that the $3.115 billion figure was derived by "[a]pplying the foregoing definition." By elevating an illustrative figure over the controlling formula that generates it, the district court rewrote the amended Settlement Agreement. This Court should "decline to engraft what the parties declined to enact." *Weaver*, 939 F.3d at 626.

The plain language reading advocated by the Settling Defendants is fully consistent with the "plain, ordinary, and generally accepted meaning," *Alicea v. Curie Bldg., L.L.C.*, 632 S.W.3d 142, 153 (Tex. App—El Paso Feb. 17, 2021) (internal citation omitted), and is the only way to interpret the contract to "give effect to all of its provisions so that none will be rendered meaningless." *McLane Foodservice*, 736 F.3d at 377. As explained above, the definition of "Base Year

26

NOP" requires application of the tax rate "of the Applicable Year," and the "applying the foregoing definition" sentence illustrates how that calculation worked in 2001, when the tax rate was 35%. Read together, as Texas law requires, both provisions can only be "given effect" when fidelity is shown to the formula.

If the parties intended to fix the Base Year NOP for all time at $3.115 billion, the definition of "Base Net Operating Profit" is superfluous. Again, the State's position asks the Court to ignore the basic principle that a contract must be interpreted in harmony, giving "effect to all the provisions of the contract." *Nat'l Oilwell Varco, L.P. v. Auto-Dril Inc.*, 68 F.4th 206, 216 (5th Cir. 2023) (internal citation omitted).

Although this dispute ignited when the maximum marginal federal corporate income tax rate was decreased in 2018, this provision works both ways. If the corporate tax rate increases in the future, the Settling Defendants will appear less profitable as compared to 1997, without any regard to the companies' business performance. In that event, the result of using mismatched tax rates would reduce or even eliminate the State's entitlement to profit adjustment payments, even though the Settling Defendants may have been equally or more profitable in their cigarette business that year, as compared to the base 1997 year. The driving force of the Profit Adjustment formula, however, is the companies' operating profits on cigarettes— not the federal corporate tax rate. To allow the federal corporate tax rate artificially

to skew the operating profits undermines the core purpose of the volume and profit adjustment. *Ferrant v. Indep. Or. of Foresters*, No. 2-16-98-CV, 2017 WL 218287, at \*4 (Tex. App.—Fort Worth Jan. 19, 2017, pet. denied) ("We will not construe contracts to produce an absurd result when a reasonable alternative construction exists."). Where the parties specifically negotiated for the Settling Defendants' net operating profits to drive the calculation, the district court's adoption of a contrary interpretation that hampers that goal was improper.

## III.    THE DISTRICT COURT ERRED IN REFUSING TO CONSIDER CONTEXTUAL EVIDENCE CONCERNING NEGOTIATION OF THE 2001 AMENDMENT.

Based on its determination that the amended Settlement Agreement is unambiguous, the district court refused to consider the parties' "history of negotiating the 2001 Amendment, stating that the parties reached a compromise to include certain expenses in the base year, and in exchange, partially reduce the size of the resulting payment, and use the tax rate as a proxy for that reduction." (ROA.61342 ("the Court does not consider or see any basis to consider the negotiating history laid out by Defendants")). That ruling runs afoul of Texas law, which "does not . . . prohibit considering surrounding facts and circumstances that inform the contract text and render it capable of only one meaning." *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014).

The court accordingly should have considered contextual evidence:

A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule. The parol evidence rule applies when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements. The rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text. Those circumstances include . . . the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties.

*Houston Expl. Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011) (footnotes omitted); *accord Hoffman v. L & M Arts*, 838 F.3d 568, 581–82 (5th Cir. 2016).

"In the same way that dictionary definitions, other statutes, and court decisions may inform the common, ordinary meaning of a statute's unambiguous language, circumstances surrounding the formation of a contract may inform the meaning of a contract's unambiguous language." *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017) (citations omitted). "Contract language is thus construed in its lexical environment, which may include objectively determinable facts and circumstances that contextualize the parties' transaction." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757–58 (Tex. 2018). Here, the context confirms what the plain language already establishes: Appendix A requires the use of a single tax rate—the tax rate of the Applicable Year—for both the Base Year and Applicable Year profit calculations.

Specifically, the entire purpose of the 2001 Amendment was to resolve a variety of disputes concerning which income and expenses should be included in calculating the Settling Defendants' net operating profits; in particular, whether the substantial "Initial Payments" made in 1997 to the State should have been part of the 1997 base amount. (ROA.61204-05). The State argued that, if those one-time expenses were included, the 1997 base would be significantly lower and the annual Profit Adjustment payments would be higher. The Settling Defendants disagreed, arguing that if the payments were not included, the 1997 base would be higher, such that the annual Profit Adjustment payments due would be lower. (ROA.61205). The parties arrived at the 2001 Amendment as a *compromise*, through which the parties agreed to *include* those expenses in the base year for 1997 but, in exchange, to *partially reduce* the size of the resulting payment using the tax rate as a proxy for that reduction. (ROA.61205; ROA.60955-59). In other words, the parties specifically negotiated how the Profit Adjustment would work in actual operation, and negotiated so that the tax rate of the "Applicable Year" would apply to the net operating profits calculation for both the Base Year and the Applicable Year. (ROA.61205; ROA.60955-59). Indeed, applying disparate tax rates to the Base Year and the Applicable Year has the opposite effect: rather than reducing the size of the resulting payment as intended, the disparity increases it as compared to not applying tax rates at all.

These "surrounding circumstances . . . inform[ed] the meaning of the words the parties chose to effect their accord" and thus may "be used to give the contract a meaning consistent with that to which its terms are reasonably susceptible." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). The district court thus erred in refusing to consider contextual evidence that reinforces, rather than alters, the plain language of Appendix A; specifically, the Profit Adjustment and its negotiated use of a single tax rate.

## IV. THE PLAIN LANGUAGE OF THE ITG STATUS AGREEMENT REQUIRES ALLOCATING PROFIT ADJUSTMENT PAYMENTS FOR 2018 AND 2019 DIFFERENTLY FROM SUBSEQUENT YEARS.

The district court's ruling allocating damages between RJRT and PM USA for 2018 and 2019 contravenes the plain language of the ITG Status Agreement. (ROA.61369-92). Specifically, the district court erred by applying the allocation methodology applicable to periods beginning January 1, 2020, rather than the methodology applicable from 2015 through 2019.[5] Because the Allocation Order rewrites the parties' clear, bargained-for contractual terms, it should be reversed.

---

[5] The State took no position on the allocation of damages to be paid by each Settling Defendant, as there was no dispute about the calculation of total damages payable to the State. (ROA.61521 (quoting ROA.61468)).

31

### A. The ITG Status Agreement Treats the Allocation of Profit Adjustment Payments for 2018 and 2019 Differently From Subsequent Years.

As fully explained above, the Profit Adjustment to the Annual Payments to Texas "compares the Defendants' aggregate 'net operating profits' at two points in time—the current year for which the Annual Payment is due and the 1997 base year[.]" (ROA.61328); *see also* Argument, Point II, *supra*. The Profit Adjustment due to Texas is then allocated among the Settling Defendants based on each company's individual profitability in the applicable payment year compared to a different base year (1996, not 1997).

Under the ITG Status Agreement, ITG retroactively joined the Settlement Agreement as of June 12, 2015. (ROA.61374). Thus, ITG's volumes and profits were included in the calculation of the volume payments and the Profit Adjustment payments to the State going back to that date. This agreement was consistent with the district court's order requiring profit and volume settlement payments for the Covered Brands, now owned by ITG, and with PwC's "profit adjustment calculations based on [the district] [c]ourt's February 25, 2020 decision on the State and PM USA's motions to enforce," which calculations "already account for the Covered Brands" for the period through December 31, 2019 by combining the profits and volumes of ITG and RJRT into one volume number and one profits figure. (ROA.61376).

32

The ITG Status Agreement treats allocation for the years 2015 through 2019 differently from the years beginning in 2020. (ROA.61369-92). The parties agreed that for the period through December 31, 2019, there would be no change and they would continue to use the combined method of allocation already applied by PwC to allocate the Profit Adjustment between RJRT and PM USA in implementing the district court's February 25, 2020 Memorandum Opinion and Order. (ROA.61376). Under that method, PwC combined the Net Operating Profits of RJRT and ITG into one figure and compared the total to RJRT's 1996 full (base year) Net Operating Profit.

For allocations in 2020 forward, the ITG Status Agreement prescribes a separate allocation method, under which ITG's profits are disaggregated from RJRT's profits and ITG is ascribed a negotiated $860 million 1996 (base year) Net Operating Profit, which is subtracted from RJRT's 1996 (base year) Net Operating Profit.

The combined method for 2018 and 2019 used in PwC's initial calculation of incremental change fully accounts for and includes ITG's volume and profits for 2018 and 2019—exactly as the parties agreed—using the precise calculation methodology already determined and applied by PwC to account for ITG's volume and profits for those years. The parties expressly agreed in the ITG Status Agreement that this method would not be disturbed for the years before 2020. The district court

thus rewrote the parties' agreement by importing and applying to 2018 and 2019 the separate allocation method and the disaggregated $860 million base year Net Operating Profit that the parties explicitly negotiated and agreed would be used for only 2020 forward. The district court had no basis to disregard or redraft the parties' clear, bargained-for contractual terms.

> **1.    In the ITG Status Agreement, the Parties Agreed to Combine ITG's Volume and Profits With RJRT's Volume and Profits for 2018 and 2019.**

The ITG Status Agreement establishes the parties agreed to *not* adjust the methodology PwC had used for calculating the Net Operating Profits, including ITG's profits on the Covered Brands, and allocating Profit Adjustment payments for the period from 2015 through 2019 (including the years 2018 and 2019 at issue):

> (4) for the period from June 12, 2015 through December 31, 2019, the "profit adjustment payments" as set forth in [PwC] Notice IDs SS208 and SS209 *already account for the Covered Brands* in the profit adjustment calculations based on [the district] [c]ourt's February 25, 2020 decision on the State and PM USA's motions to enforce, *so there is no need to recalculate for those years*.

(ROA.61376) (emphasis added).

The ITG Status Agreement further provided for specified payments for the 2015-2019 period (*Id.*). Those payments do not tie to any separate base year allocation for ITG, much less an allocation of $860 million. As the agreement states, the RJRT payment "amount includes profit-adjustment payments owed to the State during this period pursuant to Notice IDs SS208 and SS209 with respect to the

34

[Settlement Agreement]," (*id*.), as RJRT had not made payments attributable to the Covered Brands under the combined allocation method pursuant to PwC Notice IDs SS208 and SS209 while the litigation was pending.

Thus, for the period 2015-2019, the parties agreed in the ITG Status Agreement to keep and use the combined method of allocation already applied by PwC to allocate the Profit Adjustment between RJRT and PM USA. That method "already account[ed] for the Covered Brands in the profit adjustment calculations[.]" (*Id*.). Under that method, PwC combined the Net Operating Profits of RJRT and ITG into one figure and compared it to RJRT's 1996 full (base year) Net Operating Profit, rather than splitting them into two separate profit figures and comparing them to two separate 1996 full (base year) Net Operating Profit amounts.

In the district court, PM USA relied on its June 1, 2021 letter to PwC submitting the ITG Status Agreement. (ROA.61393-94). But that letter further supports RJRT's position, not PM USA's. It confirms that the parties specifically agreed *not* to change the methodology used to make the calculations for the period 2015-2019 using a combined base year, stating, "PwC does not need to revise any of its prior notices or change any of its prior calculations." (ROA.61393).

### 2. The ITG Status Agreement Adopted a Different Methodology for Allocating the Profit Adjustment Beginning January 1, 2020.

Without acknowledging the ITG Status Agreement's different treatment for the period through December 31, 2019, the district court erroneously applied the methodology in Subsections 5(5) and 5(6)—including disaggregating and using $860 million as the Base Year Net Operating Profits for ITG for the Covered Brands—to allocate the "underpayments" for 2018 and 2019. But those subsections expressly apply only to the period beginning January 1, 2020 and subsequent periods.

Subsection 5(6) provides:

> (6) *for the purpose of the allocation among manufacturers pursuant to the Engagement Letter described in subsection (5) above*, PM USA, RJRT and ITG Brands will use, and RJRT and ITG Brands will report to PricewaterhouseCoopers, *$860 million* (before any adjustment for inflation) as the 1996 Net Operating Profits from domestic sales of the Covered Brands.

(ROA.61377) (emphasis added). Thus, the $860 million 1996 base year figure was to be used only "for the purpose of the allocation . . . described in subsection (5) above." *Id*.

Subsection (5) specifies the time period to which the separate allocation approach and the $860 million base year Net Operating Profits figure apply:

> (5) pursuant to the methodology set forth in the Engagement Letter, for purposes of allocating amongst the Settling Defendants (including ITG Brands) payments owed to the State based on "net operating profits"

36

*for the period beginning January 1, 2020, and in every subsequent period*:

(a) the 1996 Net Operating Profits from domestic sales of the Covered Brands shall be removed from RJRT's individual Net Operating Profit for 1996 and shall be included in ITG Brands' individual Net Operating Profit for 1996, and

(b) ITG Brands' "net operating profits" in the applicable payment year shall be the same number used for ITG Brands in calculating the aggregate Actual Net Operating Profit for that year; . . .

(ROA.61376-77) (emphasis added).

Thus, by its plain language, subsection (5) applies only to payments "for the period beginning January 1, 2020, and in every subsequent period." And because subsection (6) is limited to the "allocation . . . described in subsection (5)," the $860 million 1996 (base year) figure in subsection (6) applies only for the period beginning January 1, 2020. PM USA's advocated application of subsections 5(5) and 5(6) to 2018 and 2019—adopted by the district court—improperly rewrote the terms of its bargain.

PM USA previously argued that the ITG Status Agreement does not use the word "only" in explaining the separate allocation method for use beginning January 1, 2020, and therefore it should be applied to periods prior to 2020. This position is non-sensical. These provisions leave no doubt that one methodology (subsection (4)) applies "for the period June 12, 2015 through December 31, 2019," and a different methodology (subsections (5) and (6)) applies "for the period beginning January 1, 2020, and in every subsequent period." (ROA.61376-77). If the parties' intent had

37

been to apply the separate allocation method in subsections 5(5) and 5(6) to periods before 2020, the ITG Status Agreement would not have stated "beginning January 1, 2020, and in every subsequent period." If that had been the intent, it would have been far easier not to include years at all.

Post-2020, the parties agreed to treat ITG's profits and RJRT's profits separately. Moreover, because ITG did not own the Covered Brands in 1996 and thus had no 1996 base year Net Operating Profit, the parties agreed to use an $860 million Base Year Net Operating Profit figure for ITG only for the period beginning in 2020. The $860 million figure was a compromise the parties agreed to use for limited purposes, not a figure anyone contends reflects the "correct" 1996 Net Operating Profits attributable to the ITG-owned Covered Brands.

PM USA's June 1, 2021 letter to PwC also acknowledged contemporaneously that this separate allocation method—treating ITG's profits on the Covered Brands separately (rather than combining them with RJRT's profits) and ascribing an $860 million 1996 base year Operating Profit to ITG—applied only for all subsequent years, reiterating that "PwC does not need to revise any of its prior notices or change any of its prior calculations concerning the profit adjustment." (ROA.61394).

**B.** **The Plain Language of the ITG Status Agreement Confirms That the Post-2020 Allocation Methodology Should Not Be Applied to Profit Adjustment Payments for 2018 and 2019.**

In interpreting contracts, courts "ascertain the parties' true intent as expressed by the plain language," *Great Am. Ins. Co.*, 512 S.W.3d at 893, and "presume parties intend what the words of their contract say," *Gilbert Tex. Const., L.P.*, 327 S.W.3d at 126. The contract does not permit the approach for payments for 2020 forward to govern allocation of Profit Adjustment "underpayments" for 2018 and 2019. The plain meaning of the ITG Status Agreement's controlling contractual language leaves no doubt that the assignment of an $860 million Base Year Net Operating Profit to ITG applies only to periods beginning January 1, 2020, not before that date. That is why RJRT and PM USA agree that subsections (5) and (6) govern the allocation of payments for periods beginning in 2020 due under the district court's Liability Order. But subsections (5) and (6) do not apply to payments for 2018 or 2019.

ITG did not own the Covered Brands in 1996—the base year the Settlement Agreement uses for allocation of the Profit Adjustment. Nothing in the Settlement Agreement required that ITG, as a Settling Defendant, be assigned a separate Base NOP and receive a separate Profit Adjustment allocation from RJRT (as the Covered Brands were included in RJRT's 1996 Base NOP).

For 2018 and 2019, RJRT and PM USA neither agreed to ascribe separate profit figures to ITG and RJRT, nor ascribe an $860 million base year figure to ITG, nor remove that amount from RJRT's base year. That $860 million figure was a compromise to be used only for prospective years, not retrospective years. Accordingly, no Base Year Net Operating Profit can be assigned to ITG (or subtracted from RJRT) in allocating "underpayments" for 2018 and 2019 under the ITG Status Agreement, as reflected in PwC's initial calculations. (ROA.61411).

PM USA's argument and the district court's ruling conflict with the ITG Status Agreement, which provides that the method PwC used for allocating the Profit Adjustment for 2018 and 2019—combining ITG's profits with RJRT's into one figure—would not be changed for those years, and would be changed only for periods beginning January 1, 2020. (ROA.61376-77).The ITG Status Agreement makes clear this method is expressly intended only for years *after* 2019. (*Id.*). Thus, the very document on which PM USA relies for using the $860 million figure—the ITG Status Agreement—contradicts its argument.

The plain language of the ITG Status Agreement provides *the method PwC used in Notice IDs SS208 and SS209* to implement the Court's February 25, 2020 Memorandum Opinion and Order regarding the Covered Brands—combining RJRT's and ITG's profits into one annual figure for calculating the Profit Adjustment for 2015 through 2019, and not assigning any separate 1996 (base year)

Net Operating Profit to ITG—applies for 2018 and 2019. Neither the Settlement Agreement nor the ITG Status Agreement provides that ITG and RJRT each should have separate profit figures for those years. That is dispositive; the plain and ordinary meaning of the contract language controls. *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 888.

Accordingly, no Base Year Net Operating Profit should be assigned to ITG (or subtracted from RJRT) in allocating damages for 2018 and 2019, as reflected in PwC's original calculations of "incremental change." (ROA.61411). The district court's ruling applying retroactively the provisions of Subsections 5(5) and 5(6), including the $860 million figure, to payments for periods before January 1, 2020 is thus contrary to the parties' agreement.

> **C.  The District Court's Ruling That the Profit Adjustment for 2018 and 2019 Should Be Allocated Based on the Approach the ITG Status Agreement Specifies for the Period Beginning in 2020 Contravenes the Plain Language of the Agreement.**

The district court's Allocation Order also contravenes the plain language of the ITG Status Agreement by applying the allocation methodology for the period beginning January 1, 2020 to Profit Adjustment "underpayments" for 2018 and 2019.

The district court incorrectly presumed that the ITG Status Agreement did not answer the question of how to calculate the base year profit and allocate the Profit Adjustment for "underpayments" for 2018 and 2019, and therefore left a gap to be

41

filled. On that mistaken basis, the court concluded that the provision of the ITG Status Agreement relating to post-2020 payments should be used to fill in the supposed gap. But there is no gap. Rather, the parties agreed to use the combined allocation method for 2015 through 2019, as PwC had done, and the separate allocation method and $860 million base year figure only for the period beginning January 1, 2020. Thus, the district court did not fill a gap, but erroneously rewrote the ITG Status Agreement to apply the wrong allocation method to 2018 and 2019.

The district court framed the issue as whether ITG "should be included in the 2018 and 2019 profit adjustment calculations[.]" (ROA.61519). The brief "Analysis" section in the Allocation Order begins by focusing on the fact that the ITG Status Agreement provides that ITG's 2021 joinder in the Settlement Agreement was retroactive so "ITG is a Settling Defendant with respect to the Covered Brands as of June 12, 2015." (ROA.61523). But those issues are not in dispute at all and do not resolve the allocation issue presented to the district court.

When ITG joined the settlement is not in question. Both RJRT and PM USA agree that ITG joined the Settlement Agreement in 2021, and became a "Settling Defendant" retroactively to June 2015, and further agree that ITG's volume and profits for the Covered Brands cigarettes shall be included in the calculation of settlement payments retroactively to June 2015. The actual "dispute" is how to allocate the Profit Adjustment: the contractually-required method to be applied in

42

accounting for ITG's volume and profits and thus in allocating the Profit Adjustment payments for 2018 and 2019. Put simply, the question is: *How* are ITG's profits on the Covered Brands to be included in 2018 and 2019 for the purpose of the allocation of the Profit Adjustment between RJRT and PM USA? That is not answered by the provision of the agreement acknowledging the date of ITG's retroactive joinder, but by the two provisions addressing allocation for periods before and after January 1, 2020, respectively, and prescribing two separate allocation methods for each time period.

The ITG Status Agreement thus answers that question of how the Profit Adjustment should be allocated, simultaneously confirming that for the period through December 31, 2019, ITG's volume and profits on the Covered Brands were included and combined with RJRT's into one profit figure, just as PwC had done in "Notice IDs SS208 and SS209 [which] *already account for the Covered Brands* in the profit adjustment calculations based on [the district] [c]ourt's February 25, 2020 decision on the State and PM USA's motions to enforce, *so there is no need to recalculate for those years*." (ROA.61376) (emphasis added).

The district court's analysis rests on the erroneous premise that "[t]he ITG Status Agreement provides the methodology for allocating payments for years after 2020, but it does not limit the application of this methodology to those years." (ROA.61523). The ITG Status Agreement does limit the 2020-forward methodology

to 2020 and years after 2020. (ROA.61523). It provides for that methodology "for the period beginning January 1, 2020, and in every subsequent period[.]" (ROA.61376-77). By its plain language, a contractual provision effective "beginning" on a date certain does not apply before that date. This is particularly clear where, as here, the provision follows a provision for the methodology to be applied for the period 2015-2019. (ROA.61376).

The district court mistakenly presumed there was no method for allocation to include ITG's profits and volumes on the Covered Brands for the years prior to 2020. That is not correct. Rather, the parties agreed in the ITG Status Agreement that for the period through December 31, 2019, the allocation method with respect to ITG's profits and volumes would be the method PwC already used in Notice IDs SS208 and SS209, combining ITG's profits and volumes on the ITG-owned Covered Brands with RJRT's profits and volumes into one profit figure. (ROA.61376).

From its mistaken premise, the district court states, "the ITG Status Agreement does not provide a procedure for allocating underpayments amongst the Settling Defendants." (ROA.61524). The court proceeded to fill the perceived gap for 2015 through 2019 by incorrectly applying the methodology the ITG Status

Agreement specified for periods beginning January 1, 2020, to 2018 and 2019 (for which a different methodology was used in the ITG Status Agreement).[6]

But there is no gap. The ITG Status Agreement left PwC's allocation method in place for the years prior to 2020, and requires applying the combined allocation method already in place for those years. The district court's conclusion that because ITG joined the settlement retroactively to June 12, 2015, the Profit Adjustment for 2018 and 2019 should be allocated as if it were for the period beginning January 1, 2020 (ROA.61523-24), is inconsistent with the express terms of the ITG Status Agreement, which treats those periods differently.

The district court also offered no basis for its unsupported conclusion that the $860 million settlement figure "is an appropriate method" for allocation for 2018 and 2019. (ROA.61524). That conclusion has no basis in the ITG Status Agreement, which provides for the negotiated figure to be used only for periods beginning in 2020. The $860 million is a compromise settlement figure. As such, its applicability is limited to the purposes for which the settling parties agreed to use it. Indeed, here,

---

[6] If the district court's erroneous conclusion that the ITG Status Agreement does not address "underpayments" was correct, it would prove too much: If underpayments were not addressed, there would be no basis to apply the negotiated $860 million figure to the underpayments for years even after 2019, and the volume and profits of RJRT and ITG should be combined and treated as one company without allocation for allocating underpayments for all years, just as PwC had done before the ITG Status Agreement.

the parties specifically agreed to a different approach for the period through December 31, 2019.

The district court's concluding statement that "ITG is a Settling Defendant as of June 12, 2015—omitting it from the allocation of underpayments for 2018 and 2019 would result in an unfair windfall for RJR" (ROA.61524), reinforces the court's error. The district court apparently misapprehended that RJRT's position is that ITG's profits are excluded from the Profit Adjustment calculations allocating the "underpayments" for 2018 and 2019. But applying PwC's combined allocation method, as the initial PwC calculations did (ROA.61411), does not omit ITG from the allocation. Indeed, just the opposite. *ITG's profits on the Covered Brands were included* with RJRT's profits in a combined calculation. The calculations "already account for the Covered Brands," and those profits are included under the combined allocation method used by PwC for 2018 and 2019 and for allocating the "underpayments" the district court found. (ROA.61376).

Contrary to the district court's conclusion, the unfair windfall falls to PM USA, not RJRT, if the terms of the ITG Status Agreement are disregarded in favor of a rewritten allocation provision applying an inapposite calculation method to a facially inapplicable time period to afford PM USA a more favorable outcome than it bargained to receive. Indeed, PM USA itself explained to PwC in its June 1, 2021 letter submitting the ITG Status Agreement—a letter PM USA submitted to the

46

district court—that the parties specifically agreed *not* to change the methodology used to make the calculations for the period 2015-2019 using a combined base year:

> *Second*, PwC does not need to revise any of its prior notices or change any of its prior calculations. Rather, the parties have resolved *all disputes* regarding such prior payments separately, and will make any additional payments in connection with such resolution outside of the PwC process.

(ROA.61393) (emphasis added).

The district court's statement that "the Settling Defendants clearly did not anticipate that they would be held liable for their underpayments" (ROA.61524), ignores that the parties knew about the dispute with the states over the corporate tax rate dispute prior to agreeing to the May 2021 ITG Status Agreement, as PM USA had first raised the issue with PwC in March 2019 and it was subject to dispute. (ROA.60888 ("PwC acknowledges receipt of dispute letters" from PM USA and the State of Mississippi)). Yet as PM USA itself acknowledged in its 2021 letter to PwC, the ITG Status Agreement resolved "all disputes" between PM USA and RJRT as of that time. (ROA.61393). The parties could have provided for retroactive application of the provision treating separately the profits of ITG and RJRT, assigning to ITG a base year profit of $860 million—or some other negotiated number—and removing that amount from RJRT's base year profits, as they did for later years. But the ITG Status Agreement reflects that they did not do so.

47

For these reasons, the district court's understanding that the ITG Status Agreement "provides the methodology for allocating payments for years after 2020, but it does not limit the application of this methodology to those years" was mistaken. (ROA.61523). The agreement specifies one methodology for periods through and including 2019 (the combined methodology used by PwC to include ITG), and a different methodology for periods beginning with 2020. Thus, the ITG Status Agreement *does* "limit the application of this methodology to those years."

Because the Allocation Order is based on an erroneous premise and contravenes the parties' agreement, this Court should apply the terms of the ITG Status Agreement, which treat the allocation of the Profit Adjustment differently for 2018 and 2019 than from 2020 beyond.

## V.  THE DISTRICT COURT'S INTEREST AWARD CONTRAVENES APPLICABLE LAW.

In the Allocation Order, the district court awarded prejudgment interest accruing from the date the "underpayments" began in April 2019 and post-judgment interest from the date of the Liability Order on March 14, 2024. (ROA.61526-27). Both rulings are incorrect. Under governing Texas law, prejudgment interest runs from the filing of the State's cross-motion to enforce on May 22, 2023. Under 28 U.S.C. § 1961(a), post-judgment interest runs from the district court's Allocation Order entered March 28, 2025.

**A.  Prejudgment Interest Accrues From the Filing of the State's Cross-Motion to Enforce, Not the Dates Payments Were Due Originally.**

Because the State asserts Texas state law claims, Texas law controls the award of prejudgment interest. *See Elbar Invs., Inc. v. Prins* (*In re Okedokun*), 968 F.3d 378, 392 (5th Cir. 2020) (applying Texas state law to determine whether plaintiffs were entitled to prejudgment interest on their Texas state law claim).[7]

Texas Finance Code section 304.104 provides that "prejudgment interest accrues on the amount of a judgment during the period beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." Tex. Fin. Code § 304.104. Under common law, the courts have adopted "the Legislature's approach to prejudgment interest." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998) ("prejudgment interest begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed"); *see also Arete Partners, L.P. v. Gunnerman*, 643 F.3d 410, 414 (5th Cir. 2011).

The State first sent the Settling Defendants a letter providing written notice of a claim relating to the corporate tax rate dispute on March 2, 2023, and sent a letter to PwC on March 3, 2023. (ROA.61329). 180 days from March 2, 2023, is August

---

[7] In the district court, all parties agreed that PwC did not calculate interest under Texas law and its interest calculations do not apply. (ROA.61346).

29, 2023. The State filed its Cross-Motion to Enforce Settlement Agreement on May 22, 2023. (ROA.60971-89; ROA.60722-39). Accordingly, under governing law, prejudgment interest began accruing on *May 22, 2023* (as it is earlier than August 29, 2023).

The district court, however, ruled that "interest accrues from April 2019, when the underpayments at issue began." (ROA.61525). Notwithstanding its acknowledgment of Texas Finance Code section 304.104, the court stated the basis for its ruling was that the State "does not assert a new 'claim' or 'suit,'" but instead "simply seeks to enforce the terms of the Texas Settlement Agreement, which has already been incorporated into the original Final Judgment of this [c]ourt." (ROA.61526). The district court cited no authority to support its conclusion. Contrary to the district court's characterization, the 2023 cross-motions to enforce *did* assert a new claim. The fact that the claim arose out of a dispute over a prior contractual provision does not make this case different from other contractual disputes to which the adoption of the approach of section 304.104 for common law claims applies. And the fact that the agreement was incorporated in a prior judgment does not alter the fact that the State's claim that the Settling Defendants breached the agreement by underpaying because PwC utilized a uniform corporate tax rate in making its calculations was a "new" claim or suit.

The district court's conclusion contravenes both the plain language and the purpose of section 304.104. The State did not dispute that its March 2023 letter to the Settling Defendants relating to the corporate tax rate issue was the first instance of written notice of the State's claim. The fact that the claim related to an agreement incorporated into a prior judgment does not affect when the Settling Defendants received written notice of the claim under section 304.104. Similarly, "the date the suit is filed" under that statutory provision could not refer to the filing of the State's original lawsuit in 1996 (ROA.60726), five years before Appendix A to the 2001 Amendment and twenty-two years before the federal corporate tax rate was lowered. Nor could "the date the suit is filed" refer to the judgment incorporating the 2001 Amendment (ROA.60753-54)—that was not the filing of a suit and long preceded the corporate tax rate dispute. *See Wheelbarger v. Landing Council of Co-Owners*, 471 S.W.3d 875, 892–93 (Tex. App. 2015) (holding prejudgment interest did not run until filing of amended petition, as "the relevant date is that on which the plaintiff asserted the claim which ultimately results in a recovery"). This construction also makes sense when read in context with the rest of section 304.104, which provides that "prejudgment interest accrues on the amount of a judgment during the period beginning on . . . the date the suit is filed and ending on the day preceding the date judgment is rendered." While administratively, the cross-motions to enforce were not assigned a new docket number because of the district court's continuing

jurisdiction dating back to 1996, the dispute over the applicable corporate tax rate was a new claim or suit. Thus, under the plain language of Texas Finance Code section 304.104, prejudgment interest began to accrue on May 22, 2023, not beginning in April 2018.

The district court's ruling awarding prejudgment interest from the date of "underpayments" contravenes the purpose of requiring 180 days from "written notice of a claim" or the filing of a suit or motion asserting the claim on which the State ultimately prevailed; here, a claim seeking payment of the incremental amounts attributable to the corporate tax rate dispute.

Accordingly, the district court's ruling awarding prejudgment interest from the date of the "underpayments" was erroneous and prejudgment interest should run from May 22, 2023.[8]

### B. Post-Judgment Interest Runs From the Date of Entry of Judgment, Not the Date of the Liability Ruling.

The district court also incorrectly ruled without analysis that "postjudgment interest is appropriate for the applicable period after the [c]ourt issued its March 14, 2024 Memorandum Opinion and Order ([ROA.61326-44])." (ROA.61526). The

---

[8] "The prejudgment interest rate is equal to the postjudgment interest rate applicable at the time of judgment." Tex. Fin. Code § 304.103. As shown below, that is March 28, 2025, the date of the Allocation Order.

Liability Order, however, is not a judgment. Post-judgment interest should not commence until entry of the court's Allocation Order.[9]

"Federal law governs post-judgment interest." *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 173 (5th Cir. 2010).[10] Post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court" and "shall be calculated from the date of the entry of the judgment[.]" 28 U.S.C. § 1961(a). The Liability Order found for the State on the underlying issue of the tax rate to calculate Net Operating Profits for the Profit Adjustment portion of the annual payments and directed the parties to submit memoranda "pertaining to the issue of damages and interest[.]" (ROA.61344; *see also* ROA.61520). That order was not entry of a judgment. *See* Fed. R. Civ. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies."). The Settling Defendants could not have appealed directly from the Liability Order. Moreover, that order did not quantify damages or interest, and directed further briefing from all

---

[9]"Prejudgment interest is computed as simple interest and does not compound." Tex. Fin. Code § 304.104. *See, e.g.*, *Foretravel, Inc. v. Star City Coach Works Ltd.*, No. 9:09-CV-141, 2011 WL 13196207, at *6 (E.D. Tex. Jan. 5, 2011) (citing *Johnson & Higgins*, 962 S.W.2d at 531–32) ("The court may . . . award pre-judgment interest using the principles of common law, which . . . accrues at the same rate as post-judgment interest under Tex. Fin. Code §§ 304.003(c) and 304.103, and is calculated as simple interest."). By contrast, post-judgment interest "shall be compounded annually." 28 U.S.C. § 1961(b).

[10]The district court referred to "the statutory rate." (ROA.61528). 28 U.S.C. § 1961(a), not state law, specifies the applicable post-judgment interest rate.

parties on those issues, so the Settling Defendants could not have paid the damages and interest pursuant to a judgment at that time.

The "whole point of post-judgment interest" is "to compensate a successful plaintiff for being deprived of compensation for losses incurred between the ascertainment of damage and payment by the defendant." *Matter of Imperial Petroleum Recovery Corp.*, 84 F.4th 264, 272, 274 (5th Cir. 2023) (affirming award of post-judgment interest from the date of the judgment). The purpose of post-judgment interest is to compensate the judgment creditor for the delay in receiving payment after a court judgment is entered. *Id.*; *accord Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990) (post-judgment interest ordinarily runs "from the date of the entry of the judgment," not the date of verdict); *Krieser v. Hobbs*, 166 F.3d 736, 746-47 (5th Cir. 1999) (same). Because the Settling Defendants could not have paid the State pursuant to the Liability Order, which expressly called for further briefing on damages and interest, that purpose would not be achieved by requiring post-judgment interest (as opposed to the continuing accrual of prejudgment interest) from the March 14, 2024 Liability Order to the March 28, 2025 Allocation Order quantifying damages. Accordingly, the Court should reverse the district court's ruling awarding post-judgment interest from March 14, 2024, as opposed to March 28, 2025.

**CONCLUSION**

RJRT requests the Court to: (i) reverse the Memorandum Order concerning liability as inconsistent with the plain language of the amended Settlement Agreement, and the Memorandum Order concerning damages entered by the district court, and the award of pre- and post-judgment interest; (ii) remand with directions to vacate those orders and enter final judgment granting RJRT's motion to enforce the Settlement Agreement; and (iii) grant such other and further relief as the Court shall deem appropriate.

Respectfully submitted,

Elli Leibenstein
Greenberg Traurig, LLP
360 North Green Street, Suite 1300
Chicago, IL 60607
Telephone: 312.456.8400
Facsimile: 312.456.8435

Stephen Saxl
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, New York 10017
Telephone: 212.801.9200
Facsimile: 212.801.6400

Elliot H. Scherker
Brigid F. Cech Samole
Bethany J. M. Pandher
Greenberg Traurig, P.A.
Wells Fargo Center, Suite 4400
333 Southeast Second Avenue
Miami, Florida 33131
Telephone: 305.579.0500
Facsimile: 305.579.0717

Rene Trevino
Greenberg Traurig, LLP
1000 Louisiana Street, Suite 6700
Houston, Texas 77002
Telephone: 713.374.3500
Facsimile: 713.374.3505

*Counsel for R.J. Reynolds Tobacco Company*

## CERTIFICATE OF SERVICE

This is to certify that the foregoing brief has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on July 23, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

_/s/ Elliot H. Scherker_
Elliot H. Scherker

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B) because:

- this brief contains 12,849 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief also complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type requirements of Fed. R. App. P. 32(A)(6) because:

- this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with a 14-point font names Times New Roman

/s/ Elliot H. Scherker
Elliot H. Scherker

*Counsel for R.J. Reynolds Tobacco Company*
