Case No. 25-40233

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF TEXAS,

*Plaintiff-Appellee*,

v.

R.J. REYNOLDS TOBACCO COMPANY,

*Defendant-Appellant*,

and

PHILIP MORRIS, INCORPORATED,

*Defendant-Appellant & Appellee.*

On appeal from the United States District Court
for the Eastern District of Texas

## BRIEF OF APPELLEE PHILIP MORRIS USA INC.

Christopher Odell
700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
Arnold & Porter Kaye Scholer, LLP
Telephone: 713.576.2400
Facsimile: 713.576.2499

Alexander Shaknes*
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: 212.836.8000
Facsimile: 212.836.8689

Daniel Bernstein
Megan Pieper*
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: 202.942.5000
Facsimile: 202.942.5999

*Counsel for Philip Morris USA Inc.*

## CERTIFICATE OF INTERESTED PERSONS

Case No. 25-40233
*State of Texas v. R.J. Reynolds Tobacco Company, et al.*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

1.     District Judge Rodney Gilstrap

2.     State of Texas

3.     Office of the Attorney General of Texas

4.     R.J. Reynolds Tobacco Company

5.     Greenberg Traurig, LLP

6.     ITG Brands, L.L.C.

7.     Patton, Tidwell & Culbertson, LLP

8.     Baker & Hostetler LLP

9.     Arnold & Porter Kaye Scholer LLP

10.    Wachtell, Lipton, Rosen & Katz

11.    Siebmann, Forrest, Burg & Smith, LLP

*/s/ Christopher M. Odell*
Christopher M. Odell

*Counsel for Philip Morris USA Inc.*

i

## STATEMENT REGARDING ORAL ARGUMENT

Philip Morris USA Inc. ("Philip Morris" or "PM USA") previously requested oral argument in its opening Appellant Brief related to liability in this litigation, which arises from a landmark settlement agreement under which Philip Morris and other major tobacco companies ("Settling Defendants") have paid billions of dollars to the State of Texas and will continue to make large annual payments to the State of Texas in perpetuity.

Philip Morris also requests oral argument on the specific damages allocation issue presented here (an issue as to which Philip Morris is an Appellee). Counsel for Philip Morris has long-standing familiarity with the contracts and the payment allocations at issue. Given the complexity of the multi-party litigation and the amounts at stake, Philip Morris believes that oral argument will aid the Court in resolving the dispute.

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................... 1

STATEMENT OF THE ISSUES ........................................................................ 4

STATEMENT OF THE CASE ........................................................................... 4

I.    Factual Background ................................................................................. 4

    A.    The Texas Settlement ................................................................... 4

    B.    The ITG Status Agreement ........................................................... 5

    C.    Instructions to PwC Regarding the ITG Status Agreement .................. 7

II.   Proceedings Below ................................................................................. 8

SUMMARY OF THE ARGUMENT .................................................................. 10

ARGUMENT ..................................................................................................... 12

I.    The District Court Correctly Applied the ITG Status Agreement to the Allocation Dispute Between Philip Morris and RJR ..................................... 12

    A.    The Plain Language of the ITG Status Agreement Requires ITG to Be Included as a Settling Defendant In All Profit Adjustment Calculations as of June 2015, Including Calculations for 2018-2019 ..................... 12

    B.    RJR's Interpretation Fails to Harmonize All the Provisions of the ITG Status Agreement, Including Provisions Requiring Additional Payments for 2018-2019 to Account for ITG as a Settling Defendant ................. 15

    C.    It Is RJR, Not the District Court, That Rewrites the Terms of the ITG Status Agreement ..................................................................... 19

II.   Persuasive Authority on a Virtually Identical Issue in Minnesota Further Supports Philip Morris's Interpretation of the ITG Status Agreement ........... 21

III.  The Correspondence Cited By RJR Confirms Philip Morris's Interpretation of the ITG Status Agreement ................................................................... 23

CONCLUSION ................................................................................................. 27

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Austin Tr. Co. v. Houren*,
　664 S.W.3d 35 (Tex. 2023)................................................................. 15, 20

*Coker v. Coker*,
　650 S.W.2d 391 (Tex. 1983)..................................................................... 15

*Kachina Pipeline Co. v. Lillis*,
　471 S.W.3d 445 (Tex. 2015).............................................................. 12, 23

*In re Matters Involving the Minn. Tobacco Settlement*,
　No. 62-CV-18-1912 (Minn. Dist. Ct. Oct. 2, 2025)......................... 21, 22, 23, 26

*Murphy Expl. & Prod. Co.-USA v. Adams*,
　560 S.W.3d 105 (Tex. 2018)..................................................................... 12

*SAS Inst., Inc. v. Breitenfeld*,
　167 S.W.3d 840 (Tex. 2005)..................................................................... 20

## INTRODUCTION

Appellee Philip Morris submits this brief in response to R.J. Reynolds Tobacco Company's ("RJR") appeal of the district court's order concerning allocation of liability (the "Allocation Order") for underpayments pursuant to the Texas Tobacco Settlement Agreement ("Texas Settlement").[1]

Philip Morris and RJR agree on the aggregate amounts they owe to Texas under the Liability Order for each year at issue (2018-2022). And they agree on the formula for allocating those aggregate amounts among the Settling Defendants. The result of applying that formula depends, however, on whether another company—ITG Brands, LLC ("ITG"), a later-joining party to the Texas Settlement—is included in the annual calculations as one of the Settling Defendants.

The dispute over treatment of ITG stems from RJR's sale of certain brands to ITG in 2015 for $7 billion. After that sale, both RJR and ITG refused to continue making settlement payments on those brands. Philip Morris and the State of Texas then moved the district court to compel the payments. In 2020, the district court issued an order requiring RJR to continue making settlement payments on those brands. A year later, ITG agreed to join the Texas Settlement, retroactively as of 2015, the date it acquired RJR's brands.

---

[1] Philip Morris in its opening Appellant brief separately urged reversal of the district court's liability order ("Liability Order"). If the Liability Order is reversed, then the Allocation Order—and the issues raised in this Appellee brief—are moot. But if the Liability Order is affirmed, the Allocation Order should be affirmed as well.

The parties' agreement with respect to ITG joining the Texas Settlement was memorialized in the May 21, 2021 Notice Regarding ITG Brands, LLC's Status Under the Texas Tobacco Settlement Agreement and Agreement Resolving Disputes Thereunder ("ITG Status Agreement"), filed with the district court. RJR and Philip Morris agree that the ITG Status Agreement controls the issue of *when* ITG should first be included as a Settling Defendant in calculating the allocation of payments.

Philip Morris's position is straightforward and in full accord with all the provisions of the ITG Status Agreement. That Agreement is clear and unambiguous, stating multiple times that ITG shall be treated as a Settling Defendant *for all purposes* under the Texas Settlement—*specifically and explicitly including* the calculation of payment allocations at issue here—as of June 2015. Accordingly, for purposes of allocating the payments due pursuant to the Liability Order, ITG should be included as a Settling Defendant for all the years at issue here—2018-forward.

RJR agrees that ITG should be included as a Settling Defendant for 2020-forward, but argues that ITG somehow should *not* be included for 2018 and 2019. RJR misplaces reliance on an inapposite provision of the ITG Status Agreement that directs a jointly retained accounting firm to include ITG in payment calculations on a going-forward basis, but not to perform recalculations for prior years (2015-2019).

RJR disregards other contract provisions that specifically acknowledge that the parties themselves made recalculations for the preceding years (2015-2019) and would be making the resulting additional payments to account for ITG's retroactive joinder

2

as of 2015. Those contract provisions make clear that ITG was to be included in the calculations as of 2015, and who recalculated the prior payments—an accounting firm or the parties themselves—does not and cannot change that fact.

RJR makes another red-herring argument, pointing out that, following the district court's 2020 order that RJR must continue paying Texas on the brands it sold to ITG, those brands were included in settlement payment calculations by treating them as if they were still RJR's. But those calculations predated the 2021 ITG Status Agreement which made ITG one of the Settling Defendants as of 2015. The question here is not whether ITG's *brands* are included as part of RJR's but as of what date ITG *itself* should be included in calculations as a Settling Defendant, with its *own* volumes and profits and any corresponding payment liability. And on that question, the controlling agreement could not be clearer—2015, the date ITG acquired its brands.

The district court therefore correctly ruled that "ITG is a Settling Defendant as of June 15, 2015" and that "omitting it from the allocation of underpayments for 2018 and 2019 would result in an unfair windfall for RJR." Since then, a state court in Minnesota has reached the same conclusion on an identical allocation issue pursuant to an analogous ITG Status Agreement in Minnesota. The district court's Allocation Order should be affirmed.

**STATEMENT OF THE ISSUES**

The issue presented in this brief is:

1.     Did the district court correctly determine that ITG should be included as a Settling Defendant in the calculation of profit adjustment allocations for the years 2018 and 2019, when the parties expressly agreed that ITG would be treated as a Settling Defendant from June 2015 forward?

**STATEMENT OF THE CASE**

## I.     FACTUAL BACKGROUND

Philip Morris sets forth the following factual background relevant to the dispute over allocation of damages between Philip Morris and RJR.   For additional background on the Texas Settlement and the payments owed thereunder, Philip Morris refers the Court to its principal Appellant's brief.

### A.     The Texas Settlement

In 1998, the State of Texas and major tobacco companies, including Philip Morris and RJR, resolved litigation through a settlement agreement (together with amendments, the "Texas Settlement") that requires the Settling Defendants to make annual payments to the State in perpetuity.  PM USA Appellants' Br., ECF No. 39 at 4.  Under the Texas Settlement, the payments owed to the State each year are first calculated in the aggregate and then allocated among the Settling Defendants. ROA.60877.

To determine aggregate Annual Payments, an $8 billion "Base Payment" is adjusted for inflation, cigarette sales volume, and profits from cigarette sales. Texas is entitled to 7.25% of the resulting amount. ROA. 60772-60773. That amount is then allocated among the Settling Defendants based on an agreed-upon formula.

That allocation formula was applied without dispute until, in June 2015, RJR sold four cigarette brands to ITG for $7 billion. *See* ROA.61370. RJR then refused to make settlement payments on those brands, arguing it no longer had them. *See* ROA.56032. ITG also refused to make payments on its newly acquired brands, arguing it was not a party to the Texas Settlement. *See* ROA.56032; ROA.57642.

Philip Morris and Texas moved the district court to compel settlement payments on the brands RJR sold to ITG. ROA.55146-55166; ROA.56025-56043. In 2020, the court agreed and ruled that RJR was required to continue paying for those brands as if they were still RJR's. ROA.59943-59944. That decision resolved the question of whether volumes and profits for ITG's brands should be included in payment calculations under the Texas Settlement, by assigning those volumes and profits to *RJR*. But the 2020 decision did not make ITG *a Settling Defendant*.

## B.    The ITG Status Agreement

On May 21, 2021, ITG agreed to join the Texas Settlement as a third Settling Defendant going back to June 2015, the date it acquired its brands from RJR. The joinder was formalized in the ITG Status Agreement. ROA.61369-61392. The ITG Status Agreement, filed with the district court, lays out the parties' agreement

5

regarding payments to Texas and directly addresses allocation of the Profit Adjustment among Settling Defendants in light of ITG's retroactive joinder to the Texas Settlement.

According to the ITG Status Agreement, "as of June 12, 2015, ITG Brands was assigned and assumed all obligations and benefits under the Texas Tobacco Settlement Agreement with respect to the Covered Brands."[2] *Id.* § 1 (ROA.61373). Indeed, the ITG Status Agreement makes clear that:

> With respect to the Covered Brands, ITG Brands shall be treated as a Settling Defendant under the Texas Tobacco Settlement Agreement, shall be bound and governed by the Texas Tobacco Settlement Agreement and the Consent Order, and shall have the obligations under and receive the benefits of the Texas Tobacco Settlement Agreement and the Consent Order, including for the avoidance of doubt the release therein, from and after June 12, 2015.

*Id.* § 3 (ROA.61374).

The ITG Status Agreement also sets forth the parties' agreement to "resolve the dispute among RJRT, PM USA, and ITG Brands regarding the allocation among manufacturers of the profit adjustment." *Id.* § 5(1) (ROA.61376). Section 5 of the ITG Status Agreement provides that "ITG Brands shall be treated as a Settling Defendant for purposes of adjusting the Applicable Base Year Payment required by the terms of" the Texas Settlement. *Id.* In addition, the parties agreed that ITG's Base Year profit for the Covered Brands was $860 million:

---

[2] The "Covered Brands" are the brands ITG acquired from RJR.

[F]or the purpose of the allocation among manufacturers [of the Profit Adjustments] pursuant to the Engagement Letter described in subsection (5) above, PM USA, RJRT and ITG Brands will use, and RJRT and ITG Brands will report to PricewaterhouseCoopers, **$860 million** (before any adjustment for inflation) as the 1996 Net Operating Profits from domestic sales of the Covered Brands.

*Id.* § 5(6) (emphasis added) (ROA.61377).

The ITG Status Agreement, moreover, specifies that certain payment amounts for past years (pre-2021) would be recalculated by the parties themselves. In particular, the Agreement refers to specific payments to be made to Texas in 2021 for past years, including additional "annual payment amounts due for 2015 to 2019" and amounts "the Parties have recalculated" with respect to payments already made for 2020. *See id.* § 4 (ROA.61375).

The ITG Status Agreement further provides that PricewaterhouseCoopers ("PwC"), the independent accounting firm jointly retained by the parties to calculate payments under the Texas Settlement, would perform calculations going forward, consistent with the ITG Status Agreement. *Id.* § 5 (ROA.61377).

### C.     Instructions to PwC Regarding the ITG Status Agreement

On June 1, 2021, Philip Morris provided the ITG Status Agreement and instructions for its application to PwC. ROA.61393-61394. As Philip Morris explained, the ITG Status Agreement directed PwC to include ITG as a Settling Defendant in all calculations on a going-forward basis, while the parties themselves had recalculated past payments in accordance with the ITG Status Agreement and would make the resulting additional payments. ROA.61393 ("PwC does not need to

revise any of its prior notices or change any of its prior calculations. Rather, the parties have resolved all disputes regarding such prior payments separately, and will make any additional payments in connection with such resolution outside of the PwC process…."). All parties agreed with the Instruction Letter; no one disputed it.

As directed in the Instruction Letter, PwC has performed Profit Adjustment calculations pursuant to the ITG Status Agreement, accounting for the Covered Brands by including ITG in the calculations as a Settling Defendant and assigning to ITG the agreed-upon Base Year profit of $860 million. *See* ROA.61395.

## II.   PROCEEDINGS BELOW

On March 14, 2024, the district entered a Memorandum Opinion and Order resolving a dispute over how the federal corporate tax rate, which changed in 2018, affects the calculation of Profit Adjustment payments owed to the State under the Texas Settlement. ROA.61326-61344 ("Liability Order"). That order, which Philip Morris has appealed, found the Settling Defendants liable for underpayments to the State for the years 2018-2022. ROA.61326-61327. It also directed the parties to brief issues relating to damages and interest. ROA.61344.

The parties all agreed on the total amount of underpayments owed to the State for each of the years 2018-2022 pursuant to the district court's Liability Order. *See* ROA.61520. The parties also agreed that, based on the numbers that go into the Profit Adjustment calculations for those years, only Philip Morris and RJR are liable for additional payments. Furthermore, Philip Morris and RJR agreed on how that

incremental Profit Adjustment liability should be allocated between them for the years 2020 forward. *See* ROA.61520-61521. They disagreed, however, on how the liability for 2018 and 2019 should be allocated. *See* ROA.61521-61523.

Specifically, Philip Morris and RJR disagreed as to whether the ITG Status Agreement, which makes ITG a Settling Defendant as of 2015, requires ITG to be included as a Settling Defendant in Profit Adjustment allocation calculations for 2018 and 2019. While Philip Morris argued that ITG should consistently be included as a Settling Defendant in calculations for all years at issue (2018-forward), RJR contended that calculations for 2018 and 2019 should be performed differently from subsequent years, without ITG included as a Settling Defendant.[3]

On July 17, 2024, the district court held a hearing relating to allocation of damages and interest. At the hearing, counsel for ITG stated that ITG "agrees with Philip Morris that it joined effective June 12th, 2015, and it agrees that it should be included in the calculations given that, and that the base year for the profit adjustment for those calculations should be $860 million." ROA.86360. ITG's counsel further described the history of payments made pursuant to the ITG Status Agreement, noting "that the parties internally calculated the sort of back years, the years before 2020" and that "ITG paid back payments based on that recalculation." ROA.86361.

On March 28, 2025, the district court issued a Memorandum Opinion and

---

[3] Because the aggregate amount of incremental Profit Adjustment payments due under the Court's Liability Order was not in dispute, the State took no position on how responsibility for those payments should be allocated between Philip Morris and RJR. *See* ROA.86359.

Order ruling in Philip Morris's favor on the issue of how to allocate underpayment liability for the years 2018-2019. ROA.61519-61527. The district court began with the premise that "the ITG Status Agreement is unambiguous: ITG is a Settling Defendant with respect to the Covered Brands of as of June 12, 2015." ROA.61523 (opinion) (citing ITG Status Agreement §§ 1, 3). The court then found that:

> [The allocation methodology found in Section 5 of the ITG Status Agreement is an appropriate method for allocating underpayment liability amongst the Settling Defendants. ITG is a Settling Defendant as of June 15, 2015—omitting it from the allocation of underpayments for 2018 and 2019 would result in an unfair windfall for RJR.

ROA.61524. Accordingly, the court required that allocation of underpayments for the years 2018 and 2019 be calculated in the same manner as the years 2020 forward, with ITG assigned a base-year profit of $860 million. *See id.*

## SUMMARY OF THE ARGUMENT

The district court's Allocation Order correctly applied the plain language of the ITG Status Agreement, which governs the present dispute over allocation of underpayments due pursuant to the court's Liability Order.

In the ITG Status Agreement, the parties agreed that ITG would be treated as a Settling Defendant for all purposes under the Texas Settlement as of June 2015. Indeed, in the "belt and suspenders" approach to contract drafting, the ITG Status Agreement then provides that, "for the avoidance of doubt," that treatment specifically applies to allocation of Profit Adjustments—the very issue here. Accordingly, for purposes of allocating the additional Profit Adjustment payments

10

due pursuant to the district court's Liability Order, ITG should be included as a Settling Defendant in the calculations for all the years at issue (2018-forward).

In contrast, RJR's interpretation is directly contrary to the ITG Status Agreement. Not only does RJR ignore the clear mandate that ITG shall be treated as Settling Defendant from 2015 on, but it also does not (and cannot) account for other provisions reflecting the parties' express agreement to recalculate and make additional payments for prior years, including 2018 and 2019, on account of ITG retroactively joining the Texas Settlement.

If RJR were correct that ITG did not need to be included retroactively, there would be no need for recalculating prior payments and no resulting additional payments to make. And yet, it is indisputable that the parties did recalculate prior payments (including 2018-2019) and did make additional payments resulting from those recalculations. In short, RJR's contention that one allocation method should apply to years before 2020 and another should apply to subsequent years is unsupported by the ITG Status Agreement and inconsistent with all the contemporaneous correspondence that RJR invokes.

The question on allocation is as of what date ITG should be included in the calculations *as a Settling Defendant*—i.e., as a separate entity with its own volumes and profits. And the governing ITG Status Agreement, as well as all the other contemporaneous documents, including the parties' instructions to PwC, provide a clear answer: ITG became *a Settling Defendant for all purposes* as of June 2015.

11

**ARGUMENT**

### I.   THE DISTRICT COURT CORRECTLY APPLIED THE ITG STATUS AGREEMENT TO THE ALLOCATION DISPUTE BETWEEN PHILIP MORRIS AND RJR

The parties agree that the May 21, 2021 ITG Status Agreement governs the present dispute over allocation of underpayments found by the district court. As explained below, the district court's Allocation Order properly interpreted that agreement and required the underpayments to be calculated using the same, consistent method for all the years at issue (2018-2022).

#### A.   The Plain Language of the ITG Status Agreement Requires ITG to Be Included as a Settling Defendant In All Profit Adjustment Calculations as of June 2015, Including Calculations for 2018-2019

To interpret the parties' contract, courts "must ascertain the true intentions of the parties as expressed in the writing itself." *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) (quoting *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011)); *see also Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018) (same).

The ITG Status Agreement expressly states that ITG shall be treated as a Settling Defendant from the date it acquired the Covered Brands:

> RJRT, ITG Brands, the State, and PM USA agree that ***as of June 12, 2015**, ITG Brands was assigned and assumed all obligations and benefits under the Texas Tobacco Settlement Agreement* with respect to the Covered Brands. For the avoidance of doubt, this assignment also includes *all obligations and benefits under the Engagement Letter*….

12

ROA.61373 (ITG Status Agreement § 1 (emphasis added)).  The Engagement Letter referenced in this quote is the December 2, 2002 PwC Engagement Letter, which specifies the general method for allocating the Profit Adjustments among the Settling Defendants.

For the avoidance of doubt as to what date ITG should be considered a Settling Defendant, the ITG Status Agreement makes the point more than once:

> With respect to the Covered Brands, ITG Brands shall be treated as a Settling Defendant under the Texas Tobacco Settlement Agreement, shall be bound and governed by the Texas Tobacco Settlement Agreement and the Consent Order, and *shall have the obligations under and receive the benefits of the Texas Tobacco Settlement Agreement and the Consent Order, including for the avoidance of doubt the release therein, from and after **June 12, 2015***.

ROA.61374 (ITG Status Agreement § 3 (emphasis added)).  Thus, as the district court's Allocation Order correctly found, the ITG Status Agreement is "unambiguous" that "ITG is a Settling Defendant with respect to the Covered Brands as of June 12, 2015."  ROA.61523.  *See also* RJR Br. at 32 ("Under the ITG Status Agreement, ITG retroactively joined the Settlement Agreement as of June 12, 2015.").

The ITG Status Agreement specifically applies this principle with respect to Profit Adjustment payment allocation.  Section 5 sets forth the parties' agreement to "resolve the dispute among RJRT, PM USA, and ITG Brands regarding the allocation among manufacturers of the profit adjustment."  ROA.61376.  In Section 5, the parties agreed that ITG should be included as one of the Settling Defendants for purposes of calculating and allocating profit adjustments due to Texas:  "ITG Brands shall be

treated as a Settling Defendant for purposes of adjusting the Applicable Base Year Payment required by the terms of Paragraph 10 of the Texas Tobacco Settlement Agreement and Appendix A as set forth in the 2001 Amendment." ROA.61376.

The parties further agreed that the accounting firm PwC would apply this approach to its Texas Settlement payment calculations on a going-forward basis, while the parties themselves had recalculated the prior payments and would make the resulting additional payments without involving PwC. *Compare* ITG Status Agreement § 5(5) (specifying what PwC would do on a going-forward basis) (ROA.61376-61377); *with id.* § 4(b) (stating that "the Parties have recalculated" a prior payment "to include ITG Brands as a Settling Defendant") (ROA.61375); *id.* § 4(c) (providing, in the year 2021, for additional "payment amounts due for 2015 to 2019") (ROA.61375); and *id.* § 21 (setting forth additional payments to be made by the Settling Defendants on account of Profit Adjustments and specifying that "no adjustment or recalculation of those settlement payments shall be made by PricewaterhouseCoopers on account of the payments referred to in this Paragraph") (ROA.61383-61384).

As the district court observed, the ITG Status Agreement, in provisions addressing PwC's future calculations, "provides the methodology for allocating payments for years after 2020, but it does not limit the application of this methodology to those years." ROA.61523 (citing ITG Status Agreement §§ 4, 5). The district

court's observation was correct.  The ITG Status Agreement nowhere states that the methodology spelled out for years after 2020 applies *only* to years after 2020.

The district court therefore appropriately held that ITG should be included as a Settling Defendant, with an assigned Base Year (1996) profit of $860 million, when calculating the allocation of underpayments owed to the State for 2018 and 2019. ROA.61523-61524.  As the court pointedly stated:  "ITG is a Settling Defendant as of June 12, 2015—omitting it from the allocation of underpayments for 2018 and 2019 would result in an unfair windfall for RJR."  ROA.61524.

### B.    RJR's Interpretation Fails to Harmonize All the Provisions of the ITG Status Agreement, Including Provisions Requiring Additional Payments for 2018-2019 to Account for ITG as a Settling Defendant

Under Texas law, a court must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless."  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis in original); *see also Austin Tr. Co. v. Houren*, 664 S.W.3d 35, 42 (Tex. 2023) ("Contract terms cannot be viewed in isolation; each provision must be considered in the context of the contract as a whole.").

Here, Philip Morris's—and the district court's—interpretation of the ITG Status Agreement harmonizes all its provisions.  RJR not only fails to do so, but it also does not and cannot explain most of the applicable provisions, instead cherry-picking one inapposite provision in a misplaced attempt to justify its position.

15

Seizing on isolated contract language, RJR contends that the ITG Status Agreement "treats allocation for the years 2015 through 2019 differently from the years beginning in 2020." RJR Br. at 33. To be sure, the ITG Status Agreement differentiates between *who* would recalculate prior payments to account for ITG's joinder of the Texas Settlement as of 2015 (the parties themselves) and *who* would calculate payments with ITG included as a Settling Defendant going forward (PwC). *See supra* at 14 (discussing ITG Settlement Agreement §§ 4, 5, 21). But, contrary to RJR's assertion, the parties *never* "agreed that for the period through December 31, 2019, there would no change" as a result of the ITG Status Agreement and that a "separate allocation method" would apply only for "2020 forward" (RJR Br. at 33).

Quite the contrary: In the 2021 ITG Status Agreement, the parties not only agreed that ITG would be treated as a Settling Defendant retroactively to 2015, but they also expressly agreed to recalculate prior payments and make additional payments for prior years to reflect that change in ITG's status as of 2015. *See, e.g.*, ITG Status Agreement § 4(b) (stating that "the Parties have recalculated" a prior payment "to include ITG Brands as a Settling Defendant" and that, as a result, "additional payments" were due to the State in 2021); *id.* § 4(c) (providing, in the year 2021, for additional "payment amounts due for 2015 to 2019"). RJR fails to account for these provisions: If RJR were right that the ITG Status Agreement made "no change" for

16

2015-2019, then there would have been no need and no room for any "recalculations" or "additional payments" on account of the ITG Status Agreement.[4]

The ITG Status Agreement also specifically provides, in a section on allocation of the Profit Adjustment among manufacturers, that "ITG Brands shall be treated as a Settling Defendant for purposes of adjusting the Applicable Base Year Payment required by the terms of" the Texas Settlement. *Id.* § 5(1). This section 5(1), by its own terms, is not limited to the years 2020 and after. RJR fails to give effect to this provision as well.

Moreover, the language on which RJR relies in Section 5(4) is entirely consistent with Philip Morris's interpretation. Section 5(4) states that "for the period June 12, 2015 through December 31, 2019, the 'profit adjustment payments' as set forth in [PwC] Notice IDs SS208 and SS209 already account *for the Covered Brands* in the profit adjustment calculations based on [the District] Court's February 25, 2020 decision on the State and PM USA's motions to enforce, so there is no need to recalculate for those years." ROA.61376 (emphasis added).

This statement is unremarkable. The district court's 2020 decision found that ITG's *volumes and profits on the Covered Brands* should be included in the payment calculations as if they were still RJR's. They were thus included in PwC's calculations as part of RJR's volumes and profits. But the 2020 decision did not make ITG a

---

[4] As discussed *infra* at 18-19, the correspondence cited by RJR confirms that the parties recalculated and made additional payments for prior years (including 2018-2019) on their own, outside the PwC process, to effectuate the ITG Status Agreement.

*Settling Defendant*, with its own volumes and profits and corresponding liability for settlement payments.[5]

It was in 2021, through the ITG Status Agreement, that ITG became a Settling Defendant under the Texas Settlement. The ITG Status Agreement established that ITG—now a Settling Defendant, co-equal with Philip Morris and RJR—would be included in the calculations as a separate entity, with its own volumes and profits, and its own liability for settlement payments. *See* ITG Status Agreement §§ 1, 3, 5(1)).[6] Thus, the Agreement necessitated additional payments for prior years, back to 2015 (*see id.* §§ 4(b), 4(c), 21)—additional payments that RJR fails to explain.[7]

The language on which RJR relies in Sections 5(5) and 5(6) of the ITG Status Agreement is also in harmony with Philip Morris's interpretation. Those Sections, which expressly reference the PwC Engagement Letter, describe what the ITG Status Agreement requires PwC to do on a going-forward basis, "for the period beginning January 1, 2020 and in every subsequent period."[8] As the district court correctly

---

[5] Mechanically, PwC had two lines in payment calculations: one for Philip Morris and one for RJR, with both RJR's and ITG's volumes and profits included on the same line, as if both were RJR's.

[6] Mechanically, this meant there would now be three, rather than two, lines in calculations: one for Philip Morris; one for RJR with its own volumes and profits; and one for ITG with its own volumes and profits.

[7] Inclusion of ITG as a Settling Defendant has an impact on all payment calculations, including allocation of the Profit Adjustment because of the effect on RJR's profits. Assigning profits to ITG rather than RJR in the Base Year, when profits on the Covered Brands were relatively high, makes RJR's current-year profits comparatively higher, with consequences for allocation among the Settling Defendants.

[8] At the time of the May 21, 2021 ITG Status Agreement, certain payments had been made for the year 2020 and certain had not. *See id.* § 4(b) (stating that "[f]or the year 2020, on which the State

observed, the ITG Status Agreement "does not limit the application of this methodology to those years."  ROA.61523 (citing ITG Status Agreement §§ 4, 5).

Finally, as a Settling Defendant, ITG (like the other two Settling Defendants) has to be assigned a "Base Year" (1996) profit amount for purposes of allocating profit adjustments among the Settling Defendants.  The only Base Year profit amount reflected in the ITG Status Agreement is $860 million.  *See* ITG Status Agreement § 5(6).  That profit is for 1996, and it does not change depending on whether the calculation is done for 2018, 2019, 2020, or any other year.

RJR's assertion that the $860 million figure was a compromise (RJR Br. at 38) is irrelevant.  Not only is it the number for 1996 on which the parties agreed, but it was also the number the parties themselves used in recalculating past payments for 2015-2019.  ROA.86360-86361 (Hearing Tr. (July 17, 2024 E.D. Tex.) at 6:12-17, 7:2-16).  Accordingly, the district court appropriately held RJR to its agreement to treat ITG as a Settling Defendant as of 2015, with a base-year profit of $860 million.  ROA.61524.

### C.     It Is RJR, Not the District Court, That Rewrites the Terms of the ITG Status Agreement

While RJR acknowledges the proper allocation method by applying it to payments for 2020 forward, RJR asks this Court to calculate payments for 2018 and 2019 in the way the Profit Adjustments had been allocated *before* the parties'

---

has already received partial payments . . . the Parties have recalculated the annual settlement payments due to the State for 2020 to include ITG Brands as a Settling Defendant").

agreement on ITG's joining the Texas Settlement.  That is obviously incorrect:  The ITG Status Agreement does not provide for two different allocation methods, one with ITG included as a Settling Defendant and one without.

To the contrary, the ITG Status Agreement clearly provides that ITG became a Settling Defendant as of 2015—the date ITG acquired the Covered Brands from RJR—for all purposes.  *See supra* at 12-15.  The district court therefore properly found that it was appropriate to apply the sole allocation methodology articulated in the contract to payments for the years 2018-2019, as well as to payments for subsequent years.  ROA.61523-61524.

RJR's professed concerns about the district court's supposed "gap filling" (RJR Br. at 41-42, 44-45) are misguided.  While it is true that the ITG Status Agreement (entered in 2021) does not explicitly address the specific underpayments currently at issue (first found by the court in 2024), the law does not require a contract to spell out every possible future contingency in order to be given effect.  Rather, when interpreting a contract, courts ascertain the parties' intent from the language of the entire agreement.  *See Austin Tr. Co.*, 664 S.W.3d at 42 ("Our primary concern when interpreting contract language is to give effect to the parties' intentions, as expressed in the contract language . . . in the context of the contract as whole."); *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) ("The intent of a contract is not changed simply because the circumstances do not precisely match the scenarios anticipated by the contract"; a court will give effect to the agreement's "clear intent.").

20

Here, the intent of the ITG Status Agreement is clear: to treat ITG as a Settling Defendant for all purposes as of 2015—and this necessarily means treating ITG as a Settling Defendant in calculations for 2018 and 2019.

## II.　PERSUASIVE AUTHORITY ON A VIRTUALLY IDENTICAL ISSUE IN MINNESOTA FURTHER SUPPORTS PHILIP MORRIS'S INTERPRETATION OF THE ITG STATUS AGREEMENT

The court below is not the only court to rule on the dispute between Philip Morris and RJR over the allocation of increased Profit Adjustment payments to a State. As in Texas, Philip Morris and RJR agreed to make annual payments to Minnesota in perpetuity. And like the Texas Settlement, the Minnesota settlement was amended in 2021 to provide for joinder of a new Settling Defendant, ITG.

Philip Morris and RJR litigated the same issue of Profit Adjustment allocation in Minnesota under a virtually identical ITG Status Agreement. On October 2, 2025, the Minnesota court ruled in favor of Philip Morris on the question of how, under the ITG Status Agreement, additional Profit Adjustment payments due to Minnesota for the years 2018 and 2019 should be allocated. *See In re Matters Involving the Minn. Tobacco Settlement*, No. 62-CV-18-1912 (Minn. Dist. Ct. Oct. 2, 2025).[9]

The Minnesota court found that "the terms of the ITG Status Agreement are clear and unambiguous." *Id.*, Slip Op. at 9. As the court recognized: "ITG assumed 'all obligations under the Minnesota Tobacco Settlement Agreement' as of June 12,

---

[9] This opinion is not currently available in the LexisNexis or Westlaw databases. Thus, for the Court's convenience, Philip Morris has attached the opinion as an addendum to this brief.

2015.  There are no exceptions or caveats." *Id.* at 10 (quoting paragraph 1 of the ITG Status Agreement).  The court further noted that "the agreement expressly stated that ITG Brands 'shall be treated as a Settling Defendant . . . from and after June 12, 2015.' This provision was inserted into the ITG Status Agreement 'for the avoidance of doubt.'" *Id.* (quoting paragraph 3 of the ITG Status Agreement).

Moreover, the Minnesota court correctly observed that "under the express terms of the settlement agreement, ITG is responsible for its share of underpayments prior to January 1, 2020, as if it had been one of the original Settling Defendants on June 12, 2015." *Id.*  This is significant.  ITG, as Settling Defendant from June 2015 onward, is responsible for its share of underpayments for the years 2018 and 2019.

It so happens that, after the relevant numbers are plugged into the agreed-upon formula for Profit Adjustment calculations, ITG's share for the years 2018 and 2019 is zero.  But the fact that ITG's share turns out to be zero in those years does not mean ITG should not be included in the calculations as a Settling Defendant.  Under RJR's interpretation, ITG could avoid any underpayment liability for 2018 and 2019, regardless of its profits.  Philip Morris's interpretation, by contrast, gives full effect to ITG's assumption of all obligations as of June 2015.

The Minnesota court also rejected RJR's argument that the ITG Status Agreement specifically settled the present dispute regarding allocation of underpayments for the years 2018 and 2019.  *Id.* at 10.  As the court pointed out, the contract provisions that RJR invokes do not address the underpayments at issue here.

*Id.* Indeed, just like Texas, Minnesota did not assert a claim for these underpayments until years after the ITG Status Agreement was entered. *See id.* at 2-3.

Thus, having read the terms of the ITG Status Agreement "in the context of the whole agreement," the Minnesota court concluded that "Philip Morris's interpretation of the ITG Status Agreement is correct." *Id.* at 9.

The Minnesota decision in favor of Philip Morris and against RJR on the question of allocation is persuasive. It carefully analyzes the language of the ITG Status Agreement and thoroughly considers the parties' arguments—identical to the arguments here—as to how that Agreement should be applied. The virtually identical Texas contract language should be applied the same way—with ITG treated as a Settling Defendant as of 2015, for all purposes, including with respect to the allocation of incremental payments owed under the Liability Order for the years 2018 and 2019.

## III. THE CORRESPONDENCE CITED BY RJR CONFIRMS PHILIP MORRIS'S INTERPRETATION OF THE ITG STATUS AGREEMENT

To determine the treatment of ITG in allocation calculations, this Court need not look beyond the unambiguous terms of the ITG Status Agreement, which leave no doubt that ITG must be treated as a Settling Defendant as of June 12, 2015 and included as such in all payment calculations as of that date. *See Kachina Pipeline Co.*, 471 S.W.3d at 450 ("[E]xtrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity."); *accord In re Matters Involving the Minn. Tobacco Settlement*, No. 62-CV-18-1912, Slip Op. at 9 ("[T]he Court finds that

the terms of the ITG Status Agreement are clear and unambiguous. Therefore, there is no need to consider extrinsic evidence of the parties' intent.").

But to the extent the correspondence cited by RJR is considered as circumstantial evidence to provide context for the ITG Status Agreement, that correspondence further supports Philip Morris's position—and the district court's decision—that the ITG Status Agreement requires inclusion of ITG as a Settling Defendant in calculations for the years 2018-2019.

RJR repeatedly cites—yet misrepresents—a letter Philip Morris sent to PwC in 2021 with instructions for applying the ITG Status Agreement. *See* RJR Br. at 38, 46-47. That letter directed PwC to include ITG as a Settling Defendant in all calculations on a going-forward basis, while the parties themselves would recalculate past payments in accordance with the ITG Status Agreement:

> PwC does not need to revise any of its prior notices or change any of its prior calculations. Rather, *the parties have resolved all disputes regarding such prior payments separately, and will make any additional payments in connection with such resolution* **outside of the PwC process**. *See* [ITG Status Agreement], §§ 4b-c.

ROA.61393 (Instruction Letter at 1 (emphasis added)).

For the avoidance of doubt, the letter reiterated that "*PwC does not need to revise any of its prior notices or change any of its prior calculations,*" and that the parties "will make any additional payments" with respect to prior notices and calculations "*outside of the PwC process.*" *Id.* at 2 (citing ITG Status Agreement §§ 5, 21 (emphasis added)).

24

Thus, both the ITG Status Agreement and the instructions to PwC in 2021 make clear that the parties recalculated payments for prior years and would make additional payments resulting from those recalculations. Because the only change to calculations occasioned by the ITG Status Agreement was inclusion of ITG as a Settling Defendant, the only "recalculations" that could, and did, result from that agreement were to include ITG as a separate entity, with its own volumes and profits. That those recalculations were made by the parties themselves rather than PwC does not change the fact that the payments needed to be recalculated to include ITG, consistent with the ITG Status Agreement.[10]

RJR now contends that Philip Morris's letter to PwC about settlement payments for disputes in 2021 somehow resolved the dispute that arose with respect to allocation of payments ordered by the district court more than three years later, in March 2024. RJR Br. at 47. But in 2021, there was no dispute over allocation of liability to Texas for underpayments resulting from the tax-rate change that the district addressed in its March 2024 Liability Order. No such liability existed at the time. In fact, there was

---

[10] With respect to the recalculation of prior payments, counsel for ITG told the district court at oral argument:

> ITG does have a view on the effect of its joinder to the settlement. It agrees with Philip Morris that it joined effective June 12th, 2015, and it agrees that it should be included in the calculations given that, and that the base year for the profit adjustment for those calculations should be $860 million…. ITG also agrees with Philip Morris that the parties internally calculated the sort of back years, the years before 2020. Under this notice ITG paid back payments based on that recalculation, so ITG agrees that that's correct as a matter of fact.

ROA.86360-86361 (July 17, 2024 Hearing Tr.), at 6:12-17, 7:2-16.

25

no litigation over the tax-rate issue in Texas until 2023. *See, e.g.*, ROA.60722-60739; *accord In re Matters Involving the Minn. Tobacco Settlement*, Slip Op. at 2-3, 10.

As is abundantly clear, both Philip Morris and RJR shared the view that there were no underpayments based on the tax-rate change. *See generally* Liability Order (addressing the Settling Defendants' arguments against any finding of underpayments based on tax-rate change); RJR Br. (appealing the Liability Order in favor of State of Texas); PM USA Appellants' Br. (same). Thus, as stated by the district court: "While the Settling Defendants may have resolved ITG-related payments prior to the year 2020 without the involvement of PwC, the Settling Defendants clearly did not anticipate that they would be held liable for their underpayments. Otherwise, this issue would not be before the Court." ROA.61524.

*       *       *

If this Court affirms the district court's Liability Order (which both Philip Morris and RJR have argued should be reversed), then the Court will need to decide RJR's appeal of the district court's Allocation Order. The key question with respect to allocation is as of what date ITG should be included in the calculations *as a Settling Defendant*—i.e., as a separate entity with its own volumes and profits and any resulting liability. As Philip Morris has demonstrated, the governing ITG Status Agreement, as well as the parties' contemporaneous correspondence to PwC, provide a clear answer—ITG became *a Settling Defendant for all purposes* as of June 2015, with an assigned Base Year profit of $860 million.

26

While the present allocation dispute can be resolved based on the plain language of the ITG Status Agreement, the context for the agreement—and the equities—also strongly favor Philip Morris's position. The dispute over treatment of ITG arises from RJR's sale of the Covered Brands to ITG for $7 billion in 2015 and RJR's subsequent refusal to make payments owed to Texas on those Brands. Philip Morris and the State of Texas had to move the district court to compel the payments owed on the Brands, and only after the district court held in 2020 that payments were in fact required did ITG agree to join the Texas Settlement, in 2021. Yet again, RJR is improperly seeking to avoid payment obligations, at Philip Morris's expense. RJR should not receive a windfall, as the district court correctly held.

## CONCLUSION

Philip Morris respectfully requests that if this Court affirms the district court's Liability Order, it also affirm the district court's Allocation Order and require that ITG be consistently treated as a Settling Defendant in Profit Adjustment allocation calculations for all years at issue, with a Base Year profit of $860 million.

Respectfully submitted,

Daniel Bernstein
Megan Pieper*
Arnold & Porter Kaye Scholer, LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: 202.942.5000
Facsimile: 202.942.5999

Alexander Shaknes*
Arnold & Porter Kaye Scholer, LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: 212.836.8000
Facsimile: 212.836.8689

/s/*Christopher M. Odell*
Christopher M. Odell
700 Louisiana Street | Suite 4000
Houston, TX 77002-2755
Arnold & Porter Kaye Scholer, LLP
Telephone: 713.576.2400
Facsimile: 713.576.2499

*Counsel for Philip Morris USA Inc.*

28

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the Federal Rules of Appellate Procedure, on October 22, 2025, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

*/s/ Christopher M. Odell*
Christopher M. Odell

*Counsel for Philip Morris USA Inc*

## CERTIFICATE OF COMPLIANCE

1.      This Motion complies with the type-volume limitation of Fed. R. App. P. 32(A)(7)(B) because:

- this Motion contains 7,010 words, excluding the parts of the Motion exempted by Fed. R. App. P. 32(f).

2.      This Motion also complies with the typeface requirements of Fed. R. App. P. 32(A)(5) and the type requirements of Fed. R. App. P. 32(A)(6) because:

- this Motion has been prepared in a proportionally spaced typeface using Microsoft Word 2010 with a 14-point font named Times New Roman.

/s/ Christopher M. Odell
Christopher M. Odell

*Counsel for Philip Morris USA Inc.*

## ADDENDUM

For the Court's convenience, Philip Morris has attached the above-cited opinion from *In re Matters Involving the Minnesota Tobacco Settlement*, No. 62-CV-18-1912 (Minn. Dist. Ct. Oct. 2, 2025).

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT

Case Type: Civil

In re Matters Involving the Minnesota Tobacco
Settlement

Court File No. 62-CV-18-1912
Judge: M. Ireland

**ORDER RELATED TO
ALLOCATION OF PAYMENTS**

---

Pursuant to the 1998 settlement between the State of Minnesota and various tobacco companies, the Defendants agreed to make annual payments to the State of Minnesota in perpetuity. On December 9, 2024, this Court issued an Order Related To State's Motion To Enforce Settlement Agreement. Specifically, this Court granted the State of Minnesota's motion related to a dispute as to how the annual payments should be calculated and found that the State of Minnesota had been underpaid. Now, there is a dispute amongst the Settling Defendants as to how to allocate the money owed to the State of Minnesota.

This motion was heard by the Court via video conference on July 15, 2025. The parties and their attorneys were noted on the record. For the reasons set forth in the attached memorandum, this Court grants the motion related to the allocation of payments filed by Philip Morris, finding that ITG Brands, LLC shall be included in the recalculation of payments from 2018 going forward.

Based on all the files, records, and proceedings herein:

**PROCEDURAL HISTORY**

1.    In 1994, Minnesota Attorney General Hubert H. Humphrey III sued several

A-1

tobacco companies and advertisers for, among other things, violating the State's antitrust and consumer protection statutes.

2.      The complaint alleged that the Defendants misrepresented or concealed the dangers and addictiveness of tobacco.

3.      The damages the State sought consisted of sums the State had spent, or would spend, to deal with the health impacts of the Defendants' tobacco sales—such as increased Medicaid payments.

4.      On May 8, 1998, the case settled and a settlement agreement agreed upon by the State of Minnesota and the Defendant tobacco companies was approved by the Court via a Consent Judgment (hereinafter the "1998 Settlement").

5.      The district court approved the 1998 Settlement by consent judgment and retains exclusive jurisdiction to enforce the agreement and resolve any disputes arising from it.[1]

6.      The 1998 Settlement Agreement required the Settling Defendants to make up-front payments and then annual payments to the State of Minnesota in perpetuity.

7.      Today, only three manufacturers currently make annual settlement payments to Minnesota— Philip Morris, R.J. Reynolds Tobacco Company ("RJ Reynolds"), and ITG Brands, LLC ("ITG")— due to consolidation in the industry (hereinafter, collectively referred to as the "Settling Defendants").[2]

8.      On July 2, 2024, the State of Minnesota filed a Motion to Enforce Settlement Agreement, asserting that the Settling Defendants had underpaid the Annual Payment due to the

---

[1] Woodruff Aff., Ex. B § I(A); see also Order of Dismissal, March 17, 2021 (noting this Court's continued jurisdiction over "[m]atters concerning the enforcement of the Minnesota Tobacco Settlement and the Consent Order . . . including by way of motions to enforce").

[2] State of Minnesota's Memorandum In Support of State's Motion to Enforce Settlement Agreement at p.2, filed July 2, 2024.

State of Minnesota.

9.  On December 9, 2024, this Court issued an Order Related To State's Motion To Enforce Settlement Agreement. Specifically, this Court granted the State of Minnesota's motion related to a dispute as to how the annual payments should be calculated and found that the State of Minnesota had been underpaid.

10.  Pursuant to the December 9, 2024 Order, the first year in which the Settling Defendants shall recalculate the Annual Payments to the State of Minnesota is 2018.

11.  Following this Court's decision, a dispute arose between R.J. Reynolds Tobacco Company (hereinafter "R.J. Reynolds") and Phillip Morris USA (hereinafter "Phillip Morris") as to how to allocate the underpayment amongst the Settling Defendants.

12.  Following an unsuccessful mediation, both R.J. Reynolds and Phillip Morris filed motions for this Court to resolve their dispute on June 17, 2025. Specifically, the motion relates to the proper allocation of damages for the years 2018 and 2019.

## UNDISPUTED FACTS

13.  ITG Brands, LLC ("ITG") purchased a number of brands from R.J. Reynolds on June 12, 2015.

14.  Following a dispute before this Court, ITG agreed to sign the Minnesota Settlement and become one of the Settling Defendants on or about March 15, 2021.

15.  The March 2021 agreement was memorialized in the "Notice Regarding ITG Brands, LLC's Status Under the Minnesota Tobacco Settlement Agreement and Agreement Resolving Disputes Thereunder ("ITG Status Agreement").

16.  In doing so, ITG agreed it had:

assigned and assumed obligations under the Minnesota Tobacco Settlement Agreement to make payments to the State in restitution for the health care costs incurred by the State related to smoking with respect to Covered Brands, and to obtain the benefits of the Minnesota Tobacco Settlement Agreement as to the Covered Brands, including specifically the release thereunder[3]

17.     Even though the ITG Status Agreement was signed in 2021, R.J. Reynolds, ITG, Phillip Morris, and the State of Minnesota agreed:

that as of June 12, 2015, ITG brands was assigned and assumed all obligations and benefits under the Minnesota Tobacco Settlement Agreement with respect to the Covered Brands.[4]

18.     Paragraph 3 of the ITG Status Agreement states:

With respect to the Covered Brands, ITG Brands shall be treated as a Settling Defendant under the Minnesota Tobacco Settlement Agreement, shall be bound and governed by the Minnesota Tobacco Settlement Agreement and the Consent Order, and shall have the obligations under and receive the benefits of the Minnesota Tobacco Settlement Agreement and the Consent Order, including for the avoidance of doubt the release therein, from and after June 12, 2015. The State may enforce the obligations ITG Brands assumed with respect to the Covered Brands by any means permitted by the Minnesota Tobacco Settlement Agreement and applicable law. As required by paragraph 1(a) of the Minnesota Tobacco Settlement Agreement, the Parties agree to present any disputes under this Notice exclusively to the Ramsey County District Court.[5]

19.     The ITG Status Agreement, then, goes on to specifically address payments for "the year 2021 and all years after, ITG Brands will make all payments to the State with respect to the Covered Brands…." [6]

20.     Paragraph 8 states:

This Notice does not alter or amend the Minnesota Tobacco Settlement Agreement in any respect, nor does it modify the

---

[3] Laura Hammargren Decl., Ex. 1, p. 4 at ¶ 2 (filed June 17, 2025).
[4] *Id.* at ¶ 1.
[5] *Id.* at ¶ 3.
[6] *Id.* at ¶ 4.

obligations, benefits, or nature or character of the payments required thereunder, or increase or decrease the amount of such payments to the State. The Parties further agree that Paragraph 5 of this notice concerns the allocation pursuant to a methodology included in exhibits to the Engagement Letter, of annual settlement payments, as adjusted, as between the Settling Defendants and is not intended to and does not alter the amounts the State is entitled to receive under the Minnesota Tobacco Settlement Agreement.[7]

21.    As noted in this Court's Order dated December 9, 2024, parallel litigation is occurring in Mississippi and Texas. Specifically, courts in Mississippi and Texas had also addressed the dispute related to the calculation of the Net Operating Profit.

22.    Now, prior to the hearing in the above-captioned matter, the United States District Court in the Eastern District of Texas. The assigned judge, the Honorable Rodney Gilstrap, also addressed the payment allocation issue in an Order signed March 27, 2025.[8]

23.    As in the motion currently before this Court, R.J. Reynolds argues that it is only responsible additional payments to the State of Texas beginning January 1, 2020, and that the agreement resolved disputes through December 31, 2019.

24.    Judge Gilstrap held that ITG, "must be treated as a Settling Defendant during the years in dispute," meaning ITG is responsible for additional payments to the state *prior* to December 31, 2019.

## ORDER

**IT IS HEREBY ORDERED**:

1.    Settling Defendant Philip Morris USA Inc.'s Motion Concerning Allocation of Payments Due Under The Court's December 9 Order is **GRANTED**.

---

[7] *Id.* at ¶ 8.

[8] *Id.* at Ex. 6, *State of Texas v. The American Tobacco Company,* Case No.: 5:96-CV-00091-JRG (Memorandum and Order, March 27, 2025).

A-6

2.    Settling Defendant R.J. Reynolds Tobacco Company's Motion Regarding The Allocation of Damages is **DENIED**.

3.    The attached memorandum is incorporated herein by reference.

Dated: _____    _____

**Hon. Mark Ireland**
**District Court Judge**
**Second Judicial District**

**MEMORANDUM**

Pursuant to the 1998 settlement between the State of Minnesota and various tobacco companies, the manufacturers of tobacco products agreed to make annual payments to the State of Minnesota in perpetuity. In 2024, the Attorney General, on behalf of the State of Minnesota, brought a motion to enforce the settlement agreement. Specifically, the State of Minnesota argued that PricewaterhouseCooper's ("PwC") recalculation of the Base Net Operating Profit was contrary to the terms of the settlement agreement.

On December 9, 2024, this Court granted the State of Minnesota's motion. In short, this Court held that the State of Minnesota had been underpaid. The Court, then, ordered the parties to meet and confer related to the issue of damages and interest for underpayments made by the Defendants. Based on representations of the parties, there is no dispute related to the aggregate amount owed to the State pursuant the December 9, 2024 Order. There is also not a dispute related to the methodology for allocating the *aggregate* amount between Philip Morris and R.J. Reynolds, but there is a dispute amongst the Settling Defendants as to how to allocate the money owed to the State of Minnesota pertaining to what year ITG should be included in calculating the allocation costs.

R.J. Reynolds argues that ITG should only be included in calculations for 2020 going forward and none prior. Philip Morris argues that ITC should included in all calculations, since it had arguably agreed to be included for all purposes as of June 12, 2015. The arguments of both parties are based upon the language of an agreement reached by the Settling Defendants in March 2021 agreement, which was memorialized in the "Notice Regarding ITG Brands, LLC's Status Under the Minnesota Tobacco Settlement Agreement and Agreement Resolving Disputes Thereunder." Hereinafter, the March 2021 agreement will be referred to as the "ITG Status

Agreement".

Here, both Philip Morris and R.J. Reynolds are, in essence, seeking to enforce the terms of a settlement agreement. The settlement of claims is encouraged as a matter of public policy, and a later dispute related to the terms of the settlement agreement are contractual in nature. *See Voicestream Minneapolis, Inc. v. RPC Properties, Inc.*, 743 N.W.2d 267, 271 (Minn. 2008). As such, an alleged breach of the settlement agreement may be brought before the court as an action for breach of contract or as a motion to enforce the settlement agreement in the original lawsuit. *Id.*

A party seeking to enforce a settlement agreement bears the burden of establishing the existence of a binding settlement agreement. *Rhodes v. Stockwell Homes, L.L.C.*, 4 N.W.3d 370, 375 (Minn. Ct. App. 2024)(citing *Berndt v. Berndt,* 149 N.W. 287, 288 (Minn. 1914). In the above-captioned matter, none of the Settling Defendants, including ITG, disputes that the ITG Status Agreement is a binding agreement. Therefore, this Court treats the underlying motion to enforce the settlement agreement as a motion for summary judgment. *See Voicestream*, 743 N.W.2d at 273.

Summary judgment is appropriate when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law.  Minn. R. Civ. P. 56.01. Contract interpretation is, by its very nature, a question of law and Minnesota courts aim to determine and enforce the intent of the parties. *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004). In the case of a written contract, courts determine the intent of the parties from the contract's plain language. *Id.*

Extrinsic evidence of the parties' intent may only be considered when a contract is ambiguous on its face. *Hous. & Redevelopment Auth. of Chisholm v. Norman*, 696 N.W.2d 329,

337 (Minn. 2005). "When a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." *Travertine*, 683 N.W.2d at 271; *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 364 (Minn. 2009). Nor should a contract, read in its entire context, be construed to lead to a harsh and absurd result. *Brookfield Trade Ctr., Inc. v. City of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998).

Here, the Court finds that the terms of the ITG Status Agreement are clear and unambiguous. Therefore, there is no need to consider extrinsic evidence of the parties' intent. The Court will, instead, determine the allocation of payments based on the language the agreement itself.

The ITG Status Agreement is approximately fourteen and a half pages, not counting the signatures and the agreed upon press release. "The intent of the contracting parties is to be ascertained, not by a process of dissection in which words or phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." *Cement, Sand & Gravel Co. v. Agric. Ins. Co.*, 225 Minn. 211, 216, 30 N.W.2d 341, 345 (Minn. 1947). Thus, Minnesota courts "read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result." *Brookfield Trade Ctr., Inc. v. City of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). "Additionally, [courts] are to interpret a contract in such a way as to give meaning to all of its provisions." *Id*.

This Court read the terms in the context of the whole agreement and finds that Philip Morris's interpretation of the ITG Status Agreement is correct. "When a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction." *Travertine*, 683 N.W.2d at 271; *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764

A-9

N.W.2d 359, 364 (Minn. 2009). Here, the ITG Status Agreement expressly and unambiguously states three things in three consecutive paragraphs of the agreement.

First, ITG assumed "all obligations under the Minnesota Tobacco Settlement Agreement" as of June 12, 2015.[9] There are no exceptions or caveats. Second, all parties — including both Philip Morris and R.J. Reynolds— "consent to any assignment of obligations and benefits in the Minnesota Tobacco Settlement Agreement has been satisfied and that effective June 12, 2015… RJRT [R.J. Reynolds] consented to the assignment and assumption…."[10] Meaning that both R.J. Reynolds and ITG knew that the effective date of the ITG Status Agreement was June 12, 2015 and not January 1, 2020. Third, the agreement expressly stated that ITG Brands "shall be treated as a Settling Defendant….from and after June 12, 2015."[11] This provision was inserted into the ITG Status Agreement "for the avoidance of doubt."[12] Therefore, under the express terms of the settlement agreement, ITG is responsible for its share of underpayments prior to January 1, 2020, as if it had been one of the original Settling Defendants on June 12, 2015.

R.J. Reynolds argues that allocating payments as suggested by Philip Morris is unfair and would result in a "windfall" in favor of Philip Morris, since Paragraph 4(a) of the agreement refers to "payments for 2021 forward" and there is a settlement of annual payments from 2015-2019. This argument, however, fails because Paragraph 4 of the agreement was resolving a specific dispute concerning the sale of brands by R.J. Reynolds, wholly unrelated to the current dispute of an underpayment to the State of Minnesota based on a miscalculation by PwC of the Net Operating Profit.

---

[9] Laura Hammargren Decl., Ex. 1, p. 3 at ¶ 1.
[10] *Id.* at ¶ 2.
[11] *Id.* at ¶ 3.
[12] *Id.*

These are sophisticated parties. Had ITG or R.J. Reynolds wanted to shield ITG from liability for the potential underpayment to the State of Minnesota related to the Net Operating Profit dispute, they could have expressly done so. Instead, every party agreed that ITG would assume all "obligations and benefits" from June 12, 2015 going forward, not January 1, 2020 going forward. R.J. Reynolds' narrow reading of the ITG Status Agreement is inconsistent with plain language of the agreement, and would render the June 12, 2015 date as meaningless.

For these reasons, this Court grant's the motion by Philip Morris related to the allocation of payments.

**MRI**