# In the United States Court of Appeals for the Fifth Circuit

---

THE STATE OF TEXAS,

*Plaintiff - Appellee,*

v.

R.J. REYNOLDS TOBACCO COMPANY,

*Defendant - Appellant,*

v.

PHILIP MORRIS, INCORPORATED,

*Defendant – Appellant/Appellee.*

---

On Appeal from the United States District Court
for the Eastern District of Texas

---

### BRIEF FOR APPELLEE STATE OF TEXAS

---

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil
Litigation

KIMBERLY GDULA
Chief, General Litigation Division

ZACHARY L. RHINES
Special Counsel
zachary.rhines@oag.texas.gov

BRIAN TUNG
Assistant Attorney General
brian.tung@oag.texas.gov

COUNSEL FOR PLAINTIFF – APPELLEE,
THE STATE OF TEXAS

# CERTIFICATE OF INTERESTED PERSONS

No. 25-40233

THE STATE OF TEXAS,

*Plaintiff - Appellee,*

v.

R.J. REYNOLDS TOBACCO COMPANY,

*Defendant - Appellant,*

v.

PHILIP MORRIS, INCORPORATED,

*Defendant – Appellant/Appellee.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellee, as a governmental party, need not furnish a certificate of interested persons.

*/s/ Zachary L. Rhines*
ZACHARY L. RHINES
Special Counsel

## STATEMENT REGARDING ORAL ARGUMENT

Appellee does not believe that oral argument is necessary to resolve this case. Nonetheless, if the Court finds that oral argument will be helpful, Appellee requests the opportunity to participate.

# TABLE OF CONTENTS

Page

Certificate of Interested Persons ................................................................. ii

Statement Regarding Oral Argument ......................................................... iii

Table of Authorities ................................................................................... vi

Introduction ................................................................................................ 1

Statement of Jurisdiction ............................................................................ 2

Issues Presented .......................................................................................... 2

Statement of the Case ................................................................................. 3

    I.   The Lawsuit and the Settlement Agreement ................................. 3

        A.  Original Agreement and First Amendment ........................... 3

        B.  The 2001 Amendment defines "Base Net Operating Profit." ............. 5

        C.  The Present Formula ............................................................. 6

    II.  PwC departs from the \$3.115 billion base figure. ........................ 8

    III. The district court confirms Texas's interpretation. .................... 9

Summary of the Argument ......................................................................... 10

Standard of Review .................................................................................... 11

Argument ................................................................................................... 12

    I.   The CSA establishes a static figure for Base NOP. ................... 12

        A.  The CSA's plain language provides Base NOP. ................. 12

        B.  Defendants' reading defies the CSA's plain language and creates absurd results. ................................................. 15

        C.  Context confirms the district court's interpretation. ......... 21

II.  The district court properly declined reliance on extrinsic evidence. ........ 26

    A.  The disputed terms of the CSA are unambiguous. ........................... 26

    B.  Even if ambiguous, context confirms Texas's interpretation............. 27

III. The district court properly awarded both prejudgment and postjudgment interest. ..................................................................... 28

    A.  Prejudgment interest should be paid from the date of underpayment. ....................................................................... 29

    B.  The district court properly ruled that postjudgment interest should begin accruing in 2024. ............................................. 31

Conclusion ................................................................................ 32

Certificate of Service ................................................................. 32

Certificate of Compliance ........................................................... 33

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Americo Life, Inc. v. Myer*,
  440 S.W.3d 18 (Tex. 2014) .................................................................... 27

*Coker v. Coker*,
  650 S.W.2d 391 (Tex. 1983) ................................................................. 20

*Endeavor Energy Res., L.P. v. Energen Res. Corp.*,
  615 S.W.3d 144 (Tex. 2020) ................................................................. 27

*ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*,
  868 F.3d 408 (5th Cir. 2017) ................................................................31

*Hanser v. McDonough*,
  56 F.4th 967 (Fed. Cir. 2022) .............................................................. 14

*Ho & Huang Props., L.P. v. Parkway Dental Assocs., P.A.*,
  529 S.W.3d 102 (Tex. App. 2017) ........................................................ 30

*In re Serv. Corp. Int'l*,
  355 S.W.3d 655 (Tex. 2011) ................................................................. 21

*Indem. Ins. Co. of N. Am. v. W & T Offshore, Inc.*,
  756 F.3d 347 (5th Cir. 2014).................................................................26

*Indem. Ins. Co. v. W & T Offshore, Inc.*,
  756 F.3d 347 (5th Cir. 2014).................................................................26

*Interstate Contracting Corp. v. City of Dallas*,
  407 F.3d 708 (5th Cir. 2005) ............................................................... 12

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
  494 U.S. 827 (1990) ..............................................................................31

*Kansas City S. Ry. Co. v. Sasol Chemicals (USA), L.L.C.*,
  113 F.4th 446 (5th Cir. 2024) .............................................................. 19

*Keiland Constr., L.L.C. v. Weeks Marine, Inc.*,
  109 F.4th 406 (5th Cir. 2024) ........................................................ 11, 12

*Kinsale Ins. Co. v. Flyin' Diesel Performance & Offroad, LLC.*,
　99 F.4th 821 (5th Cir. 2024) ........................................................................ 12

*Krieser v. Hobbs*,
　166 F.3d 736 (5th Cir. 1999) ........................................................................31

*Lavaca Bay Autoworld, L.L.C. v. Marshall Buick Oldsmobile*,
　103 S.W.3d 650 (Tex. App. 2003)................................................................15

*Miles v. Martin,*
　321 S.W.2d 62 (Tex. 1959) ......................................................................... 24

*Pirani v. Baharia (In re Pirani)*,
　824 F.3d 483 (5th Cir. 2016) ...................................................................... 14

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
　551 U.S. 224 (2007) .....................................................................................17

*Reider v. Woods*,
　603 S.W.3d 86 (Tex. 2020) ......................................................................... 24

*Risinger Holdings, LLC v. Sentinel Ins. Co., Ltd.*,
　565 F. Supp. 3d 844 (E.D. Tex. 2021)................................................... 17, 18

*Rosetta Res. Operating, LP v. Martin*,
　645 S.W.3d 212 (Tex. 2022) ....................................................................... 19

*Seals v. Liberty Life Assurance Co. of Boston*,
　No. 1:14-CV-13423, 2015 WL 13741598 (E.D. Mich. April 29, 2015) ............. 14

*Tex. Star Motors, Inc. v. Regal Fin. Co.*,
　401 S.W.3d 190 (Tex. App.—Houston [14th Dist.] 2012, no pet.) .................. 30

*URI, Inc. v. Kleberg Cnty.*,
　543 S.W.3d 75 (Tex. 2018)......................................................................... 26

*Wheelbarger v. Landing Council of Co-Owners*, 471 S.W.3d 875,
　(Tex. App.—Houston [1st Dist.] 2015, pet. denied)........................................ 30

## INTRODUCTION

In 1998, Defendants R. J. Reynolds Tobacco Company and Philip Morris USA, Inc. entered a historic settlement agreement to resolve claims brought by the State of Texas stemming from Defendants' decades-long campaign of deception regarding the dangers of smoking that resulted in widespread addiction, disease, and death among Texans. The agreement, referred to as the Comprehensive Settlement Agreement ("CSA"), requires Defendants to make yearly payments to Texas in perpetuity based on a formula set out in the CSA. Relevant here, the formula incorporates aggregate, post-tax net operating profits ("NOP") realized by Defendants for both the payment year and the "Base Year" of 1997. NOP is determined post-tax and thus a change in tax rate directly impacts NOP. If tax rates are lowered, Defendants' NOP increases, and vice-versa. Importantly, due to recurring disputes over Defendants' Base Year NOP, the Parties amended the settlement in 2001 to provide that "the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000."

For nearly two decades, Defendants agreed that their Base Year Net Operating Profits were $3,115,100,000. But then something changed. In 2018, the Tax Cuts and Job Act decreased the top effective corporate tax rate from 35% to 21%. ROA.60945. Defendants seized on this and began calculating their 1997 Base Year Net Operating Profits by incorporating the new, lower tax rate instead of abiding by the agreed-upon amount. This resulted in an increase in Defendants' Base Year NOP, causing them to underpay the State of Texas to the tune of approximately $25 million per year. Now, they ask the Court to endorse this tortured reading of the contract. But as the

1

district court recognized, the CSA's unambiguous language requires Defendants to utilize $3,115,100,000 as Defendants Base Year Net Operating Profits in their payment calculation. This Court should affirm.

## STATEMENT OF JURISDICTION

The original Complaint, filed by the State of Texas against major tobacco companies in 1996 contained both federal and state law claims, and the federal court properly had jurisdiction under 28 U.S.C. §§ 1331 and 1367. Defendants appealed the district court's Memorandum Opinion and Order on liability entered March 14, 2024, ROA.61558–76, and its subsequent Memorandum Opinion and Order concerning allocation of damages entered March 28, 2025. ROA.61519–27. This Court therefore has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether the CSA provides a clear statement as to the amount of "the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997"?

2. Whether the district court acted within its discretion to refuse to consider extrinsic evidence in interpreting the unambiguous terms of the Texas Settlement Agreement?

3. Whether the district court properly awarded prejudgment and postjudgment interest?

## I.  The Lawsuit and the Settlement Agreement

On March 28, 1996, the State of Texas sued the major tobacco companies and alleged that their decades-long campaign of deception regarding the dangers of smoking caused widespread addiction, disease, and death among Texans. ROA.245–46. Texas sued and sought to recover healthcare costs it incurred and expected to continue incurring from tobacco-related illnesses and to prohibit the marketing of tobacco products to minors. ROA 246–48. In January 1998, after almost two years of litigation, Texas entered into the CSA with Defendants to resolve the State's claims. ROA.49262–393. The CSA was later amended in 1998 and again in 2001. ROA.60740–57 (2001 amendment), 60803–72 (1998 amendment).

### A.  Original Agreement and First Amendment

1. To compensate Texas for healthcare costs associated with smoking-related illnesses, the CSA requires two categories of payments: a lump sum "initial payment" and "annual payments" in perpetuity. ROA.60771–74. Under the original agreement, effective January 16, 1998, the Annual Payments were adjusted upward based upon the greater of 3% or the CPI applied each year. ROA.49274. Payments could then be decreased or increased based upon the volume of domestic tobacco product sales as provided under Paragraph B.5 of the Proposed Resolution, which provided:

> Beginning in year 1; payment made equal to scheduled annual payment times the ratio of actual relevant domestic tobacco product unit sales volume to relevant base volume. In the event of a decline in volume, relevant actual volume and relevant base volume are adult volume figures; in the event of an increase in volume, relevant actual volume

and relevant base volume are total volume figures. Base volume is 1996 volume.

Any reduction in an annual payment will be reduced by 25% of any increase above the industry's base year net operating profits (after application of inflator discussed above) from domestic sales of tobacco products."

ROA.49354; *see* ROA.49274 (directing usage of Paragraph B.5 for this formula).

2**.** In July 1998, the Parties agreed to amend the CSA for the first time. The 1998 Amendment introduced Appendix A, which superseded the use of Paragraph B.5 originally used in the CSA to calculate annual payments by providing new definitions for the Net Operating Profit formula to be used for the Volume Adjustment and Profit Adjustment. ROA.60804, 60814–15, 60848–49. Notably, in this new description of the formula is the introduction of the same methodology clause. ROA.60848–49.

> For purposes of this Appendix, "net operating profits from domestic sales of cigarettes" shall mean net operating profits from domestic sales of cigarettes as reported to the United States Securities and Exchange Commission ("SEC") for the Applicable Year or, in the case of a Settling Defendant that does not report profits to the SEC, as reported in financial statements prepared in accordance with generally accepted accounting principles and audited by a nationally recognized accounting firm. **The determination of Settling Defendants' aggregate net operating profits from domestic sales of cigarettes shall be derived using the same methodology as was employed in deriving such Settling Defendants' aggregate net operating profits from domestic sales of cigarettes in 1997.** Any increase in an Applicable Base Payment pursuant to this subparagraph B(ii) shall be payable within 120 days after the date that the payment at issue was required to be made.

ROA.60848–49 (emphasis added).

### B. The 2001 Amendment defines "Base Net Operating Profit."

Despite the 1998 Amendment setting out an expanded formula for calculating NOP, the Parties again had to amend Appendix A on June 8th, 2001, because "certain disputes have arisen between the parties concerning the meaning of the term 'net operating profits' as used in Appendix A . . . parties have agreed to settle and resolve with finality the NOP Issue and certain other issues between them arising out of Appendix A. . . . ." ROA 60741–42, 60745. The Parties solution was to include, for the first time, the fixed $3,115,100,000 figure as a response to the disputes regarding Appendix A. From that point, it was understood that "[t]he Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000." ROA.60754.

The 2001 Amendment, in relevant part, provides that "the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000." ROA 60754. Subsection (B) states the parties' agreed upon figure for the Base Net Operating Profit, explains how this $3.115 billion figure was derived from the same methodology outlined above, and requires that the above definition must be applied for calculating the Actual Net Operating Profits:

> Applying the foregoing definition, the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000. The determination of the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes shall be derived using the same methodology as was employed in deriving such Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997.

ROA.60754. The only authorized modification to this figure is an inflation

adjustment set out in the text which increases the Base NOP annually by the "greater of the rate of 3% per annum or the actual total percent change in the Consumer Price Index" measured from January 1, 1998, through the date of the payment at issue. *See* ROA.60753. As with the Base Volume, the Base NOP is otherwise static.

Subsection (C) specifically defines the term "Applicable Year" as it appears in the preceding paragraphs:

> (C) "Applicable Year" means . . . the calendar year ending on the date on which the payment at issue is due, regardless of when such payment is made . . . .

ROA.60754 (emphasis added).

## C. The Present Formula

The formula, as laid out in the now-controlling 2001 Amendment Agreement, begins with an $8 billion "Base Payment," adjusted annually for inflation and split amongst the four states; Texas is entitled to 7.25% of the total. ROA.60772–73. The formula then accounts for two potential adjustments based on Volume and Profit that may modify the total annual payment. ROA.60753–54.

The Volume Adjustment provides that:

> [I]n the event the aggregate number of Cigarettes shipped for domestic consumption by the Settling Defendants in the Applicable Year (as defined hereinbelow) (the "Actual Volume") is greater than the aggregate number of Cigarettes shipped for domestic consumption by the Settling Defendants in 1997 (the "Base Volume"), the Applicable Base Payment shall be multiplied by the ratio of the Actual Volume to the Base Volume.

ROA.60753. It continues: "in the event the Actual Volume is less than the Base Volume . . . the Applicable Base Payment shall be reduced by subtracting from it the

amount equal to" a given ratio. *Id.* Thus, if cigarette sales go up, so does the Base Payment; if sales go down, however, the calculation then turns to the "Profit Adjustment" to determine what adjustment occurs.

The Profit Adjustment provides that, if volume of cigarette sales decrease but Net Operating Profits increase, payments are adjusted upward. ROA.60753–54. This compares "the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes for the Applicable Year (the 'Actual Net Operating Profit')" against the baseline of "the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 (the 'Base Net Operating Profit')." ROA.60753. As the district court succinctly explained, "this language compares the Defendants' aggregate 'net operating profits' at two points in time—the current year for which the Annual Payment is due and the 1997 base year." ROA.61328.

Third, the definition of "net operating profits" (NOP) as it applies to the Profit Adjustment reduction calculation to be:

> (1) operating income before goodwill amortization, . . . and casualty losses; (all as reported to the United States Securities and Exchange Commission ("SEC") for the Applicable Year . . . ); minus (2) the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the Applicable year, plus (b) 4.472 percentage points.

ROA.60753–54.

Taken together, each year, Settling Defendants owe Texas 7.25% of $8 billion, adjusted for inflation. That amount is then increased if (1) there is a relative increase in the volume of cigarette sales compared to the Base Volume or (2) there is a relative

decrease in the sale volume but increase in net operating profit. The Base Payment decreases only when there is both a decrease in sale volume and decrease in net operating profit.

## II. PwC departs from the $3.115 billion base figure.

The CSA provides that independent accounting firm PricewaterhouseCoopers (PwC) will calculate the total payment each year. ROA.60725. From 2001 to 2018, PwC used the $3.115 billion figure for the Base Net Operating Profit, adjusting only for inflation, and annually calculated the Actual Net Operating Profit using the Applicable Year's financial records and tax rate. ROA.60728, 60886–903.

In 2018, Congress lowered the top effective corporate tax rate from 35% to 21% through The Tax Cuts and Jobs Act. ROA.60945. PwC subsequently departed from the $3.115 billion figure for the Base Net Operating Profit by recalculating both the Actual Net Operating Profit (2018 finances) and the Base Net Operating Profit (1997 finances) using the Applicable Year's (2018) 21% tax rate. ROA. 60886–903, 60907. On March 3, 2023, Texas sent a letter to PwC disputing its erroneous recalculation of the Base Net Operating Profit. ROA.60905. The State argued that the $3.115 billion agreed figure should have remained in place, and the new 21% tax rate can only apply to the Actual Net Operating Profit calculation. *Id.* The State pointed out that Appendix A fixed the Base Year Net Operating Profit at $3,115,100,000 and does not permit annual recalculation of that figure other than the inflation adjustment. *Id.* PwC refused to reinstate the agreed $3,115,100,000 figure and indicated that it would continue to recalculate the Base Net Operating Profit using the 2018 tax rate change. ROA.60964–69, 60729.

### III. The district court confirms Texas's interpretation.

As a result of this dispute, the Parties filed cross-motions to enforce the CSA in May 2023. ROA.60722–60739; ROA.61081–61099. In doing so, the Parties asked the district court to resolve the ultimate question of whether the Parties should recalculate Base Year NOP or use the agreed-upon amount of $3,115,100,000. ROA.60722–60739; ROA.61081–99.

The district court found that the contract "unambiguously states a fixed number that constituted Defendants' net operating profits in 1997," which is not subject to an annual recalculation. ROA.61341. "It is clear to the Court from the language of Appendix A that the State and the Defendants agreed on a numerical amount constituting the NOP in 1997 for the Defendants: $3,115,100,000." ROA.61343. The district court noted that the Parties agreed that "[t]he Settling Defendants' aggregate net operating profits . . . shall be derived using the same methodology *as was employed in deriving such Settling Defendants' aggregate net operating profit from domestic sales of Cigarettes in 1997.*" ROA.61341. In the court's view, this sentence harmonized the formula contained in the formula with the $3,115,100,000 figure provided in the 2001 Amendment, asserting that nothing in the agreement suggests Base NOP must be recalculated each year. *Id.*

Further, the district court found support for this conclusion in the fact that "Applicable Year" is contained in both subparts of the definition of "net operating profits." ROA.61342. The court stated that if clause (2) —subtracting "the maximum marginal federal corporate income tax rate … in effect on December 31 of the Applicable year, plus (b) 4.472 percentage points is meant to apply Applicable

Year data to the base year, it failed to see why subpart (1) would not also apply Applicable Year data to the base year. *Id.* In the court's mind, this would "blur the distinction between the Base Year and Applicable Year, leading to nonsensical results." *Id.* Defendants appealed. ROA.61528.

The district court also relied on a Mississippi court decision "addressing identical language in Mississippi's 2001 amendment to its prior settlement agreement with the same Defendants." ROA.61330. "That judgment rejects the arguments raised by the Defendants here and addresses the same language at issue here." *Id.* "The Mississippi Court rendered judgment in favor of the State of Mississippi, finding that language to be 'clear and unambiguous' and held that 'the value agreed upon by the parties of $3,115,100,000 . . . shall be the value utilized [for the calculation of the Base Year net operating profits] each and every year." *Id.* (alterations in original). Although the court did not find that judicial estoppel applies, ROA.61335, the court did "find[] the Mississippi Court's decision on its analogous issue persuasive." ROA.61343.

### SUMMARY OF THE ARGUMENT

The district court correctly held that the contract unambiguously states a fixed number ($3,115,100,000) that constituted Defendants' Base Net Operating Profits. There are only three possible interpretations of how Applicable Year and Base Net Operating Profit interact but only one interpretation, adopted by the district court and Texas, harmonizes and applies all parts of the contract and is thus, the most reasonable interpretation.

Despite this fixed number and the underlying logic of the Profit Adjustment calculation, Defendants ask the court to apply current tax rates to the calculation of the 1997 NOP and require an annual recalculation of the settled $3,115,100,000 figure. But that would require the Court to treat the term "Applicable Year" as having two different meanings in adjacent clauses. If uniformly applied throughout subsection (b), Defendants' contention that "Applicable Year" applies current year data to both the Actual Net Operating Profit and Base Net Operating Profit would render the entire profit adjustment a nullity: using payment year data in the Base NOP would result in identical input on both sides of the equation, precluding any upward adjustment. Because Defendants' interpretation would lead to absurd results, it is not a reasonable interpretation and, thus, creates no ambiguity.

Because the plain language of the amended Settlement Agreement is subject to only one reasonable interpretation and is unambiguous, the district court did not err in deciding not to consider extrinsic evidence to create ambiguity where none existed on the face of the contract. However, even if extrinsic evidence is considered, the drafting history and purpose of the Texas Settlement Agreement confirm that Base Net Operating Profit has a fixed amount of $3,115,100,000 and that the application of the Applicable Year's tax rate to the Actual Net Operating Profit and the Base Year's tax rate to the Base Net Operating Profit comports with the intent of the agreement.

### STANDARD OF REVIEW

The Court "review[s] matters of contract interpretation *de novo*." *Keiland Constr., L.L.C. v. Weeks Marine, Inc.*, 109 F.4th 406, 415 (5th Cir. 2024) (citing

*Habets v. Waste Mgmt., Inc.*, 363 F.3d 378, 382 (5th Cir. 2004)). Since Texas law governs the contracts here, the Court "appl[ies] the substantive law of" Texas. *Id.*

**ARGUMENT**

The district court correctly held that the CSA unambiguously states a fixed number ($3,115,100,000) that constituted Defendants' Base NOP. Because the CSA is unambiguous, the district court did not err in deciding not to consider extrinsic evidence. Defendants rely on (1) a half-complete reading of the contract that, under its own terms, would produce absurd results, and (2) "commercial logic" that conveniently results in payments that will only go down. Neither have merit.

## I. The CSA establishes a static figure for Base NOP.

"The goal of contract construction is to ascertain the parties' intent as expressed in the language of the agreement." *Kinsale Ins. Co. v. Flyin' Diesel Performance & Offroad, LLC.*, 99 F.4th 821, 826 (5th Cir. 2024) (quoting *Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 218 (Tex. 2022)). "To that end, we must 'first determine whether it is possible to *enforce the contract as written*.'" *Id.* (emphasis added) (quoting *Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) (cleaned up)); *see Interstate Contracting Corp. v. City of Dallas,* 407 F.3d 708, 712 (5th Cir. 2005) ("[A]n unambiguous contract will be enforced as written.").

### A. The CSA's plain language provides Base NOP.

**1.** The CSA's plain language provides that Base NOP is "$3,115,100,000." ROA.60754; *see Kinsale*, 99 F.4th at 826 (providing that the Court's "analysis begins with the contract's express language" (quoting *Burlington Res. Oil & Gas Co. v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 203 (Tex. 2019)). The CSA's formula

12

compares the Actual NOP to the Base NOP, and if the former is greater than the latter, then the amount the Volume Adjustment offsets the payment is reduced by 7.25% of 25% of such increase in such profits. *See* ROA 49274, 49354 (original); *see also* ROA.60753 (2001). The parties amended the CSA in 2001 to reflect that "the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000." ROA.60754.

The district court recognized the same. It held that "the contract unambiguously states a fixed number that constituted Defendants' net operating profits in 1997, and that fixed number is not subject to recalculation each year." ROA.61341. The district court further held that the current tax rate affects actual profit calculation as opposed to demanding recalculation of the fixed base rate. ROA.61342.

Thus, under Texas's (and the district court's) interpretation of the CSA, if Defendants generate $4,115,100,000 in Net Operating Profits in 2025, that amount would be compared to the fixed Base NOP which "in 1997 were $3,115,100,000." ROA 60754. This comparison of Applicable Year data to Base Year data will yield a meaningful profit adjustment result because there is a $1 billion difference between Actual NOP and Base NOP.

**2.** Defendants argue that this figure is merely an "illustration" and that the district court erred in assigning it operative effect. PM Br. 19–20; RJR Br. 25. They conclude that the fixed base figure must be deemed illustrative because "the tax rate in effect as of 2001 . . . was subject to change in the future." PM Br. 19. Defendants attack on the fixed figure is not even direct because it is predicated upon a single

parenthetical which is cross-referenced to the Applicable Year[1] rather than attached to the fixed figure which they aim to undermine or any reference to Base Year calculations. PM Br. 19.

Adopting this illustrative approach violates core canons of construction under Texas law, including: (1) that all terms in an agreement should be given effect, and (2) specific terms should govern over general terms. *Pirani v. Baharia (In re Pirani)*, 824 F.3d 483, 494 (5th Cir. 2016) (explaining that Texas follows both these cannons of construction and collecting cases) (cited favorably in *Texas v. American Tobacco Co.*, 441 F. Supp. 3d 397, 439 (E.D. Tex. 2020)). Furthermore, illustrations in a contract are generally indicated by clauses such as "including" or "including, but not limited to." *See Seals v. Liberty Life Assurance Co. of Boston,* No. 1:14-CV-13423, 2015 WL 13741598, *15 n.10 (E.D. Mich. April 29, 2015) (collecting cases). Using the word "applying," followed by the definitive statement "Settling Defendants' aggregate net operating profits . . . were $3,115,100,000 in 1997," does not provide a basis to determine that this calculation is a mere illustration. *Cf. Hanser v. McDonough*, 56 F.4th 967, 971 (Fed. Cir. 2022) ("[T]o determine whether a particular parenthetical provides a definition or is 'merely an illustrative example,' we must consider the specific language at issue in the statutory or regulatory context in which it appears and then draw the most sensible conclusion about its meaning.").

Defendants contend that the Court must favor a formula over a set number. *See* PM Br. 20–21 (discussing *Lavaca Bay Autoworld, L.L.C. v. Marshall Buick*

---

[1] "[T]he maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the Applicable Year." ROA. 60754.

*Oldsmobile,* 103 S.W.3d 650 (Tex. App.—Corpus Christi 2003, no pet.)). There, in a contract dispute between two parties with competing interpretations, the court ruled against the party aiming to decrease its payments to zero which would have invalidated the rest of the provisions of the contract. *Lavaca Bay*, 103 S.W.3d at 659. Defendants contend that the court ruled that a formula is more fundamental to a contract than a specific number. PM Br. 20. But the specific number that the court refused to apply was not an agreed figure, but "a zero." *Lavaca Bay,* 103 S.W.3d at 659. The court expressly stated that "we find Marshall's arguments unpersuasive *because they each rest on the same single digit, a zero.*" *Id.* (emphasis added). Here, the district court's interpretation gives effect to every clause. Indeed, as explained below, it is Defendants' interpretation that would literally zero out any upward adjustment—defeating the otherwise clear language requiring an annual payment, however adjusted. *See infra* Section I.B.2.

## B. Defendants' reading defies the CSA's plain language and creates absurd results.

Defendants contend that, once the Court sets aside the Base NOP definition as a mere illustration, the CSA's language requires recalculation of the Base NOP according to current year tax rates. Defendants' primary argument is that the term "Applicable Year" applies current year data to the calculation of both the Actual Net Operating Profit and the Base Net Operating Profit. RJR Br. 20; PM Br. 10. Defendants thus contend that the "Applicable Year" tax rate applies to the 1997 financials when determining the Base NOP. *See* RJR Br. 26–27 ("'[T]he definition of "Base Year NOP' requires application of the tax rate 'of the Applicable Year'"");

PM Br. 10 ("[T]he contractual formula contemplates a determination of Base Net Operating Profit using the Applicable Year's tax rate in each year's profit adjustment calculation."). This argument collapses under mild scrutiny.

1. The term "Applicable Year" appears three times in the formula set out in Subsection (B):

> (1) operating income before goodwill amortization, . . . and casualty losses; (all as reported to the United States Securities and Exchange Commission ("SEC") for the **Applicable Year** . . . ); minus (2) the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the **Applicable year**, plus (b) 4.472 percentage points. . . . Notwithstanding the foregoing, the Settling Defendants' aggregate total amount of restructuring charges, restructuring related charges and discontinued operations included for purposes of clause (1) of the preceding sentence shall not in any **Applicable Year** exceed the Annual Restructuring Cap.

ROA. 60753–54 (emphasis added). The term also appears in the definition of the term Actual Net Operating Profit, but not in the definition of the term Base Net Operating Profit.[2] Subsection (B) of the CSA, as amended, defines the term "net operating profits" as it applies to the Profit Adjustment reduction calculation to be:

> (1) operating income before goodwill amortization, . . . and casualty losses; (all as reported to the United States Securities and Exchange Commission ("SEC") for the Applicable Year . . . ); minus (2) the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income

---

[2] *Compare* ROA.60753 ("[T]he Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes for the **Applicable Year** (the 'Actual Net Operating Profit')" (emphasis added)) *with id.* ("[T]he Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes **in 1997** (the 'Base Net Operating Profit')" (emphasis added)).

> tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the **Applicable year**, plus (b) 4.472 percentage points.

ROA.60753–54 (emphasis added).

There are at most three possible interpretations of how Applicable Year and Base Net Operating Profit interact: (1) Base Net Operating Profit is calculated with financials from 1997 and the tax rate of 1997; (2) Base Net Operating Profit is calculated with financials of the Applicable Year and the tax rate of the Applicable Year; or (3) Base Net Operating Profit is calculated with financials from 1997 but the tax rate from the Applicable Year.

As Texas explained, and the district court accepted, the first interpretation harmonizes and applies all parts of the contract and is thus, the most reasonable interpretation. This because the term "Applicable Year" occurs through Subsection (B)(ii) and must have the same meaning unless otherwise indicated. *Cf. Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning."); *see also Risinger Holdings, LLC v. Sentinel Ins. Co., Ltd.,* 565 F. Supp. 3d 844, 859 (E.D. Tex. 2021) (applying statutory construction principles to the interpretation of contracts). This interpretive canon excludes Option 3. Although Option 2 would be a consistent use of the term, it would require Base NOP to use both the financials *and* tax rate of the current year—defeating the existence of a baseline in the first place. Only Option 1, calculating Base NOP is calculated with financials from 1997 and the tax rate of 1997

is a consistent use of "Applicable Year." This reading also aligns with the Base NOP figure of $3,115,100,000.

Because the district court's interpretation is the only one that uniformly applies all terms and the only one that renders no portion meaningless, the district court was correct when it held that the contract unambiguously requires the use of the $3,115,100,000 agreed Base Net Operating Profit figure and that the Applicable Year's tax rate does not apply to the Base Net Operating Profit.

2. Defendants make several arguments to attempt to obfuscate this express language and avoid this result, but none are persuasive. Defendants' advocate for Option 3 and that the "Applicable Year" tax rate applies to the 1997 financials when determining the Base NOP. *See* RJR Br. 25–26.

This reading relies on the fact that the CSA references NOP three times in the same section; from this, Defendants cherry pick where their preferred definition of the term "Applicable Year" would apply. But identical words that appear throughout a contract should be presumed to have the same meaning. *Cf. Risinger Holdings,* 565 F. Supp. 3d at 859–60 (citing *Beharry v. Ashcroft*, 329 F.3d 51, 61 (2d Cir. 2003) (Sotomayor, J.)). And cross-references to Applicable Year appear *throughout* the formula. Base Net Operating Profit would turn not just on the tax rate[3] from the Applicable Year but also the Operating Income[4] from the Applicable Year.

---

[3] "[M]inus (2) the amount determined by clause (1) above multiplied by a percentage equal to the sum of (a) the maximum marginal federal corporate income tax rate (such rate being 35% as of May 1, 2001) in effect on December 31 of the *Applicable year*. . . ." ROA. 60754

[4] "For purposes of this Appendix, the term "net operating profits" shall mean: (1) operating income before goodwill amortization, . . . and casualty losses; (all as reported to the United States Securities and Exchange Commission ("SEC") for the *Applicable Year* . . . ."ROA.60753–54

The district court recognized as much when it explained that "[i]f subpart (2) concerning the tax rate is meant to apply Applicable Year data to the base year, the Court fails to see why subpart (1) would not also apply Applicable Year data to the base year . . . .[T]his would blur the distinction between the Base Year and the Applicable Year, leading to nonsensical results." ROA 61342. Indeed, "Nothing in Appendix A expresses or even suggests that the Base Net Operating Profits is an indefinite amount that must be recalculated every year." ROA.61341.

Under Defendants' reading, using the same hypothetical figures above, *supra* Section I.A.1, the result would be a comparison of $4,115,100,000 in Actual Net Operating Profits to an identical $4,115,100,000 Base Net Operating Profits—always zeroing out the difference. This outcome would occur regardless of the actual profits in the Applicable Year, meaning the profit adjustment is a nullity because it could never trigger an upward adjustment. Defendants' interpretation of the contract would lead to the absurd result of rendering the entire Profit Adjustment meaningless. *See Rosetta Res. Operating, LP v. Martin*, 645 S.W.3d 212, 219 (Tex. 2022) ("We also avoid constructions of contract language that would lead to absurd results.").

The district court correctly rejected that interpretation as producing an absurd result. *See Kansas City S. Ry. Co. v. Sasol Chemicals (USA), L.L.C.*, 113 F.4th 446, 451 (5th Cir. 2024) ("An interpretation may be unreasonable if it would create various absurdities throughout the contract.") (cleaned up).

Even if Defendants could permissibly advance the selective interpretation, it would render other provisions meaningless. See *Coker v. Coker*, 650 S.W.2d 391, 393

19

(Tex. 1983) (holding that courts must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless") Defendants argue that because subpart (2) of the definition references the maximum federal corporate tax rate "of the Applicable Year" to calculate the deduction from the Settling Defendants' operating income, ROA.60754, the Parties must have intended to use the Applicable Year's tax rate to calculate Base Net Operating Profits, rather than the 1997 rate. PM Br. 10; RJR Br. 16. But this interpretation would require the Base Year to be calculated and recalculated every year, rendering the Parties' express agreement to the fixed $3.115 billion figure entirely obsolete. The Settling Defendants' selective interpretation impermissibly renders meaningless the agreed $3.115 billion figure. *See Coker*, 650 S.W.2d at 393.

Defendants contend that the CSA provides a floating tax rate, claiming the CSA "clearly and unambiguously specifies that the parties themselves calculated the net operating profits . . . using the tax rate *in effect in 2001*." PM Br. 17. And that "the companies' base-year net operating profits were calculated under the agreement not by looking to 1997 for the tax rate in effect then, but by using the tax rate 'as of . . . 2001' when the agreement was entered." *Id.* But the tax rate in effect in 1997 and 2001 was the same: 35%. ROA 60945. So that argument fails.

Defendants next rely on the parenthetical. *See* ROA.60754 (providing "the maximum marginal federal corporate income tax rate (*such rate being 35% as of May 1, 2001*) in effect on December 31 of the Applicable Year, plus (b) 4.472 percentage points"(emphasis added)). Here, Defendants construe this parenthetical as

commanding the later calculation of 1997 NOP to use 2001's 35% tax rate rather than 1997's 35% tax rate. PM Br. 19. Defendants, however, fail to explain why their interpretation does not require the Base NOP to use the "operating income" from the payment year, as both turn the term "Applicable Year." *See infra* Section I.C.1. The district court rejected this argument for the same reason. ROA.61342.

The best interpretation of the parenthetical in part (2) is that it simply stated what the maximum marginal corporate income tax rate was as of May 1, 2001, and if this rate was in effect on December 31, 2001, it would become the operative tax rate for the 2001 Applicable Year. Stated another way, it makes sense for this statement to be relevant in calculating the Actual Net Operating Profits going forward, rather than to the calculation of Base Net Operating Profits.

### C. Context confirms the district court's interpretation.

1. Context supports what the plain language commands. The Court must first "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011); *accord Pirani*, 824 F.3d at 493. As the district court found, there is an interpretation that harmonizes all provisions: Base NOP is static and anchored at $3,115,100,000.

For example, the "same methodology" clause is further evidence that the district court was correct in holding that the term "Applicable Year" as used in the "net operating profits" formula can only apply to the Actual NOP without "leading to nonsensical results." ROA 61342. According to the district court, "[n]othing in Appendix A expresses or even suggests that the Base Net Operating Profits is an

indefinite amount that must be recalculated every year." ROA 61341. Indeed, the district court held that it is the same methodology clause that "harmonizes the formula outlined in Appendix A with the net operating profits for 1997 (subject only to adjustment for inflation)." ROA 61341.

And this makes perfect sense. Defendants' Net Operating Profits in 1997 were a specific amount, based on specific financials and tax rates from that year. Recalculating it each year would make little logical sense. Defendants nonetheless argue that giving meaning to the same methodology clause "requires the use of a single tax rate" to effectuate the profit adjustment and an annual recalculation. PM Br. 15–16; RJR Br. 16. Rather than requiring this frequent recalculation, the district court held that the "'net operating profits' formula applies to determine the Actual Net Operating Profit (for the current year)." ROA 61342.

The same methodology clause is only non-superfluous if the formula it modifies does not set out how to derive both halves of the equation. Consider, as an analogy, a recipe that calls for oranges and lemons: 1) The recipe states that to prepare an orange, you cut through the orange peel; and 2) to prepare the lemon using the same methodology. This does not mean that you prepare the lemon by cutting through an orange peel, but you use the same *process*—cutting through a peel—upon different objects (orange v. lemon). In the same way, the contract sets out the formula for determining the tax rate for Actual NOP: 1) "maximum marginal federal corporate income tax rate . . . in effect on December 31 of the Applicable Year"; and 2) to determine Actual NOP and Base NOP "using the same methodology." ROA 60754. Again, this does not mean that you determine Base NOP by inputting 2019 data, but

you use the same *process*—using financial data reported to the SEC—using different years (1997 vs. 2019).

2. Defendants contend that, the CSA's plain and unambiguous text notwithstanding, the Court should apply the lower tax rate because it comports with the "commercial logic of the profit adjustment." PM Br. 22. Defendants assert that because the tax rate could change that it does not serve "its contractual purpose" to serve "as a baseline to compare the companies operating profits." PM Br. 24. This is precisely the purpose of using a fixed figure that Base NOP will remain $3,115,100,000 and current profits will be compared to that number.

It might seem all too simple, but the purpose of the profit adjustment is that when the tobacco industry makes more money, they pay more to offset the healthcare costs to which they have contributed. The thrust of the "commercial logic" argument advanced by Defendants is that when tax rates are cut, although the tobacco industry will make even more money, they should not have to pay more. Defendants argue, as though it is a persuasive point against the State, that if the tax rate increases, the tobacco industry would pay less. PM Br. 24. That is precisely the point. All profit calculations being equal the tobacco industry would make less money.

Philip Morris also contends that if the Parties "really intended to freeze the Base Net Operating Profit at $3.115 billion" that they "knew how to do so." PM Br. 26. This is a novel canon: that different parties drafting different contracts in a different scenario are to be construed together. The Supreme Court of Texas has cautioned against this line of argument, "when construing multiple documents together, courts must do so with caution, bearing in mind that tethering documents to each other is

'simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation." *Reider v. Woods*, 603 S.W.3d 86, 94–95 (Tex. 2020); *Cf. Miles v. Martin,* 321 S.W.2d 62, 66 (Tex. 1959) ("Extrinsic declarations by one party . . . which are not binding upon the other party thereto cannot be used to create an ambiguity."). Defendants only wish to invoke separate contracts when it benefits them: they support invocation of the MSA, a contract to which Texas is not a party, in support of their point, but they reject even persuasive reference to the Mississippi judgment as a "different agreement" and "[not] governed by Texas law." PM Br. 27 (Defendants argue that the MSA should be weighed against the State, but that the Mississippi judgment would be erroneous to consider against Defendants).

Assuming the MSA is relevant, however, only hurts Defendants' position. Philip Morris cites to the inclusion of a "fixed base-year profit figure" in the Master Settlement Agreement as evidence that if the Parties failed to include a fixed number, a fixed number should not be inferred:

| MSA Exhibit E (1998) (fixed base) | Texas Appendix A (2001) (floating base) |
|---|---|
| ". . . the Original Participating Manufacturers' aggregate operating income from sales of Cigarettes for the Applicable Year . . . (the 'Actual Operating Income') *is greater than $7,195,340,000 (the 'Base Operating Income')* . . . ." ROA.60876 (emphasis added). | ". . . the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes for the Applicable Year (the 'Actual Net Operating Profit') *is greater than the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 (the 'Base Net Operating Profit')* . . . ." ROA.60753 (emphasis added). |

PM Br. 26. By omitting the fixed figure that the Parties included within Appendix A,

the two formulations for profit adjustment are made to look very dissimilar. However, if one turns only to the next page of Appendix A then the inclusion of the fixed Base figure results in a striking similarity between the two provisions. Such a comparison is provided here:

| MSA Exhibit E (1998) (fixed base) | Texas Appendix A (2001) (fixed base) |
| --- | --- |
| "...the Original Participating Manufacturers' aggregate operating income from sales of Cigarettes for the Appliable Year... (the 'Actual Operating Income') *is greater than $7,195,340,000 (the 'Base Operating Income')* ...." ROA.60876 (emphasis added). | "...the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes profit from domestic sales of Cigarrettes for the Applicable Year (the 'Actual Net Operating Profit') *is greater than the Settling Defendants aggretate net operating profits from domestic sales of Cigarettes in 1997 (the 'Base Net Operating Profit')....the Settling Defendants' aggregate net operating profits from domestic sales of Cigarettes in 1997 were $3,115,100,000.*" ROA 60753-54 (emphasis added) |

Rather than demonstrating a contrast between the two documents, the remarkable similarities between the two formulas suggest that the 2001 Amendment to the CSA indeed may have relied upon the wisdom of the MSA to prevent the annual recalculation of the Base Year's NOP by setting a fixed base-year profit number.

Notwithstanding the clear similarities between the provisions, even fundamental disparities between the MSA and the 2001 Amendment to the Texas Settlement Agreement would be immaterial because Texas was not a Party to the MSA. Philip Morris states that "the same lawyers who drafted the MSA could have taken the same approach" when drafting the 2001 Amendment. Their argument, however, fails to consider the fact that the MSA was made between different Parties with

different motivations. Texas was not a Party to the MSA; as such, Texas' lawyers were not involved in the drafting process for the MSA. While similarly drafted provisions may suggest a common intention, dissimilar provisions cannot be relied upon because while there are only limited ways to phrase similar provisions, there are almost limitless ways one can draft dissimilar provisions.

## II. The district court properly declined reliance on extrinsic evidence.

### A. The disputed terms of the CSA are unambiguous.

In *Indemnity Insurance Co. of North America v. W & T Offshore, Inc.,* the Fifth Circuit recognized that "[i]f, after reading the terms of the policy and giving meaning to all provisions, the terms 'are unambiguous, the court must enforce the policy according to its plain meaning.'" 756 F.3d 347, 352 (5th Cir. 2014). A court may not use extrinsic negotiation evidence to "make the language say what it unambiguously does not say" or "to show that the parties probably meant, or could have meant, something other than what their agreement stated." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 757 (Tex. 2018) (citations omitted). Moreover, "extrinsic evidence may only be used to aid the understanding of an unambiguous contract's language, not change it or create ambiguity." *Id.* at 757 (quotation omitted). Because the text of the contract is unambiguous, the district court did not consider extrinsic evidence to inject confusion into what is the clear and obvious import of the text.

Settling Defendants argue, however, that the district court erroneously declined to look beyond the text. R.J. Reynolds argues that the courts' ruling runs afoul of Texas law, which "does not . . . prohibit considering surrounding facts and circumstances that inform the contract text and render it capable of only one

meaning." RJR Br. 28 (citing *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014)). But the Settling Defendants conveniently omit the preceding sentence, altering the quote's context. Just before the quoted sentence, the Supreme Court of Texas noted that "[w]hen interpreting an integrated writing, the parol-evidence rule precludes considering any evidence that would render a contract ambiguous when the document, on its face, is *capable* of a definite legal meaning." *Americo Life*, 440 S.W.3d at 22 (emphasis added). As such, Settling Defendants' argument that the district court erred by not considering extrinsic evidence to create ambiguity after it found the contract unambiguous is contrary to Texas law and only invites Parties and courts to create ambiguity where none exists. PM Br. 28–29.

### B. Even if ambiguous, context confirms Texas's interpretation.

Even in the unlikely instance that this Court were to find that the contract is susceptible to more than one reasonable interpretation and thereby find the contract ambiguous, the surrounding context and negotiating history confirms Texas long-standing interpretation of the contract. If a contract is susceptible "to two or more reasonable interpretations," then it is "ambiguous as a matter of law" and a finder of fact "may consider evidence of the parties' subjective intent." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020). Consideration of evidence of the Parties' subjective intent confirms Texas interpretation that the Parties sought to establish the $3.115 billion figure as a baseline.

Both the July 1998 Amendment, ROA.60848–49 (adding Appendix A), and the 2001 Amendment, ROA.60754 (revising Appendix A by adding the fixed base Net Operating Profit figure) confirm Texas' interpretation that the $3,115,100,000 figure

27

is not merely illustrative but fundamental to the Profit Adjustment. *See also supra* Statement of the Case, Sections I.A–B. Indeed, the purpose of the 2001 Amendment was to resolve "certain disputes have arisen between the parties concerning the meaning of the term 'net operating profits' as used in Appendix A . . . parties have agreed to settle and resolve with finality the NOP Issue and certain other issues between them arising out of Appendix A. . . ." ROA 60741–42, 60745. Both the Master Settlement Agreement and the Mississippi judgment confirm Texas' interpretation of the fixed-rate figure is correct. *See supra* Statement of the Case, Section III (discussing the district court's finding that Mississippi identified identical language and found the contract to establish a fixed base-year figure); *see also supra* Argument, Section I.C.2 (discussing the similarity between the MSA and the CSA's use of fixed base-year figures).

## III. The district court properly awarded both prejudgment and postjudgment interest.

While the bulk of this brief focuses on the liability order, R.J. Reynolds raises an issue about the district court's later order that addressed the interest owed by the Defendants. The district court held that Texas was entitled to prejudgment interest from April 30, 2019 through March 14, 2024 and postjudgment interest after the court issued its March 14, 2024 liability order. ROA.61526. The district court explained that prejudgment interest "prevents the Settling Defendants from profiting off of money that rightfully belonged to the State" and the "State would have been able to use that money to benefit Texans" if "not for the Settling

Defendants' underpayments." *Id.* Consequently, prejudgment interest was "necessary to make the State whole." *Id.*

R.J. Reynolds raises two issues on this front. RJR Br. at 48-54. First, it contends that prejudgment interest began accruing on May 22, 2023—the day Texas filed its cross-motion to enforce. RJR Br. at 50. Second, it asserts that postjudgment interest should have begun to accrue at the time of the District Court's ruling on damages, not on liability. Each is incorrect.

## A. Prejudgment interest should be paid from the date of underpayment.

Texas's claim in this case is not a new one. Instead, it is an ancillary dispute that arises from an almost three-decade old final judgment. And the district court has retained continued jurisdiction over any disputes arising from that judgment. ROA.49393. R.J. Reynolds's contention that this is a new claim accordingly does not comport with the facts—namely, that the district court previously entered a final judgement that approved and incorporated the CSA. ROA.49260–61. Since then, Texas has been entitled to the full amount of the monies specified by the settlement agreement.

"Prejudgment interest is 'compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment.'" *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (citation omitted). This lawsuit was filed and settled decades ago. Texas is not bringing any new claims nor seeking any new remedies—instead, it simply seeks to receive what it is already due under the

judgment. And that requires the monies RJ Reynolds failed to pay under the settlement agreement and interest to cover the lost use of that money.

Finally, while the statute states that prejudgment interest begins to accrue "the date suit is filed," Texas courts have routinely held that the relevant date is "the date that the plaintiff first filed a pleading in which the plaintiff asserted the claim." *Ho & Huang Props., L.P. v. Parkway Dental Assocs., P.A.*, 529 S.W.3d 102, 123 (Tex. App. 2017) (citing *Wheelbarger v. Landing Council of Co-Owners*, 471 S.W.3d 875, 891–93 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Tex. Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 203–04 (Tex. App.—Houston [14th Dist.] 2012, no pet.)). Here, "the claim" upon which the Court should base its interest analysis is not, as R.J. Reynolds implies, the arguments in this ancillary dispute, but rather the underlying merits claim that resulted in damages—Texas's claims from 1996. *Wheelbarger*, 471 S.W.3d at 893 ("[T]he relevant date is that on which the plaintiff asserted the claim which ultimately results in a recovery"); *see also Tex Star Motors, Inc.*, 401 S.W.3d at 204 (finding that the relevant date was the date plaintiffs' amended petition was filed because defendant "did not have notice of the cause of action on which [plaintiff] recovered until" that date). The district court agreed, noting that the purpose of ordering Defendants to pay interest was to make Texas whole from the time Defendants began underpaying. ROA.61526. The Court should base its analysis on the claim that resulted in the final judgment and settlement, and R.J. Reynolds should not be allowed to benefit from failing to comply with that same judgment by paying significantly less interest.

## B. The district court properly ruled that postjudgment interest should begin accruing in 2024.

"[T]he purpose of postjudgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835–36 (1990). R.J. Reynolds misidentifies the final judgment that set out the "ascertainment of the damage", *id.*, and R.J. Reynolds' payment schedule. The district court entered this final judgement decades ago. ROA.49260–61.

Courts have routinely held that when there are multiple judgments, postjudgment interest begins to accrue from the date of the original judgment as long as the original judgement has not been materially altered by later judgments. *See, e.g.*, *Krieser v. Hobbs*, 166 F.3d 736, 747 (5th Cir. 1999) (finding that postjudgment interest runs from the first entry of judgment because "the damages were *fully ascertained*" and "[t]hat amount did not change upon entry of the amended judgment"); *see also ExxonMobil Corp. v. Elec. Reliability Servs., Inc.*, 868 F.3d 408, 419–20 (5th Cir. 2017) (collecting cases).

The damages owed by R.J. Reynolds were ascertained in the original judgment. And the district court's later ruling on this ancillary dispute did not change the amount of damages owed by R.J. Reynolds or the payment schedule specified in the original judgment, but rather reaffirmed R.J. Reynolds' original obligations. As such, postjudgment interest should run from the date the original judgment was entered.

## Conclusion

The Court should affirm the judgment below.

October 22, 2025

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief, General Litigation Division

Respectfully submitted,

*/s/ Zachary L. Rhines*
ZACHARY L. RHINES
Special Counsel
zachary.rhines@oag.texas.gov

BRIAN TUNG
Assistant Attorney General
Brian.tung@oag.texas.gov

OFFICE OF
THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548 (MC-009)
Austin, Texas 78711-2548
Telephone: (512) 463-2100

COUNSEL FOR PLAINTIFF - APPELLANT

## Certificate of Service

On October 22, 2025, this motion was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

*/s/ Zachary L. Rhines*
ZACHARY L. RHINES
Special Counsel

# CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7) because it contains **8,647** words, excluding the parts exempted by Rule 32(f); and (2) the typeface and type-style requirements of Rules 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Zachary L. Rhines
ZACHARY L. RHINES
Special Counsel